# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE** | : | |
| **APPLICATION OF JASON LEOPOLD** | : | |
| **TO UNSEAL CERTAIN** | : | **Case No. 1:13-mc-00712-BAH** |
| **ELECTRONIC SURVEILLANCE** | : | |
| **APPLICATIONS AND ORDERS** | : | |

### GOVERNMENT'S RESPONSE TO PETITIONERS'
### SUPPLEMENTAL MEMORANDA OF POINTS AND AUTHORITIES
### IN SUPPORT OF THEIR APPLICATION TO UNSEAL PEN REGISTER
### AND/OR TRAP AND TRACE AND ELECTRONIC SURVEILLANCE
### APPLICATIONS, ORDERS, AND RELATED COURT RECORDS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to the Petitioners' Supplemental Memoranda of Points and Authorities in Support of Their Application to Unseal Pen Register and/or Trap and Trace and Electronic Surveillance Applications, Orders, and Related Court Records.

### OVERVIEW

Petitioners commenced this litigation by requesting that the Court unseal all court records, including applications, affidavits and court orders, relating to the government's applications for: 1) court orders filed pursuant to the Pen Register Statute, 18 U.S.C. §§ 3121-27 ("PR/TT matters"); 2) search warrants issued pursuant to the Stored Communications Act, 18 U.S.C. §§ 2701-12 ("SCA search warrant matters"); and 3) court orders filed pursuant to 18 U.S.C. § 2703(d) ("§ 2703(d) matters"). Petitioners sought all such matters, regardless of when filed, but stated that their request to unseal was limited to closed matters that did not relate to ongoing investigations. Petitioners also sought prospective relief, requesting that the Court devise a system to presumptively unseal these three types of matters.

What followed over the course of more than a year were efforts by the Court, the Clerk's Office and the parties to understand the magnitude of petitioners' broad and unprecedented

request, the legal principles involved, and the practical considerations involved in unsealing several decade's worth of sealed matters.  The United States Attorney's Office for the District of Columbia ("USAO-DC" or "the Office") has agreed with petitioners' basic premise that court records comprising applications and orders relating to electronic surveillance methods need not necessarily be permanently sealed.  The USAO-DC has not agreed, however, that the First Amendment or the common law right of access provide petitioners with the wholesale and sweeping relief that they seek in this litigation.  Nonetheless, in the interest of providing greater transparency and information about the USAO-DC's use of the PR/TT and SCA statutes, the Court and the USAO-DC (with the assistance of the Court) have now publicly released large amounts of information regarding these types of matters that were filed in this jurisdiction over approximately the last decade.

Thus, in the course of this litigation and in terms of the backward looking relief that petitioners seek, the Court has released, for the first time, lists identifying all PR/TT applications filed by the USAO-DC between 2008 and 2016.  These lists, which together comprise nearly 700 pages, reflect the "miscellaneous" case number for each application, the judge to whom the case was assigned, the date the application was filed, and whether an email account, cellular telephone number, or land line was the subject of the application.  The task of compiling these lists was burdensome, as personnel in the Clerk's Office were required to individually access each PR/TT matter to gather the information in these lists. The Court, again with the assistance of the Clerk's Office, also has made available the approximate number of § 2703(d) matters filed by the USAO-DC and other institutional filers between the years of 2011 and 2016.

The USAO-DC also has gathered, prepared, and released previously unavailable information in this matter, including "extraction charts" for the PR/TT applications that the Office

filed between 2011 and 2016.  In these charts, the USAO-DC extracted data from 10% of the PR/TT applications that the Office filed over this six-year span.  The data extracted included (but was not limited to) the following categories of information: miscellaneous case number; date executed and date docketed; type of application (e.g., original application, Order, extension application); whether a Court opinion accompanied the Order; number of pages; the name of the assigned judge; the device type; the lead statutory violation; the law enforcement agency; the service provider; the number of target email addresses, target phone numbers, etc.; and whether any other requests were made in the application and, if so, what was sought in those requests. These extraction charts, in total, amount to nearly 50 pages of information that is now publically available for the first time. The Office also agreed to unseal or partially unseal PR/TT materials filed since 2008 in any matter in which a PR/TT application was denied and any PR/TT matter in which a substantive opinion was issued.

In terms of prospective relief, the Clerk's Office and the USAO-DC recently entered into a Memorandum of Understanding ("MOU") that provides for the electronic filing and public reporting of caption information for the three types of filings at issue in this litigation. In accordance with the MOU, the USAO-DC now uses a standard caption when initiating and filing these particular miscellaneous matters, which includes: 1) the number of target telephone lines, subscriber accounts and/or devices that are the subject of the application; 2) the type of target (e.g., landline/cellular/mobile telephone, email account, cell tower or other facilities or devices subject to the application); 3) the service provider to which the order would be directed; and 4) the primary offense statute(s) under investigation.  In addition, the MOU calls for the public release of docket numbers and case captions associated with these sealed applications on a biannual basis, except for those applications related to the non-disclosure of grand jury subpoenas.

In sum, by this litigation, petitioners have obtained much of what they seek.  However, petitioners contend that the Court and the USAO-DC must undertake further efforts and devote significant additional resources in this litigation. Petitioners thus request that the USAO-DC prepare "extraction charts" for all (100%) PR/TT matters that the Office filed from 2008 to the effective date of any Court order, and that this be done within three months of the Court's order, and that the Court unseal case numbers and certain docket information relating to § 2703(d) orders from 2008 to the effective date of any Court order and publicly release a list similar to the previously-released PR/TT lists. The history of this litigation amply demonstrates that, if petitioners were granted the relief that they seek, the Court and this Office would be required to allocate significant additional resources over a period of months, at a minimum, to complete the extraction process for PR/TT matters and to compile the lists of § 2703(d) matters.

Petitioners attempt to justify their expansive requests for what they already have obtained and what they continue to seek by contending that they have a First Amendment right and a common law right of access to these materials.  Petitioners claim that these materials are similar to search warrant materials and they note that this Court has held that there is a First Amendment and common law qualified right of access to search warrant materials in closed investigations. Petitioners thus argue that because they seek the materials at issue in this litigation "only" in closed matters that do not relate to ongoing investigations, their request relating to approximately a decade's worth of sealed filings is legally justified.

We disagree.  The PR/TT and § 2703(d) matters to which petitioners seek access are, at their core, pre-indictment, investigative matters, akin to grand jury proceedings which traditionally have been afforded a broad degree of secrecy; these materials are not like the search warrant

materials that were at issue in the two local cases that petitioners cite. Moreover, petitioners'

statement that they are entitled to these materials because they only seek the materials in closed

investigations overlooks the obvious: there is simply no practicable way to determine whether

these matters – filed over approximately a decade – are open or closed, or if they relate to an

ongoing investigation. Petitioners ignore this practical reality, and attempt to fit this litigation into

the strict confines of the First Amendment/common law right of access line of cases that they cite.

These cases involve requests by parties, usually the press, to unseal specific matters or to unseal

specific cases. Notably, petitioners do not cite a single case that stands for the proposition that the

First Amendment or the common law right of access requires the Court and the government to

engage in a labor-intensive, multi-step process to determine whether almost a decade's worth of

sealed matters relate to a closed or open criminal investigation or to extract multiple categories of

information from those thousands of matters, or to provide lists of such cases for almost ten years.

As this Court has observed in this matter, such burdensome tasks necessarily detract from the

Court's overarching obligation to fairly administer justice and the USAO-DC's mission of fairly

investigating and prosecuting crime. Thus, the Court should reject petitioners' argument that

burden is irrelevant in this matter and should consider how petitioners' requested relief burdens

this Court's and the USAO-DC's limited resources.

For all these reasons, and as more fully discussed below, the Court should deny petitioners'

application as moot for backward-looking relief they already have received and otherwise deny

their broad request for relief. As also discussed below, based upon their most recent filings,

petitioners' primary goal in this litigation now appears to be prospective relief. That request also

should be denied, in part, as moot based on the MOU that substantially provides petitioners, going

forward, with access to the information they seek concerning the government's use of the PR/TT

and SCA statutes to gain access to electronic information; in all other respects, petitioners' request for prospective relief should be denied.

## PROCEDURAL HISTORY

### I.     Leopold's Initial Filing, The Reporters Committee Joins the Case, and Preliminary Status Hearings and Discussions.

On July 16, 2013, Jason Leopold ("Leopold"), a journalist, filed a Petition to Unseal Records, and accompanying Memorandum of Points and Authorities [Dkt. 1].  Pursuant to Local R. Crim. P. 57.6, Leopold sought a court order unsealing and making public all "applications, supporting affidavits, and court orders regarding pen registers, trap and trace devices, tracking devices, cell site location, stored email, telephone logs, and customer account records from electronic service providers" in closed cases.  Leopold did not limit his request to a specific time period.  The court records to which he requested access are governed by the Pen Register Statute, 18 U.S.C. §§ 3121-27, and the Stored Communications Act, 18 U.S.C. §§ 2701-2712.  In addition, Leopold requested prospective relief, proposing that the Court "change its procedures to provide for a presumptive expiration date of 180 days on all sealing and nondisclosure orders."  Id. at 5.

On December 20, 2013, the government filed its Response, stating that it did "not disagree with petitioner's basic premise that applications and orders relating to electronic surveillance methods need not necessarily be permanently sealed," and citing 18 U.S.C. § 3123(d)(1) (order granting application of pen register shall be sealed "until otherwise ordered by the Court") and 18 U.S.C. § 2705(b) (order for preclusion under SCA remains in effect "for such period as the Court deems appropriate"). Government's Response, at 2 [Dkt. 10].  The government noted, however, that Leopold's request was "premised on several mistaken assumptions" and that, consequently, his request was "overbroad."  Id.  In this regard, the government explained: 1) that the USAO-DC

6

was not the only institutional litigant who filed pen register and SCA applications in this Court and that, therefore, the USAO-DC would be unable to provide a list of miscellaneous docket numbers relating to all electronic surveillance matters filed in this jurisdiction; 2) Leopold's request for only those materials that did not relate to ongoing law enforcement investigations required "further refinement" because although an investigation related to a particular sealed matter may no longer be ongoing, there were instances where "secrecy must be maintained even after an investigation has been completed due to ongoing witness safety or national security concerns," and, also, that "unsealing documents related to a concluded investigation may sometimes jeopardize ongoing investigations that developed from closed investigation[s];" and, 3) that Leopold's presumptive expiration date of 180 days for unsealing all sealed matters filed pursuant to the Pen Register Statute or the SCA was "arbitrary on its face." Id., at 2-3. Finally, the government expressed its willingness to work with the Court to develop protocols and/or procedures to "identify and extinguish 'stale' sealing orders relating to electronic surveillance techniques." Id., at 3.

On August 18, 2016, the Court granted the unopposed motion to intervene in Leopold's lawsuit filed by the Reporters Committee for Freedom of the Press ("Reporters Committee"). On that same date, the Reporters Committee filed an Application to Unseal and for Other Appropriate Relief, wherein it echoed Leopold's request that the Court unseal all applications and orders filed by the government in this Court pursuant to the Pen Register Statute and SCA, except those matters relating to ongoing investigations [Dkt.18]. The Reporters Committee also requested that the Court issue an order directing the Clerk's Office to make public the dockets and docket entries reflecting the filing of these applications, warrants and orders; and for an order directing that future applications, warrants and orders be filed publicly or be "unsealed after an appropriate period of

time consistent with statutory, constitutional, and common law requirements." Reporters Committee's Application, at 7.

At the first status hearing, held on May 4, 2016, the Court indicated its intent "to understand precisely what's being asked for," what "considerations" the parties believed the Court "should be giving to this in order to either make this a manageable task, if the task should go forward at all" (5/4/16 Tr. 3). Leopold's counsel stated that his client was not seeking personal identifying information such as a target's name or email and that such information could be redacted (5/4/16 Tr. 9-10). The Court noted that after redactions were made, petitioners would "get a pile of papers" with essentially the same information, that is was "hard. . . to understand the usefulness of that information" and that the government would be required to perform a "significant burdensome task" (5/4/16 Tr. 11).

On June 24, 2016, the government and Leopold's counsel appeared for a second status hearing before the Court. At that hearing, the Court reiterated its intent to "figure out precisely what [petitioner was] looking for" and noted the government's willingness to "work with the Court, work with the plaintiff to set out a process for seeing how [the Court and the government] can accommodate the unsealing of records that no longer have any reason to be sealed" (6/24/16 Tr. 3-4). Leopold's counsel noted that his client, a national security reporter, was "particularly interested" in the government's use of the Pen Register statute and the SCA to gain access to electronically stored information "beginning after September 11, 2001" (6/24/16 Tr. 10, 13). The Court informed the parties that the Clerk's Office had run "very, raw, rough numbers" and that, in 2011, the government filed 244 pen register applications and 81 § 2703(d) applications (6/24/16 Tr. 10). The Court noted that it did not know whether miscellaneous matters filed "back in 2001" were electronically filed (6/24/16 Tr. 13). The USAO-DC was not the only institutional filer of

these matters, and the parties agreed (at the suggestion of the Court) to focus on applications filed by the Office (6/24/16 Tr. 11-12).  The status hearing concluded with the Court ordering the parties to confer to determine: 1) a process for handling petitioner's request for the last five or six years; 2) how many miscellaneous sealed matters were filed by the USAO-DC during those years; 3) a process for unsealing the documents sought by petitioners; and, 4) what information the parties would need from the Court in terms of lists of miscellaneous case numbers (6/24/16 Tr. 14-16).[1]

## II.     The Court Releases a List of PR/TT Matters for 2012 and the USAO-DC Undertakes a Sampling Process Regarding the Unsealing and Redaction of Closed PR/TT Matters.

On August 23, 2016, the parties filed their first Joint Status Report, stating that they had agreed, based upon information provided by the Court at the previous status hearing, to start with determining a process for unsealing PR/TT matters filed by the USAO-DC in 2012 [Dkt. 19].  To that end, the parties requested the Clerk's Office assistance in compiling a list of Miscellaneous Case ("MC") numbers for those matters.  The government proffered that, upon receipt of the list, it would consult with the assigned Assistant United States Attorney ("AUSA") and law enforcement to determine whether each investigation was open or closed, or related to a pending investigation; file motions to partially unseal in order to obtain certified copies of the records in the Court's file; redact certain identifying information; and file a second motion to partially unseal the documents, as redacted.  The government agreed to engage in this process for three PR/TT matters to gain insight into what the process would entail on a larger scale.

On September 16, 2016, the parties appeared for a third status hearing.  By this point, the Reporters Committee had joined the litigation.  The government explained the steps it would take

---

[1]    At this hearing, Leopold's counsel withdrew his motion to appointment of a special master (6/24/16 Tr. 4-5).

to unseal three PR/TT matters from 2012, and the Court stated it would "take a close look" at the government's redactions, in considering the motions to unseal, because the Court, and not the USAO-DC was "the final arbiter of what should or should not be disclosed" (9/16/16 Tr. 4-11, 23).

Upon direction from the Court, the Clerk's Office assembled a list of captions and docket numbers for 235 PR/TT matters filed under seal by the USAO-DC during 2012.  The parties learned during later discussions with the Clerk's Office that assembling this list required the Clerk's Office to enter each MC docket individually to determine the identity of the institutional litigant (that is, whether the application had been filed by the USAO-DC or another institutional filer).  On September 21, 2016, the Court issued an Order and Notice to Parties in which it unsealed and publicly filed the 2012 list of PR/TT matters [Dkts. 22, 22-1].  The 2012 list did not include the target telephone numbers or any personal identifying information, but did include the docket number, the case caption, the date the matter was filed, the date an order was entered, the category, and the event.  See Dkt. 22-1 (Attachment A).

The government then took the information in the 2012 list released by the Court and set about learning the steps that would need to be taken to unseal, in properly redacted form, three PR/TT matters.  Because there was no mechanism within the USAO-DC to tie an MC docket number during that time period to an investigation or the prosecution of a particular individual, personnel in the Office first determined the target telephone number associated with each MC docket number and the assigned AUSA.  Second, the government attempted to determine if the matter was open or closed.  To accomplish this, the government randomly selected 10 matters from the 2012 list in which the AUSA who had been assigned was still employed by the USAO-DC.  Matters handled by persons no longer employed by the Office were not selected because it was

10

anticipated that the process of locating and contacting former AUSAs would be onerous and time-consuming.  Third, for the ten matters selected, undersigned counsel contacted each AUSA and asked if, in his or her view, the court records in the particular PR/TT matter previously assigned to them could be unsealed, in part, or in its entirety. This process involved consultation with the AUSA's supervisor and/or law enforcement agents about the status of the investigation and any possible effects on other related investigations.  Ultimately, it was determined that four PR/TT matters were closed and could be unsealed, in part, with redactions.[2]

On October 27, 2016, the government began the next stage of this process by filing motions to partially unseal these four PR/TT matters to gain access to copies of the court records.  This step was necessary because the USAO-DC does not have a system for retrieving these documents.  The motions were hand-filed, in paper form.  On October 31, 2016, the Court granted the government's partial motions to unseal.  On or about November 4, 2016, undersigned counsel obtained certified copies of the court records in each of the four representative PR/TT matters.  Undersigned counsel then reviewed the court records individually and made appropriate redactions.  Finally, the government stated its intention to file motions to unseal the four PR/TT matters, as redacted.[3]

On December 9, 2016, the parties filed a Second Joint Status Report [Dkt. 25].  The government noted that it had filed, on December 8, 2016, motions to partially unseal the four PR/TT matters from 2012.  The parties stated that before the Court convened another status hearing, it would be helpful for the parties to confer once these motions had been granted and

---

[2]   As noted, the USAO-DC initially agreed to undertake this process with respect to three PR/TT matters but ultimately proceeded with four such matters.

[3]   The USAO-DC's November 18, 2016 status report outlined the steps that it took during this phase of the litigation [Dkt. 24].

petitioners had an opportunity to review the content of the unsealed court documents. That same day, the Court granted the government's motions to partially unseal the four PR/TT matters and publicly filed the court records in these matters, with redactions, in this docket [Dkt. 26].

On December 16, 2016, the parties filed a Third Joint Status Report [Dkt. 27].   The government explained that the sampling process described above was "resource intensive for both the USAO and the Clerk's Office" and that the information revealed, in light of the redactions, was "substantially similar" and "largely boilerplate."  Id.  The parties jointly proposed that the Clerk's Office compile and file on the public docket lists of pen register matters filed by the USAO-DC for the years 2001 to 2011.  Id.

### III.    The Court Proposes an Extraction Process In Lieu of the Unsealing/Redaction Process that Proved Burdensome and Yielded Little Useful Information.

On December 19, 2016, the parties appeared before the Court at a status hearing to discuss the government's sampling process and the parties' recent Joint Status Reports.  The government noted that the process was "very time consuming" for the Clerk's Office and the government, and yielded largely boilerplate information.  The government thus suggested engaging in the sampling process for 10%, rather than 100%, of the PR/TT matters filed in 2012 (12/19/16 Tr. 13, 15, 17-18).  Petitioners disagreed as to 10%, but agreed not to challenge the government's "categorical redactions," which included names, addresses and personal identifying information (12/19/16 Tr. 5-6, 12, 27-28).

During the hearing, the Court explained that Court's records for PR/TT matters were electronically stored and retrievable only from 2007, or 2008, to the present (12/19/16 Tr. 14-15). This was important because petitioners sought these and other records dating back to 2001, and the Court's internal research revealed that gathering such records from 2001 to 2007 or 2008 would

be exceedingly difficult, given that the records were not stored electronically.  In addition, in lieu of the burdensome and ultimately not especially productive unsealing and redaction process that the government's representative sampling of four PR/TT matters had revealed, the Court suggested that the government make certain categories of information available through an "extraction process" (12/19/16 Tr. 20-21, 23-24). The Court explained that such an approach would be "one way to reduce the burden and satisfy public policy interests" in access to judicial records and "might be an alternative [to the] more time-consuming task of redaction" (12/19/16 Tr. 32). The Court took note of the "enormous amounts of effort and time" expended by the Clerk's Office and the USAO-DC thus far, "which have a number of other missions before them" (12/19/17 Tr. 19).

In a discussion with the Court about the Fourth's Circuit's opinion in In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(d) v. Applebaum, 707 F.3d 283 (4th Cir. 2013), petitioners proffered that they "tried to stay away from the open investigation issue," that is, by only seeking information about closed investigations. On this point, the Court observed, "determining whether a case is open or closed. . . can [itself] be a burdensome step" (12/19/16 Tr. 26-27).   The Court concluded the hearing by discussing the possibility of allowing the USAO-DC electronic access to the sealed pen register matters from 2012, in lieu of the government seeking paper copies from the Clerk's Office (12/19/16 Tr. 33-34).

On January 17, 2017, the parties filed a Fourth Joint Status Report [Dkt. 28].  In that report, petitioners agreed to limit their request for PR/TT matters to a timespan from 2008 to 2016 because the Clerk's Office was able to retrieve those records electronically.  Id.  The parties agreed, in principle, to the extraction approach, but there was still disagreement over the categories of information to be extracted and the number of matters the government would provide.  Id. Petitioners requested 100% of the matters filed from 2008 to 2016; the government maintained

that a 10% sampling over this nearly 10-year period was sufficient and not unduly burdensome.

Id.

On February 10, 2017, the parties filed a Fifth Joint Status Report [Dkt. 30].  In this report, the government agreed to the unsealing and partial unsealing of two categories of PR/TT matters: 1) matters in which an application was denied; and, 2) matters in which a substantive opinion or order was issued by the Court.[4]  The parties agreed upon most categories of information to be extracted, but disagreed over whether the government could withhold the names of AUSAs involved in the matters or redact the statutory violation at issue in sensitive matters.  A sample chart of extraction categories was attached to the parties' Fifth Joint Status Report.  The parties also continued to disagree over whether the government should provide extracted information from 100% of the PR/TT matters filed in 2012, or a representative sampling of 10% of those matters.  The parties requested that the Court proceed in preparing a list of docket information, as it did for 2012, for the remaining PR/TT matters from 2008 through 2016.[5]

On February 17, 2017, the parties appeared before the Court for a status hearing.  Because the parties had agreed to a public release of docket information for PR/TT matters filed in 2008 through 2011, and 2013 to 2016, the Court agreed to instruct the Clerk's Office to unseal and disclose docket information for PR/TT matters filed by the USAO-DC during those years (2/17/17

---

[4]    There were two matters that appeared on the 2012 list in which the PR/TT application was denied.  The government filed a motion to partially unseal Misc. No. 12-585, which the Court granted on April 12, 2017, and then posted redacted copies in the docket of this case and on the Court's website [Dkt. 35].  The government also filed such a motion in Misc. No. 12-94, but it appears the Court never ruled on that motion.

[5]    The USAO-DC initially objected to the Court's release of such lists for PR/TT matters filed in 2013 and beyond because it was more likely that open investigations would be involved.  On further reflection, and in the interest of providing additional transparency, the Office ultimately agreed to such the release of these lists for the years 2013 through 2016.

Tr. 4).  The Court also discussed the parties' agreement to proceed with the 10% extraction process for 2012, and the particular categories of information that would be disclosed (2/17/17 Tr. 11-17).[6] The Court ruled that the government could withhold AUSA names and, in particularly sensitive matters, the statutory violations at issue (2/17/17 Tr. 21-22).  However, petitioners retained the right to challenge such redactions or omissions on a case-by-case basis (2/17/17 Tr. 23).  The government agreed to the extraction process for 10% of both open and closed PR/TT matters "to avoid the burden of determining whether the cases were open or closed," which the Court noted was "a big burden itself" (2/17/17 Tr. 17-19).

## IV.    The Court Releases Lists of PR/TT Matters for 2008 through 2011, and 2013 through 2016, the USAO-DC Prepares and Releases a 10% Extraction Chart for PR/TT Matters in 2012, and Petitioners Reject Anything Other than Unsealing/Redaction of All Matters or 100% Extraction Charts.

On February 22, 2017, the Court publicly released lists of case numbers and docket information for PR/TT matters filed by the USAO-DC in years 2011, 2013, 2014, 2015, and 2016, as Attachment A (2011 – 284 matters), Attachment B (2013 – 310 matters), Attachment C (2014 – 209 matters), Attachment D (2015 – 217 matters) and Attachment E (2016 – 189 matters) [Dkt. 32]. The Court also ordered the government to complete the extraction process for 10% of the PR/TT matters filed in 2012 and provide the results to petitioners by April 17, 2017 [Dkt. 33].

On April 14, 2017, the parties filed a Sixth Joint Status Report [Dkt. 36].  Attached to the report as Exhibit A was a copy of the 2012 PR/TT extraction chart, which the government had previously provided to petitioners on April 12, 2017.   In the report, the government informed the

---

[6]    There were 15 categories, or columns, of information on the extraction chart:  1) Case No.; 2) Docket No.; 3) Date Executed; 4) Date Docketed; 5) Type; 6) Order Accompanied by Opinion; 7) No. of Pages; 8) Signed By; 9) Device Type; 10) Statutory Violation; 11) Agency; 12) Service Provider; 13) No. of Target Email Addresses/Phone Numbers/Addresses, Etc.; 14) Other Statutory Authority, and if so what (e.g., Section 2703(d)); and, 15) Other Requests, and if so, for what (e.g., cell site data).

Court and petitioners that completing the extraction process for 10% of PR/TT matters filed by the USAO in 2012 – 24 matters -- took approximately 8.5 hours.  In addition, in order to gain access to the information and to prepare the extraction chart, the Clerk's Office permitted the government to access the sealed court records via CM/ECF for the selected 24 PR/TT matters.  The government noted that it was prepared to complete a similar extraction process for 10% of the PR/TT matters filed by the USAO-DC in 2008 to 2011 and 2013 to 2016.[7]  Petitioners argued that a 10% extraction process for these years was "statistically insignificant."  The parties stated that they were at an impasse but noted that they continued to work on prospective relief, including the Clerk's Office allowing the USAO-DC to file sealed matters via CM/ECF and the USAO-DC devising a system of uniform captioning that could be released publicly, similar to the "EC docket" used by the United States District Court for the Eastern District of Virginia, and referred to in the Applebaum decision.  The Court then issued a briefing schedule.

On April 24, 2017, the Court publicly released lists of docket information for PR/TT matters filed by the USAO-DC in years 2008, 2009, and 2010, as Attachment A (2008 – 329 matters), Attachment B (2009 – 244 matters), and Attachment C (2010 – 231 matters) [Dkt. 37]. Hence, the total number of PR/TT applications filed by the USAO-DC from 2008 to 2016 was 2,248.  The Court's release of lists capturing the filing of these 2,248 matters comprised a total of 678 pages.[8]

---

[7]   The government estimated that completing an extraction chart for 100% of the PR/TTs for 2012 would take an additional 80 hours, and completing extraction charts for 100% of the PR/TTs for the remaining years at issue, 2008 through 2011, and 2013 through 2016, would take an additional 640 hours. Thus, in total, approximately 720 hours – more than three months of forty-hour work weeks – would be required to accomplish this task. Additional time would be spent by personnel in the Clerk's Office to provide the USAO-DC with access to each matter, a process that must be done in each individual matter.

[8]   2008 (93 pages); 2009 (69 pages); 2010 (66 pages); 2011 (83 pages); 2012 (53 pages); 2013 (91 pages); 2014 (65 pages); 2015 (84 pages); and 2016 (74 pages).

On May 19, 2017, petitioners filed their Supplemental Memorandum of Points and Authorities in Support of Their Application to Unseal Pen Register and/or Trap and Trace Applications, Orders, and Related Court Records, in which they addressed their petition with respect to unsealing PR/TT matters [Dkt. 38].  By Minute Order issued May 22, 2017, the Court ordered petitioners to refile their memorandum addressing their request to unseal matters filed under the SCA, as well, because their May 18, 2017, filing only addressed their request pertaining to the Pen Register Statute.

On June 7, 2017, the Court granted the parties' Joint Motion for Extension of Time to File Supplemental Memorandum and Related Briefing and Hearing Schedule [Dkt. 40].  In the same Order, Court denied the parties' request for the Clerk's Office to prepare similar lists of docketed miscellaneous matters filed pursuant to Section 2703(d) "due to the myriad challenges, and resultant burden, of compiling such a list."

On June 30, 2017, the parties filed a Seventh Joint Status Report in which they requested that the Court issue a revised briefing schedule and schedule a status hearing [Dkt. 41].  In that filing, the parties reported that they had conferred and had also participated in a telephone conference with the Clerk's Office about how to work with the Clerk's Office to obtain information about the filing of SCA search warrants and § 2703(d) applications and orders during the time period of 2008 to 2016.  Id.

**V.      The USAO-DC Releases Extraction Charts for PR/TT Matters Filed in 2011, and 2013 through 2016, the Court Discloses the Number of § 2703(d) Filings Between 2008 and 2016, and Briefing Continues.**

On July 7, 2017, the government filed five charts, comprising 42 pages, reflecting the agreed-upon extracted information for 10% of the PR/TT matters filed by the USAO-DC in 2011, 2013, 2014, 2015 and 2016 [Dkt. 42].

On July 14, 2017, the parties appeared before the Court and requested that the Clerk's Office perform a search of the § 2703(d) applications filed by all government filers from 2008 to 2016 in order to obtain the number of filings, but not generate a list of these filings (7/14/17 Tr. 4-7, 10).  The parties also discussed how the Clerk's Office could generate lists of SCA Rule 41 search warrants, filed pursuant to § 2703(a) and (b), during these same years (7/14/17 Tr. 7-9, 13-22).

On July 17, 2017, the Court filed a Notice to the Parties informing them that the Clerk's Office had determined that the total number of § 2703(d) matters filed by the USAO-DC and other institutional litigants for the years 2008 to 2016 was 2,636.

On July 17, 2017, petitioners filed a Report Providing Guidance to the Clerk of the Court Regarding the Search for Stored Communications Search Warrant Materials in which they proposed certain search strategies the Clerk's Office could employ to generate a list of miscellaneous matters filed pursuant to the SCA, including search warrants, and applications and orders pursuant to § 2703(d) [Dkt. 44].

On August 25, 2017, petitioners filed a Supplemental Memorandum of Points and Authorities in support of Their Applications to Unseal Electronic Surveillance Applications, Orders, and Related Court Records [Dkt. 47]. They ask that the Court order the USAO-DC to provide "extraction charts" for all (100%) PR/TT matters filed by the USAO-DC from 2008 to the effective date of any Court order and that the Office produce these charts within three months of the Court's order. Petitioners also ask the Court to unseal case numbers and certain docket information relating to § 2703(d) orders for 2008 to the effective date of any Court order and publicly release a list similar to the previously-released PR/TT lists. Petitioners have abandoned their request that the Court unseal matters relating to SCA search warrants materials filed in prior

years due to the Court's inability to provide accurate docket lists for such matters. In terms of prospective relief, petitioners request that the Court allow the government to file all PR/TT and SCA matters electronically so that docket information, including certain categories of information, be made available to the public via PACER. In addition, they request that all PR/TT and SCA matters remain under seal for a period of 6 months (180 days), but then be subject to an order to show cause why each particular matter should not be unsealed in its entirety. The USAO-DC now files this Response.

## **ARGUMENT**

This litigation involves matters that, over approximately the last decade, were properly filed and placed under seal pursuant to the Pen Register Statute or Stored Communications Act. Petitioners assert that they have a First Amendment and/or common law right of access to the PR/TT and § 2703(d) materials that they have received thus far and to those that they still seek. As discussed below, we disagree, in part because we do not agree with petitioners' central premise that these matters are analogous to search warrant materials relating to the physical search of a property, in part because there is no way to determine which of the materials at issue in this litigation are open or closed, and in part because of the burden that petitioners' requests place on this Court and the USAO-DC.

## I.   **The Statutes:  The Pen Register Statute and the Stored Communications Act.**

The Electronic Communication Privacy Act of 1986 ("ECPA") set forth and refined the basic contours of electronic surveillance law.  Pub. L. No. 99-508, 100 Stat. 1848 (1986).  The ECPA comprised three titles, only two of which are at issue here, the Pen Register Statute and the Stored Communications Act ("SCA").  These provisions permit law enforcement and prosecutors - only upon making certain showings to the satisfaction of the Court - to obtain court authorization

to obtain information in ongoing pre-indictment criminal investigations.

Although petitioners largely overlook the sealing provisions in the Pen Register Statute and the SCA, the cases that petitioners seek to unseal in some fashion fall into two categories: 1) those that are sealed as required by law; and 2) those that are sealed by court order upon a showing of good cause. In the first instance, Congress necessarily determined that the need for secrecy outweighs the public's interest in disclosure. In the second, the Court determined that good cause justified keeping the document secret. The sealing provisions in both statutes protect a wide range of interests, including the integrity of criminal investigations and the confidentiality of law enforcement techniques; the privacy of individuals implicated by criminal investigations who are not subsequently charged or were associated with facets of an investigation but never suspected of criminal activity; and the safety and security of witnesses, victims, confidential informants, and others involved in or affected by criminal investigations.[9]

Turning first to Title III of the ECPA, this title covers pen register and trap and trace devices, or PR/TTs. Pub. L. No. 99-508, 100 Stat. 1848, 1873 (1986) (codified at 18 U.S.C. §§ 3121-3127).  The Pen Register Statute permits the government to submit an ex parte application, under seal, to a court requesting an order authorizing or extending the installation and use of PR/TTs to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from a cellular or landline telephone number, an email

---

[9]    Petitioners complain that the government is compiling lists of individuals' "political associations, their religious beliefs, the identities of their close friends, and what topics interest them during sessions of private research and reading." Leopold Petition, at 3. This statement, however, illustrates how petitioners misapprehend the USAO-DC's use of these statutes to obtain access to electronic information. The government does not file PR/TT or § 2703(d) applications to "compile lists" of individuals, their political associations, their religious beliefs, the identities of their friends and the Internet searches they perform. Rather, PR/TT and § 2703(d) applications are used by the government to gather information about and evidence of crime.

address, or a social media account that is believed to be used by a suspect or target in an ongoing criminal investigation.[10]

The government's ex parte application must include three elements: (1) "the identity of the attorney for the Government or the State law enforcement or investigative officer making the application"; (2) "the identity of the law enforcement agency conducting the investigation"; and (3) "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." 18 U.S.C. § 3122(b); see Smith v. Maryland, 442 U.S. 735 (1979) (holding that a person has no reasonable expectation of privacy in the telephone numbers that he or she dials).

Upon certification by the Court that the government's ex parte application meets the requirements of the statute, the Court enters an ex parte order. 18 U.S.C. § 3123(a)(1), (2). The Pen Register Statute specifically requires that orders authorizing the installation of PR/TTs be sealed "until otherwise ordered by the court." 18 U.S.C. § 3123(d)(1).[11]

Title II of the ECPA created a new chapter of the United States Code to cover law enforcement's access to stored communications and transaction records. Pub. L. No. 99-508, 100 Stat. 1848, 1860 (1986) (codified at 18 U.S.C. § 2701 et seq.). This portion of the statute is commonly referred to as the Stored Communications Act, or SCA. The SCA "was enacted to

---

[10]    A pen register is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."  18 U.S.C. § 3127(3).  Thus, a pen register is able to record outgoing numbers dialed by a target phone.  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).  Thus, a trap and trace captures the numbers of incoming calls made to a target phone.

[11]    In this jurisdiction, PR/TT matters are unsealed typically pursuant to a protective order entered after charges are filed.  PR/TTs that do not result in criminal charges typically remain sealed and are not disclosed outside of the prosecutors and investigators who were involved in obtaining and conducting the PR/TTs.

protect the privacy of users of electronic communications by criminalizing the unauthorized access

of the contents and transactional records of stored wired and electronic communications, while

providing an avenue for law enforcement entities to compel a provider of electronic

communications services to disclose the contents of records of electronic communications." In re

Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(d) v. Applebaum,

707 F.3d 283, 286-87 (4th Cir. 2013). Thus, the SCA "was 'designed to protect legitimate law

enforcement needs while minimizing intrusions on the privacy of system users as well as the

business needs of electronic communications system providers.'" Id. (quoting 132 Cong. Rec.

14601 (1986) (statement of Sen. Leahy)).

The core provision of the SCA is § 2703, which authorizes government access to stored

communications or transaction records in the possession of third party service providers. There are

three categories of information, each with differing access requirements: 1) contents of wire or

electronic communications in electronic storage; 2) contents of wire or electronic communications

in a remote computing service, and, 3) subscriber records concerning electronic communication

service or remote computing service. The first two categories of content information generally

require either a search warrant under Rule 41, or notice to the subscriber or customer.  18 U.S.C.

§ 2703(a), (b). Only the third category of information – subscriber records – is now at issue here.[12]

The SCA permits the government to submit, under seal, an ex parte application for an order

pursuant to § 2703(d), which requires an electronic communication service and/or remote

computing service provider to disclose certain records and other information pertaining to the

provider's account(s) associated with an email address, telephone number, account number, user

---

[12]   As noted, because there appears to be no way for the Clerk's Office to generate an accurate docket list
of SCA search warrant matters, petitioners have withdrawn their request for these materials.

name, IP address or domain name.   A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought . . . are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Acting under 18 U.S.C. § 2703(c)(1)-(2), the government "is not required to provide notice to a subscriber or customer" regarding the proposed order.  See 18 U.S.C. § 2703(c)(3).

A court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom . . . [the] court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of . . . [the] court order." 18 U.S.C. § 2705(b). Such a nondisclosure, or preclusion, order must be issued if the court finds "reason to believe that notification . . . will result in—(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial." Id. A preclusion order remains in effect "for such period as the Court deems appropriate." 18 U.S.C. § 2705(b).[13]

## II.   Backward Looking Relief:   Petitioners Have Not Established a First Amendment or Common Law Right of Access to the Documents They Have Received or That They Seek.

Petitioners acknowledge that there is little case law on the First Amendment or common law right of access to PR/TT and § 2703(d) matters. There is, however, caselaw from this jurisdiction holding that there is a First Amendment and common law qualified right of access to search warrants and related materials in closed investigations. See Matter of the Application of the

---

[13]   The USAO-DC's policy has been to seek non-disclosure orders under § 2705(b) of specific, limited duration. On October 19, 2017, the Department of Justice adopted a policy that sets a default limit of one year.

WP Co. LLC, 201 F. Supp.3d 109 (D.D.C. 2016); In re Application of N.Y. Times Co. for Access

to Certain Sealed Court Records, 585 F. Supp.2d 83 (D.D.C. 2008). In an attempt to capitalize on

this authority, petitioners: 1) contend that PR/TT and § 2703(d) matters are analogous to search

warrant materials; and 2) state that they seek PR/TT and § 2703(d) matters "only" in closed

investigations.

As discussed below, we do not agree that PR/TT and § 2703(d) matters are analogous to

search warrant materials and do not agree that petitioners have a First Amendment or common law

right to these matters. Moreover, petitioners' statement that their request is limited to materials in

closed matters rings hollow.  There is simply no practicable way to determine whether PR/TT and

§ 2703(d) matters filed under seal over the last decade pertain to open or closed investigations.

Even where a matter is closed, there might still be compelling interests that overcome a qualified

right of access to that matter. Again, because of the breadth of this litigation, it is not feasible to

discern whether these interests exist. In the interest of judicial economy, the Court should deny

petitioners' request as moot as to the backward-looking relief that they already have received and

deny their request in all other respects.[14]

### A.   If the Matters Sought Are Judicial Records, They Are Not Necessarily Presumptively Accessible.

The public's right of access to judicial records derives from two sources: the First

Amendment and the common law right of access. United States v. El-Sayegh, 131 F.3d 158, 160,

---

[14]    The practical impossibility of determining which matters are open or closed, and whether there are compelling interests to keep even closed matters sealed, results from the breadth of the petition, which seeks such a broad swath of documents filed over many years. Petitioners fail to acknowledge, much less grapple with, this issue. In the government's view, this issue distinguishes this litigation from the First Amendment and common law right of access cases upon which petitioners rely and provides further support for the view that this Court may consider burden in assessing whether petitioners have established that they are legally entitled to the relief that they seek. The issue of burden is discussed in more detail, infra, pp. 35-39.

161 (D.C. Cir. 1997). Whether a document qualifies as a judicial record depends on "the role it plays in the adjudication process." <u>SEC v. Am. Int'l Grp.</u>, 712 F.3d 1, 3 (D.C. Cir. 2013) (quoting <u>El-Sayegh</u>, 131 F.3d at 163). A judicial record "assumes a judicial decision," but if there is no such decision, there is "nothing judicial to record." <u>Id.</u> (quoting <u>El-Sayegh</u>, 131 F.3d at 162).

There is no authority in this jurisdiction regarding whether the materials at issue in this litigation are judicial records. Assuming for the sake of argument that they are, it does not necessarily follow that there is a presumption of access to these materials, which are investigative in nature. Traditionally, investigative proceedings have been closed to the public. See <u>Press-Enterprise II</u>, 478 U.S. at 10 ("Grand jury proceedings have traditionally been closed to the public and the accused."); <u>Douglas Oil Co. v. Petrol Stops N.W.</u>, 441 U.S. 211, 218 n.9 (1979) (noting that investigative proceedings have been kept secret since at least the 17th century); <u>In re Motion of Dow Jones & Co.</u>, 142 F.3d 496, 504 (D.C. Cir. 1988) ("Although some have identified a common law tradition of public access to criminal trials, this never extended to preindictment, pretrial proceedings involving a grand jury."). Thus, "[t]here is … no right of access to 'documents which traditionally have been kept secret for important policy reasons.'" <u>Dow Jones</u>, 142 F.3d at 504 (quoting <u>Times Mirror Co. v. United States</u>, 873 F.2d 1210, 1219 (9th Cir. 1989)). In furtherance of these interests, courts routinely seal and do not publicly docket the issuance of wiretaps, pen registers, and other requests for records issued as part of ongoing investigations.

### B. Experience and Logic Dictate that Petitioners Lack A First Amendment Right to the Documents that They Have Received and that They Seek.

"The First Amendment guarantees the press and the public access to aspects of court proceedings. . . ." <u>El-Sayegh</u>, 131 F.3d at 158; <u>see also</u> <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 606 (1982) (First Amendment right of access to criminal trials); <u>Press-Enterprise</u>

25

Co. v. Superior Court, 464 U.S. 501, 510 (1984) (First Amendment right of access to the voir dire examination of jurors in a criminal trial) ("Press-Enterprise I"); Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7-9 (1986) (First Amendment right of access to preliminary hearings) ("Press-Enterprise II"); see also Washington Post v. Robinson, 935 F.2d 282 (D.C. Cir. 1991) (First Amendment right of access to completed plea agreements).

"The public possesses a qualified First Amendment right of access to judicial proceedings where (i) there is an 'unbroken, uncontradicted' history of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding." United States v. Brice, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573 (1980)); see also Press-Enterprise II, 478 U.S. at 8-10 (posing the test as 1) "whether the place and process have historically been open to the press and the general public," and, 2) "whether public access plays a significant positive role in the functioning of the particular process in question"). This test has been referred as the "experience and logic" test. See e.g., Applebaum, 707 F.3d at 291. The "considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." Press-Enterprise II, 478 U.S. at 9. Both the "experience" and "logic" parts of the test must be satisfied for the First Amendment right of access to apply. In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1332 (D.C. Cir. 1985).

The records that petitioners seek to unseal – PR/TT and § 2703(d) matters – do not meet the "experience and logic" test. Thus, for example, in a case decided by the Fourth Circuit, subscribers sought to unseal, at the pre-grand jury, investigative stage, § 2703(d) applications and orders pertaining to the unauthorized disclosure of classified documents to Wikileaks.org, and the alleged involvement of U.S. Army Private First Class Manning. See Applebaum, 707 F.3d 283.

The subscribers conceded that the experience prong was not met because there was not a long tradition of access to § 2703(d) orders, given that the statute was enacted in 1986.  Id. at 291.

Even apart from that concession, however, the Fourth Circuit made clear that there was "no history of access to § 2703(d) matters." Applebaum, 707 F.3d at 291-92 n.9. As the Court explained, "§ 2703(d) orders are most analogous to sealed or unexecuted search warrants and grand jury proceedings for which traditionally, there has been no right of access." Id. This comparison makes sense. Section 2703(d) applications are traditionally submitted ex parte and in camera. The statute specifically authorizes the United States to obtain an order prohibiting notification of the existence of a § 2703(d) order to anyone. See 18 U.S.C. § 2705(b); see also Goetz, 886 F.2d at 63; In re Application of the N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials, 577 F.3d 401, 410 (2d Cir. 2009) (no First Amendment right of access to wiretap materials where applications were created by statute and statute also had protective scheme); Dow Jones, 142 F.3d at 502-03 (no First Amendment right of access to proceedings ancillary to grand jury investigation because no tradition of openness). Hence, there is no historical right of access to pre-indictment criminal matters, such as § 2703(d) matters.

The Fourth Circuit in Applebaum also held that the logic prong also was not met because:

> The § 2703(d) process is investigative, and openness of the orders does not play a significant role in the functioning of investigations.  Section 2703(d) proceedings consist of the issuance of and compliance with § 2703(d) orders, are *ex parte* in nature, and occur at the investigative, pre-grand jury, pre-indictment phase of what may or may not mature into an indictment. Pre-indictment investigative processes "where privacy and secrecy are the norm" "are not amenable to the practice and procedures employed in connection with other judicial proceedings."  In re Sealed Case, 199 F.3d 522, 526 (D.C. Cir. 2000).

707 F.3d at 292 (emphasis added).

The <u>Applebaum</u> Court considered, and rejected, the subscribers' claim that transparency of § 2703(d) matters "would ensure fairness, decrease bias, improve public perception of the justice system, and enhance the chances that orders are well-justified and not overbroad." 707 F.3d at 292 (internal quotation marks omitted). These reasons are, essentially, the same reasons put forward by petitioners in this litigation. The Court explained that it was "not persuaded" by these reasons and quoted the Supreme Court's words in <u>Press-Enterprise II</u>:

> Although many governmental processes best operate under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly.

<u>Applebaum</u>, 707 F.3d at 292 (quoting <u>Press-Enterprise II</u>, 478 U.S. at 8-9).  Hence, the Fourth Circuit concluded that "there is no First Amendment right of access" to § 2703(d) materials. <u>Id.</u> The rationale of <u>Applebaum</u> regarding § 2703(d) matters is compelling and should be applied here.

Moreover, <u>Applebaum</u>'s rationale applies equally well to PR/TT matters.  The Pen Register Statute requires the Court to place all orders authorizing the installation of PR/TTs under seal, at least until "otherwise ordered by the court." 18 U.S.C. § 3123(d)(1).  Hence, to the extent there is an "unbroken, uncontradicted history" with respect to PR/TT matters, it is a history of sealing, not a history of openness. Moreover, it takes "little imagination" to understand that the Pen Register Statute – which permits prosecutors to pursue criminal investigations without jeopardizing those investigations and without putting anyone at risk - would be frustrated if matters under the statute were handled openly.  <u>See</u> <u>Applebaum</u>, 707 F.3d at 295 (noting that "pre-indictment investigative matters such as § 2703(d) orders, pen registers, and wiretaps[] … are all akin to grand jury investigations").

Petitioners contend that this litigation is governed not by <u>Applebaum</u>, but by two cases decided by this Court: <u>Matter of the Application of the WP Co. LLC</u>, 201 F. Supp.3d 109 (D.D.C.

2016) ("<u>Application of WP</u>"), and <u>In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records</u>, 585 F. Supp.2d 83 (D.D.C. 2008) ("<u>Application of N.Y. Times</u>"). <u>Application of N.Y. Times</u> involved search warrant materials relating to the physical search of property owned by someone who had been a "person of interest" in the government's anthrax investigation. 585 F. Supp.2d at 86. After that person was cleared from suspicion, the newspaper sought access to the search warrant materials. Former Chief Judge Lamberth held, as a matter of first impression, that there was a "First Amendment qualified right of access to warrant materials after an investigation has concluded." 585 F. Supp. 2d at 88. Eight years later, this Court decided <u>Application of WP</u>, which pertained to search warrant materials relating to the investigation of Jeffrey E. Thompson; that investigation, in turn, had been ancillary to this Office's investigation of alleged campaign violations during the 2010 D.C. mayoral election. In <u>Application of WP</u>, this Court reiterated and refined the holding in <u>Application of N.Y. Times</u>. The Court confirmed that although there generally is a First Amendment qualified right of access to search warrant materials in closed investigations, "the public's First Amendment right of access does not automatically attach to search warrants issued in any closed criminal investigation," noting that "courts have been reluctant to recognize even a qualified public right to access to such materials where … an investigation concludes without an indictment." 201 F. Supp.3d at 122. The Court explained that, "without an indictment, even a 'closed investigation is more analogous to a federal grand jury proceeding, to which no public right of access attaches, than the sort of public criminal proceeding that lies at the core of the First Amendment." <u>Id.</u>

Petitioners rely predominantly on <u>Application of N.Y. Times</u> and largely ignore the more nuanced holding this Court reached in <u>Application of WP</u>. Hence, petitioners argue that the PR/TT and § 2703(d) materials that they have received thus far in this litigation and the additional

materials that they still seek are akin to search warrant materials (as in Application of N.Y. Times) and that they seek these materials only in closed investigations (again, as in Application of N.Y. Times). Consequently, according to petitioners, they have a First Amendment right to the broad swath of documents that they seek.

Petitioners' attempt to fit their claim into the framework of Application of N.Y. Times, fails in part because the PR/TT and § 2703(d) materials at issue here are more like grand jury matters than the search warrant at issue in Application of N.Y. Times. As noted, that case involved a search warrant that had been executed at a physical location.  The Court thus noted that "routine historical practice countenances in favor of a qualified First Amendment right of access to warrant materials; warrant applications and receipts are routinely filed with the clerk of the court without seal." 585 F. Supp.2d at 88 (citing Fed. R. Crim. P. 41(i)) (footnote omitted). This is fundamentally different than the process for obtaining PR/TT and § 2703(d) orders. Indeed, the Pen Register Statute authorizes the government to file an ex parte application under seal and requires that a court seal any order authorizing such an application. 18 U.S.C. § 3123(d)(1). Similarly, the SCA expressly authorizes the United States to obtain an order prohibiting notification of the existence of the § 2703(d) order to anyone. 18 U.S.C. § 2705(b).

Moreover, in Application of N.Y. Times and Application of WP, the press made requests for unsealing in specific matters. It thus was possible for the Court to discern whether the investigations in those cases was open or closed and, if closed, whether there were compelling interests that overcame the press's qualified right of access. The Court cannot make such determinations in this litigation, due to the petitioners' broad request for unsealing in some fashion so many different matters filed over nearly a decade.  Hence, properly read in the context of this unusual litigation, neither Application of WP nor Application of N.Y. Times supports the

petitioners' broad claim that the First Amendment entitles them to the relief that they have received or that they still seek.[15]

C. **Petitioners Have Not Established a Common Law Right of Access to the Documents That They Seek.**

The public has a qualified common law right "to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Comm., Inc., 435 U.S. 589, 597 (1978). The common law right of access is "broader, but weaker" than the right of access provided by the First Amendment. El-Sayegh, 131 F.3d at 160. In assessing whether a judicial record must be disclosed in accordance with the common law right of access, the Court must "balance[e] the public's right of access against the interests favoring nondisclosure." In re Fort Totten Metrorail Cases, 960 F. Supp. 2d 2, 6 (D.D.C. 2013); see also Washington Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 902 (D.C. Cir. 1996). Although there is a "strong presumption in favor of public access to judicial proceedings," EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996), access is neither automatic nor preordained.

To determine whether there is a qualified common law right of access to judicial records, the D.C. Circuit has identified six factors that a respondent (here, the government) can show to overcome the presumption in favor of public access: 1) the need for public access to the documents

---

[15]    Even assuming that there were a First Amendment right of access here, that "right is not absolute." United States v. Brice, 649 F.3d 793, 795 (D.C. Cir. 2011). The presumption of access can be overcome if closure serves a compelling interest; a substantial probability exists that, in the absence of closure, the compelling interest would be harmed; and no alternatives to closure exist that would adequately protect the compelling interest. Id. at 796; see also Robinson, 935 F.2d at 290. Here, petitioners argue that the USAO-DC cannot overcome petitioners' qualified right of access based on these factors. Of course, these factors have never been applied in a case such as this where, at a minimum, petitioners claim entitlement to extraction charts for 100% of the PR/TTs matters filed by the Office over the past decade, as well as lists from the Court detailing the § 2703(d) matters filed in this jurisdiction from 2008 to the date of the Court's Order.  On this record, we believe that even if there were a First Amendment right to some or all of the materials at issue in this litigation, that qualified right would be overcome based at least, in part, on the compelling interest of preserving governmental and judicial resources.

at issue; 2) the extent of previous public access to the documents; 3) the fact that someone has objected to disclosure, and the identity of that person; 4) the strength of any property and privacy interests asserted; 5) the possibility of prejudice to those opposing disclosure; and, 6) the purposes for which the documents were introduced during the judicial proceeding. United States v. Hubbard, 650 F.2d 293, 317-22 (D.C. Cir. 1980). The decision regarding access "is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Id. at 316-17 (internal quotation marks and footnote omitted).

In Applebaum, the Fourth Circuit concluded that there was a common law right of access to § 2703(d) matters, but found that the government's interests (i.e., "maintaining the secrecy of its investigation, preventing potential subjects from being tipped off, or altering behavior to thwart the Government's ongoing investigation") outweighed the public's common law right of access. 707 F.3d at 293-94.  In his concurrence, Judge Wilson disagreed with the majority's premise that a common law right of access attached to § 2703(d) judicial orders and motions. He reasoned that, in passing the Electronic Communications Privacy Act of 1986, "Congress sought to protect the privacy interests of individuals in electronically stored information." Id. at 297. Hence, he "believe[d] that a common law right of access is squarely at odds with the Act's essential purpose." Id.

Judge Wilson's concurrence is convincing and finds support in this jurisdiction. For example, in Dow Jones, the D.C. Circuit rejected the claim that there is a common law right of access to proceedings that are ancillary to grand jury matters.  142 F.3d at 504. "The common law right … is not absolute…. Although some have identified a common law tradition of public access to criminal trials, this never extended to preindictment, pretrial proceedings involving a grand

jury." Id. Moreover, the Court noted, "even if there were once a common law right of access to materials of the sort at issue here, the common law has been supplanted by Rule 6(e)(5) and Rule 6(e)(6) of the Federal Rules of Criminal Procedure. These Rules, not the common law, now govern." Id. (emphasis added); see also In re New York Times Co. to Unseal Wiretap, 577 F.3d 401, 405 (2d Cir. 2009) (rejecting claim of common law right of access to Title III wiretap materials because Title III "supersedes any arguable common law right," and citing City of Milwaukee v. Illinois, 451 U.S. 304, 313–14 (1981) ("[F]ederal common law ... is resorted to [only] in absence of an applicable Act of Congress." (internal citations, quotation marks, and alteration marks omitted))).

Similarly, here, the Pen Register Statute expressly requires sealing "until otherwise ordered by the court," 18 U.S.C. § 3123(d)(1); the SCA permits sealing under certain circumstances and once ordered, the sealing remains in effect "for such period as the Court deems appropriate." 18 U.S.C. § 2705(b). Hence, this Court should decline to find that there is a common law right of access to PR/TT and § 2703(d) matters.

Even if a common law right of access does exist for these matters, the Hubbard factors favor non-disclosure. The first Hubbard factor pertains to the need for public access to the documents at issue. The USAO-DC agrees that transparency is important; however, we note here that the Court and the USAO-DC have provided petitioners with an unprecedented amount of access to the materials at issue in this litigation. Hence, this factor counsels in favor of the disclosures that have been made to date, but does not suggest additional disclosure is necessary.[16]

---

[16] During this litigation, petitioners' counsel stated that "they were 'very pleased' with the steady release of information, which they said will aid researchers, lawmakers and the public in tracking the scope, evolution and expansion of government conduct." Leopold's counsel also stated that, "we're continuing to get information on a regular basis that has never been available before." Spencer S. Hsu, U.S. Court

With respect to the second factor - the extent of previous public access to the documents – this factor strongly favors the USAO-DC. As discussed above, there is no history of previous access to these sealed matters. In the Matter of Ft. Totten Metrorail Cases, 960 F. Supp. 2d 2, 11 (D.D.C. 2013) (strong showing on one Hubbard factor can outweigh other factors) (citing In re Sealed Case, 237 F.3d 657, 666 (D.C. Cir. 2001)). The remaining four Hubbard factors simply cannot be applied, or are unworkable, because of the wholesale nature of petitioners' request. As became clear during this litigation, the USAO-DC did not retain copies of all PR/TT and § 2703(d) applications filed from 2008 to 2016. Even if the USAO-DC had copies, or were able to access copies via CM/ECF, the amount of time and effort required to assess the remaining four Hubbard factors – whether someone would object to disclosure, the strength of any property and privacy interests asserted, the possibility of prejudice to those opposing disclosure and the purposes for which the documents were introduced during the judicial proceeding - is unfathomable and, in many instances, these factors would be nearly impossible to ascertain. The fact that four of the six Hubbard factors cannot even be determined supports the conclusion that petitioners' request does not fit neatly into the common law right of access framework set forth in the cases that they cite. Hubbard, 650 F.2d at 316-17 (stating that the decision regarding access "is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Id. at 316-17 (internal quotation marks and footnote omitted) (emphasis added); see also In the Matter of Ft. Totten Metrorail Cases, 960 F. Supp. 2d at 6 (the Hubbard inquiry is case-specific).

---

Expands Disclosure of Requests to Secretly Track Electronic Records, Wash. Post, Feb. 23, 2017, https://www.washingtonpost.com/local/public-safety/us-court-expands-disclosure-of-requests-to-secretly-track-electronic-records/2017/02/23/20ef5a54-f950-11e6-bf01d47f8cf9b643_story.html?utm_term=.7dc77250aad1.

In sum, because the first <u>Hubbard</u> factor merely weighs in favor of the disclosure that already has occurred, because the second <u>Hubbard</u> factor weighs heavily in favor of non-disclosure, and because the Court is unable to assess the last four <u>Hubbard</u> factors due to the nature of petitioners' broad request, the Court should conclude that petitioners do not have a common law right of access to the materials that they seek or that they have received.

## D. **This Court May Consider the Burden on the Court and the USAO-DC in Assessing Petitioners' Unprecedented Request.**

Petitioners contend that, because the First Amendment and common law right of access cases upon which they rely do not mention burden as a factor, this Court may not consider the burden that petitioners' broad request places on the Court or on the USAO-DC in assessing whether petitioners are entitled to relief. We disagree.

The case law that has developed under the First Amendment and common law right of access is distinguishable in that this body of law involves requests by parties, usually the press, to unseal specific matters or to unseal specific cases. These are the cases upon which petitioners rely. <u>See</u>, <u>e.g.</u>, <u>In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records</u>, 585 F. Supp.2d 83 (D.D.C. 2008) (newspapers' motion to unseal search warrant applications, supporting affidavits, court orders and search warrant returns relating to the government's criminal investigation into the mailing of anthrax to members of Congress and the media); <u>Matter of the Application of the WP Co. LLC</u>, 201 F. Supp.3d 109 (D.D.C. 2016) (newspaper's request to unseal warrant materials related to campaign finance investigation involving election of the D.C. mayor, as well as unrelated separate investigations involving one of the same targets); <u>Smith v. United States Dist. Court for Southern District of Illinois</u>, 956 F.2d 647 (7th Cir. 1992) (criminal defendant

sought access to Clerk of Court memo involving statistics and policies regarding extensions of time in prisoner civil rights cases); United States v. Aref, 533 F.3d 72 (2d Cir. 2008) (civil liberties organization sought to unseal classified national security information arising out of criminal defendants' trial involving sale of surface-to-air missile); In re Search of Fair Finance, 692 F.3d 424 (6th Cir. 2012) (newspaper sought to unseal court documents filed relating to issuance of search warrant involving specific financial fraud investigation); Baltimore Sun Co. v. Goetz, 886 F.2d 60 (4th Cir. 1989) (newspaper sought to unseal search warrant application involving FBI investigation of organized crime and fraud in health insurance industry); In re EyeCare Physicians of America, 100 F.3d 514 (7th Cir. 1996) (companies whose premises searched sought to unseal search warrant documents related to those searches); United States v. Loughner, 769 F. Supp.2d 1188 (D. Ariz. 2011) (media petitioned court to release search warrant materials in case involving mass shooting of 19 people, including a U.S. Congresswoman, at a political event); In re Search Warrant for Secretarial Area Outside of Office of Gunn, 855 F.2d 569 (8th Cir. 1988) (newspaper sought to unseal search warrant documents related to ongoing investigation into alleged bribery in defense industry).

None of these cases involves a sweeping request like the one at issue here, which involves the unsealing or partial unsealing of thousands of PR/TT and § 2703(d) matters filed over the course of nearly ten years. Similarly, the cases that petitioners cite for the proposition that "[b]urden is not a compelling or countervailing interest sufficient to overcome the public's constitutional or common law rights of access," apply that proposition in the context of a single, discrete case. In sum, the cases that petitioners rely upon in this litigation are distinguishable because they deal with the First Amendment and common law rights of access in a completely different context.

It is inherently reasonable, under the circumstances of this case, for the Court to consider the practical aspects of petitioners' requests, the burden on Court and the USAO-DC, and the ultimate value of the information sought to be disclosed. District courts possess the inherent authority to manage their dockets and courtrooms "with a view toward the efficient and expedient resolution of cases." Dietz v. Bouldin, 136 S. Ct. 1885, 1888-89 (2016) (citing Landis v. North American Co., 299 U.S. 248, 254 (1936)); see also In re Fannie Mae Sec. Litig., 552 F.3d 814, 822-23 (D.C. Cir. 2009) (observing, in the context of multidistrict litigation, that "[d]istrict judges must have authority to manage their dockets, especially during a massive litigation such as this, and we owe deference to their decisions whether and how to enforce the deadlines they impose"). Indeed, the district court is "the master of its docket." Attias v. Carefirst, Inc., 865 F.3d 620, 625 (D.C. Cir. 2017).

In an analogous case, the D.C. Circuit upheld the district court's consideration of administrative burden, as well as the limited value of the information sought to be disclosed, in denying the petitioners' request for relief. See In re Sealed Case, 199 F.3d 522, 526 (D.C. Cir. 2000). There, the D.C. Circuit held that the district court did not abuse its discretion in denying a group of news organizations' request for a generic rule requiring public docketing of all grand jury matters. That case involved the interpretation of Local R. Crim. P. 6.1, which provides that when "continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury," ancillary proceedings may be made public. The D.C. Circuit noted the "extraordinary nature" of petitioners' request for public docketing and reiterated its prior holding that there was "no constitutional, statutory, or common law principle requiring [it]." Id. at 525 (citing Dow Jones & Co., 142 F.3d 496). The district court had found that, due to the need for grand jury secrecy, creation of a public docket would necessarily be "non-descriptive" to protect the identity of

witnesses and targets. Id. at 524-25.  Therefore, the district court held that a "mandatory public docket" was not required by Rule 6.1 because "[s]uch a non-descriptive docket" would be of "only limited utility to the media while imposing undue administrative burdens on the trial court."  Id. The D.C. Circuit upheld the district court's decision, finding that it had "no good reason to second-guess the District Court's interpretation of its own rule."  Id. at 526; see also Dow Jones, 142 F.3d at 502 (rejecting claim that there was a First Amendment right of access to ancillary grand jury proceedings and noting that recognizing such a right "would create enormous practical problems in judicial administration").

Similarly, in this case, the Court should reject petitioners' attempt to use Local R. Crim. P. 57.6 to obtain unsealing, or partial unsealing, in thousands of cases.  Rule 57.6 allows any "news organization" or "other interested person" to "seek[] relief to any aspect of the proceeding in a criminal case" by filing an application for relief.  The Rule also states that the application "shall include a statement of the applicant's interest in the matter" and "shall be served on the parties to the criminal case."  (Emphasis added). Thus, Rule 57.6 contemplates access in discrete criminal cases, and does not provide the means to obtain the wholesale unsealing, even in part, of sealed matters that have been filed over a number of years.

Further, in a case decided recently in the United States District Court for the Northern District of California, the Court denied a wholesale request to unseal similar matters, essentially because the request was impractical. There, petitioners who were academic researchers at the Stanford Center for Internet and Society, filed a petition requesting that the court assign docket numbers and docket and unseal all "technical-assistance applications and orders" filed by the government from January 1, 2006, up until six (6) months before the petition is granted, pursuant to the Wiretap Act, 18 U.S.C. §§ 2510-2522, the SCA, the Pen Register statute, and the All Writs

Act, 28 U.S.C. § 1651. <u>See</u> In re: Petition of Jennifer Granick and Riana Pfefferkorn to Unseal Technical Assistance Orders and Materials, Misc. Case No. 16-80206 [Dkt. 2]. Petitioners relied on the First Amendment and the common law right of access; they also sought prospective relief. As in the instant case, petitioners did not seek to unseal records where there was an ongoing criminal investigation, and did not seek to unseal the names or other identifying information about the targets of any of the investigations.

On June 23, 2017, the Court issued an order denying petitioners' motion because the scope of relief sought by petitioners was "overbroad" [Dkt. 36]. Although the Court recognized "a qualified constitutional right to access to court records," the Court noted that petitioners' request for "wholesale unsealing was not practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is permissible." <u>Id.</u> "Otherwise, there was an undue risk that information which should be sealed, whether because it is required by statute or to protect ongoing investigations or privacy interests, will be improperly released." <u>Id.</u> In reaching its ruling, the Court noted that in the majority of cases cited by the petitioners in support of unsealing, "specific information rather than wholesale unsealing" was sought. <u>Id.</u>

In sum, although petitioners attempt to shoehorn this litigation into the First Amendment and common law right cases upon which they rely, their broad request does not fit comfortably within the analytical framework of those cases. Therefore, their requests should not be considered solely within the confines of that ill-fitting framework. The Court thus may, and should, assess burden – both on the Court and on the USAO-DC – in assessing petitioners' broad request for relief.[17]

---

[17]   Although petitioners contend that burden should not be a factor in assessing their request for relief, they nonetheless claim that they only seek "limited information concerning matters currently under seal"

**E. Petitioners' Request for Further Backward-Looking Relief Should Be Denied Because It Is Unduly Burdensome.**

Petitioners ask the Court to order the government to provide 100% extraction charts for all PR/TT matters filed by the USAO-DC from 2008 to the effective date of any Court order, within 90 days of that order. Based upon information publicly released by the Court, the USAO-DC filed 2,248 PR/TT matters from 2008 to 2016. The government has already provided petitioners with extraction charts for 10% of the PR/TT matters filed between 2011 and 2016. Completing the extraction process for 100% of the PR/TT matters filed from 2008 to the present would be a time-consuming process that would require the expenditure of significant resources on the part of the Court and the USAO-DC. To fulfill this request, personnel in the Clerk's Office must individually access each Miscellaneous case docket via CM/ECF in order to permit the USAO-DC to have access to the judicial records. The Court has not provided the parties with an estimate of how long it would take Clerk's Office personnel to complete this task but, given the numbers of applications involved, it would appear to call for a significant time commitment. In terms of the USAO-DC's time commitment, as noted above, the preparation of the extraction chart for 24 pen register matters filed in 2012 took approximately 8.5 hours. Using 8.5 hours as a yardstick, completion of an extraction chart for the remaining 90% of the pen register matters filed from 2008 to present would take approximately 720 hours for the USAO-DC. Hence, petitioners'

---

and that are closed, and that they have "take[n] into account existing practical challenges faced by the Court and the USAO, including resource considerations." Petitioners' Supplemental Memorandum, filed 8/25/17, at 30. This claim rings hollow. As this Court has noted several times, determining whether a sealed matter now involves an open or closed investigation is, by itself, a burdensome process. Moreover, petitioners minimize or ignore the amount of resources that have been expended thus far and that would be required in the future to meet their current demands.

request would require a significant amount of time and resources for the Court and the USAO-DC to fulfill. For this reason, the Court should deny this request.

Petitioners also ask the Court to unseal case numbers and certain docket information relating to § 2703(d) orders for 2008 to the effective date of any Court order and publicly release a list similar to the previously-released PR/TT lists. Based upon searches conducted by the Clerk's Office, the parties learned that the government (not limited to the USAO-DC) filed 2,636 such matters from 2008 to 2016.  This request does not implicate the USAO-DC or its resources, but would require the Clerk's Office to devote significant personnel and time to this project.

**III.    Prospective Relief:  The Court and the Government Have Entered into a Memorandum of Understanding that Substantially Provides Petitioners with the Relief They Seek.**

In light of recent developments, the Court should deny in part as moot and otherwise deny petitioners' request for prospective relief. Petitioners have modified their requests for relief based upon information learned throughout the course of this litigation. They now request the Court to:

- permit the government to file all PR/TT and SCA matters, including search warrants and § 2703(d) applications, electronically via CM/ECF;

- once a PR/TT or SCA matter has been filed under seal, automatically and immediately make available to the public via PACER, the case name and associated docket information -- such as the case caption or title, the filing entity, the date filed, the date entered, the category, the event, the title or name of the case initiating document and magistrate judge to whom the matter is assigned;

- permit PR/TT and SCA matters filed electronically to be searchable by filer via PACER;

- issue an order to the government to show cause in any PR/TT or SCA matter that is still under seal after 180 days why that matter should not be unsealed;[18]

---

[18]    Although petitioners do not acknowledge it, putting in place a system that calls for the Court to issue show cause orders in each of the hundreds of PR/TT and SCA matters that are filed each year would be labor-intensive for the Clerk's Office and would require the USAO-DC to expend resources to review each matter and respond to each show cause order.

- order the USAO-DC and other institutional filers to develop internal policies to carry out the unsealing of future PR/TT and SCA matters;

- make available all unsealed PR/TT and SCA matters on the Court's website;

- direct the Clerk's Office to create separate events for the filing of § 2703(d) matters that also involve Grand Jury matters and the filing of SCA search warrant matters;

- suggest that the government develop a system of uniform, standard captions for filing PR/TT and SCA matters that does not reveal personal identifying information such as target names, telephone numbers and email addresses.

By filing this lawsuit, petitioners have been instrumental in prompting a sea change in how the Court and the USAO-DC handle the filing of sealed matters under the Pen Register Statute and the SCA. Recently, the Clerk's Office and the USAO-DC entered into a Memorandum of Understanding ("MOU") setting forth procedures for the electronic filing of sealed applications for the types of sealed matters at issue in this case and providing for the public release of docket numbers and case captions associated with these sealed applications, except for those applications related to the non-disclosure of grand jury subpoenas.[19]  Under the MOU:

- the USAO-DC files or will file electronically, via CM/ECF, using Court-approved captions, sealed applications for the following miscellaneous matters:

  1) pen register and trap and trace devices;
  2) electronic communications and records and/or nondisclosure pursuant to the SCA;
  3) search warrants for electronic communications pursuant to Fed. R. Crim. P. 41.

- the Court-approved captions include the following information:

  1) the number of target telephone lines, subscriber accounts and/or devices that are the subject of the application;
  2) the type of target (e.g., landline/cellular/mobile telephone, email account, cell tower or other facilities or devices subject to the application);
  3) the service provider to which the order would be directed;
  4) the primary offense statute(s) under investigation.

---

[19]    The MOU, entered into on August 15, 2017, is now available on the Court's website: http://www.dcd.uscourts.gov/sites/dcd/files/MOU_Electronic_Filing_Pen_Registers.pdf.

- the Clerk's Office will publicly release caption information for these sealed matters via CM/ECF on a biannual basis.  The Clerk's Office reports, referred to as "MC Docket Reports," will be made publicly available via CM/ECF and on the Court's website on March 31st and September 30th of each year in electronic form.  The MC Docket Reports will contain docket numbers and case captions associated with the specified sealed applications filed during the 6-month period ending six (6) months before the issuance of the MC Docket Report.  Thus, for example, a sealed application filed in November 2018 will be included in the semi-annual MC Docket Report issued by the Clerk's Office on September 30, 2019.[20]

The procedures set forth in the MOU substantially provide petitioners with the prospective relief they seek and strike the appropriate balance among competing interests, that is, promoting transparency, protecting security and privacy concerns, and conserving judicial and governmental resources.  Hence, the Court should deny petitioners' request for prospective relief as moot to the extent that the MOU satisfies that request and deny the request in all other respects.

---

[20]   Petitioners attached to their second Supplemental Memorandum a copy of General Order 17-02, issued by the United States District Court for the Central District of California on February 17, 2017, which sets forth a pilot project to allow the government to file electronically, via CM/ECF, applications for search warrants, pen registers and § 2703(d) orders [Dkt. 47-6].  Unlike the MOU in this jurisdiction, that General Order does not include a provision for publicly releasing docketing information relating to these filings.

## CONCLUSION

For the reasons stated herein, the Court should deny petitioners' application, in part, as moot as to the relief they have already received and deny it in all other respects.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar Number 472-845

MARGARET J. CHRISS
Chief, Special Proceedings Division
D.C. Bar Number 452-403

T. ANTHONY QUINN
Deputy Chief, Special Proceedings Division
D.C. Bar Number 415-213

_____/s/_____
PAMELA S. SATTERFIELD
Assistant United States Attorney
Special Proceedings Division
555 4th Street, N.W.
Washington, D.C. 20530
D.C. Bar No. 421-247
Pamela.satterfield@usdoj.gov
202-252-7578

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, this 26th day of October, 2017, I caused a copy of the foregoing Government's Response to be served via ECF to all counsel of record.

____/s/_____
Pamela S. Satterfield
Assistant United States Attorney