**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN THE MATTER OF THE APPLICATION OF JASON LEOPOLD TO UNSEAL CERTAIN ELECTRONIC SURVEILLANCE APPLICATIONS AND ORDERS. |

Misc. Action No. 13-mc-00712

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Invoking both the First Amendment and common law rights of access to judicial records, Jason Leopold, an investigative journalist, and the Reporters Committee for Freedom of the Press initially petitioned the Court to unseal almost twenty years of sealed government applications, and related orders, to obtain information about, and the contents of, electronic communications in criminal investigations now closed. *See generally* Pet. Unseal Records ("Pet."), ECF No. 1; Appl. to Unseal and for Other Appropriate Relief ("Intervenor's Pet."), ECF No. 18. These petitions commenced a constructive effort among the petitioners, U.S. Attorney's Office for the District of Columbia ("USAO"), and Clerk of this Court to consider mechanisms for allowing greater transparency in the judicial review process for such applications and orders, while maintaining the secrecy of information implicating both legitimate individual privacy and law enforcement interests, and navigating the practical difficulties posed by evolving internal technological tools and administrative practices within the USAO and the Clerk's Office for processing and docketing these records. The parties' commendable willingness to work together, in good faith, to identify areas of common ground and compromise has substantially narrowed the legal dispute and resulted in a largely collaborative rather than an acrimonious litigation. For the reasons set out below, the petitions are granted in part and denied in part.

1

## I.    BACKGROUND

This is not the only court with a significant volume of sealed government surveillance records on secret dockets that remain inaccessible to the public.[1]  The progress of this litigation is outlined in some detail because the lessons learned and issues confronted inform the relief available, and may be instructive to other courts confronting similar issues.

Jason Leopold, a journalist currently employed by BuzzFeed News, filed a petition in July 2013 to unseal government applications and related orders for the following types of statutorily authorized surveillance: "pen registers, trap and trace devices [collectively "PR/TT devices"], tracking devices, cell site location, stored email, telephone logs, and customer account records from electronic service providers, except for those which relate to an ongoing investigation." Pet. at 1; *see also* Gov't's Resp. to Pet. ("Gov't's Resp.") at 1, ECF No. 10.[2] These records, along with the docket numbers assigned by the Clerk's Office and docket sheets identifying all documents filed on each docket for such matters, typically remain under seal indefinitely.  In view of this fact, Leopold also sought a list of all docket numbers, in closed investigations, associated with government applications and orders relating to PR/TT devices and the compelled disclosure of electronically stored communications and records, pursuant to the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA").  Pet. at 4.  In addition to this retrospective relief in the form of unsealing docket numbers and PR/TT and SCA materials in

---

[1]    This case is not the first occasion this Court has taken steps to facilitate greater transparency regarding sealed material. *See, e.g.,* Memorandum & Order, *In re Search Warrant for E-Mail Account [redacted] Maintained on Computer Servers Operated by Google, Inc., Headquartered At 1600 Amphitheatre Parkway, Mountain View, Calif.*, 946 F. Supp. 2d 67, 69 (D.D.C. May 22, 2013) (Lamberth, C.J.) (announcing creation of a new page on the Court's website "where all search warrants and arrest warrants will be publicly available after execution, unless a separate sealing order is entered to redact all or portions when the government makes the [requisite] showing . . . .").
[2]    Leopold was employed by Vice News and was a regulator contributor to Al Jazeera English at the time he filed his petition.  Pet. at 1–2; Pet'rs' Suppl. Mem. Supp. Pet. ("Pet'rs' Mem.") at 5, ECF No. 47.

closed criminal investigations, Leopold requested prospective relief in the form of a presumptive 180-day expiration date for all sealing or non-disclosure orders for such materials, extendable for ongoing investigations or in exceptional circumstances. *Id.* at 5.

In response to the petition, the USAO acknowledged, in December 2013, "that applications and orders relating to electronic surveillance methods need not necessarily be permanently sealed." Gov't's Resp. at 2. Nonetheless, asserting that the requested relief was overbroad, the USAO identified several obstacles to the wholesale unsealing and disclosure that Leopold sought. *Id.* at 2–3. First, the USAO could not provide a complete list of docket numbers associated with all PR/TT and SCA applications and/or orders filed in this Court because other components of the U.S. Department of Justice ("DOJ"), applied for and obtained such surveillance orders, without USAO involvement. *Id.* at 2. Second, limiting the requested unsealing to "closed" investigations posed administrative burdens in (1) identifying the appropriate USAO personnel and law enforcement officials to verify the status of the investigation, and, (2) where an aspect of an investigation was closed, assessing whether the need for secrecy remained due to concerns over witness safety, national security, or jeopardizing ongoing investigations growing out of closed investigations. *Id.* at 2–3. Third, the USAO criticized the petition's suggested protocol of a presumptive 180-day expiration date for sealing and non-disclosure orders as "arbitrary on its face," as that presumptive limit gave short shrift to the interests justifying the initial sealing and unduly cabined judicial discretion, in conflict with governing statutes. *Id.* at 3.

While taking no position on whether the First Amendment or common law established a right of access to the materials at issue, the USAO pointed out, correctly, that "the decision whether, and if so how, to establish a protocol to identify more accurately, track, and ultimately

terminate sealing orders is a matter that falls within the administrative responsibility of this

Court," and offered, as an institutional litigant, to "assist the Court in whatever manner the Court

might deem appropriate towards the aim of formulating appropriate guidelines" in this area.  *Id.*

at 2–3 nn.2–3.

Nothing more transpired in this matter for over two years, until the matter was reassigned

to the undersigned in March 2016.[3]  At subsequent status hearings, Leopold's counsel clarified

that the petition sought no personally identifying information concerning investigative targets,

Hr'g Tr. ("May 2016 Tr.") at 9:5–25, 10:1–21 (May 4, 2016), ECF No. 20; Hr'g Tr. ("June 2016

Tr.") at 9:14–17 (June 24, 2016), ECF No. 21, and agreed, at the Court's suggestion, to limit the

scope of requested relief to only those PR/TT and SCA applications filed by the USAO, June

2016 Tr. at 12:2–5, 9.

The USAO provided additional detail on the practical challenges presented by the

petition, some of which, ironically, were exacerbated by the limitations agreed to by Leopold.  In

particular, determining whether the USAO or a different DOJ component had filed a PR/TT or

SCA application would be challenging, as the USAO maintained no lists of docket numbers for

PR/TT and SCA matters initiated by USAO prosecutors, and because the USAO's internal

tracking system for criminal investigations did not correspond to the Miscellaneous ("MC")

docket numbers assigned by the Clerk's office.  June 2016 Tr. at 12:15–22.[4]  Moreover, even the

---

[3]      During this period, Leopold moved for the appointment of a special master, Leopold's Mot. Appoint. Special Master, ECF No. 11, which motion was withdrawn in June 2016, *see* Hr'g Tr. ("June 2016 Tr.") at 5:3 (June 24, 2016), ECF No. 21.

[4]      Until January, 2018, the Clerk's Office used four case types to docket new matters: civil cases were then and still are docketed with a "CV" case number; criminal cases initiated by indictment or information were then and still are docketed with a "CR" case number; search warrants filed pursuant to Federal Rule 41 of Criminal Procedure, criminal complaints and associated arrest warrants, misdemeanor informations, and financial affidavits filed pursuant to the Criminal Justice Act, were docketed with a "Magistrate Judge" or "MJ" matter number; and various types of civil, bankruptcy, grand jury and criminal investigative matters were docketed with a

USAO lacked access to the sealed MC dockets and, thus, could not determine which PR/TT and SCA applications were filed by the USAO or a different DOJ component or the status, as open or closed, of the investigations in connection with which those applications were filed.  *Id.* at 12:23–25, 13:1–5.

While acknowledging that the petition was "quite broad," *id.* at 5:24, Leopold's counsel explained that the relief sought would reveal changes over time in the types of surveillance requests the government made pursuant to particular statutory authorities, as well as the government's evolving legal arguments in support of particular surveillance applications, citing, as an example, the government's argument that 18 U.S.C. § 2703(d) allowed the government to obtain historical cell cite data.  May 2016 Tr. at 12:7–15; *see also* June 2016 Tr. at 6:2–3 (describing petition's "overall goal" as enabling the public "to understand the use of and justification for [PR/TT] and [§] 2703(d) orders.").  Similarly to the USAO, Leopold expressed willingness "to work with the Court to narrow it down to the things that we're specifically interested in."  June 2016 Tr. at 5:24–25, 6:1.

The Court directed the parties to propose a future course and, given the breadth of relief

---

"Miscellaneous" or "MC" matter number.  *See, e.g.*, LCvRs 40.3(a)(1) n.1 & 57.10(a)(1) n.3 (describing "miscellaneous cases" to include "(a) actions to perpetuate testimony as in Rule 27, Federal Rules of Civil Procedure; (b) actions to enforce administrative subpoenas and summonses; (c) proceedings ancillary to an action pending in another district; (d) supplementary proceedings brought in aid of execution; (e) motions for return of property in criminal proceedings; and (f) requests for judicial assistance."); LCvR 40.3(c)(2)(iii) ("[A]ny motion relating to a bankruptcy case or proceeding (including . . . any motion for a writ of mandamus or prohibition) (which motion shall be assigned a miscellaneous case number)"); LCrR 6.1 ("A motion or application filed in connection with a grand jury subpoena or other matter occurring before a grand jury, all other papers filed in support of or in opposition to such a motion or application, and all orders entered by the Court in connection therewith, shall be filed under seal" and "assigned a Miscellaneous case number."); LCrR 17.2 ("When any papers are filed by a non-party opposing closure [in a criminal case], the matter shall be assigned a Miscellaneous docket number");  LCrR 57.6 ("Any news organization or other interested person, other than a party or a subpoenaed witness, who seeks relief relating to any aspect of the proceedings in a criminal case shall file an application for such relief in the Miscellaneous Docket of the Court."); DCt.LBR 5011-1(d) (assigning MC number to emergency bankruptcy matters). In January, 2018, the Clerk's Office adopted new case types to designate grand jury and criminal investigative matters, as described in more detail *infra* Part II.D.

the petitioners sought, to refine the scope of Leopold's request to "a manageable time period

where we have records that are electronic and so more easily accessible to review and to track."

*Id.* at 18:13–15.[5]  In addition, the parties were directed to identify any "information the parties

would need from the Court to help facilitate moving forward."  *Id*. at 18:16–18.  The Reporters

Committee for Freedom of the Press moved to intervene soon thereafter, *see* Reporters Comm.'s

Unopposed Mot. to Intervene ("Mot. Intervene"), ECF No. 16, which motion was granted,

Minute Order, dated Aug. 18, 2016.[6]

---

[5]     The Case Management/Electronic Case Filing system ("CM/ECF system") is an electronic filing system that allows attorneys "to open new civil cases, and file civil, criminal, and miscellaneous pleadings (including some sealed documents) electronically right from their office."  *Electronic Case Filing & Court Records*, U.S. DISTRICT COURT, DIST. OF COLUMBIA, http://www.dcd.uscourts.gov/ECFCR (last visited Feb. 20, 2018).  CM/ECF is used across the federal judiciary to give "the courts a way to easily manage these files electronically," *Electronic Filing (CM/ECF)*, U.S. COURTS, http://www.uscourts.gov/courtrecords/electronic-filing-cmecf (last visited Feb. 20, 2018), and to provide attorneys and the public "[c]ase information, including the docket sheet and the filed documents, . . . from locations other than the courthouse," *FAQs: Case Management / Electronic Case Files (CM/ECF)*, U.S. COURTS, http://www.uscourts.gov/courtrecords/electronic-filing-cmecf/faqs-case-management-electronic-case-files-cmecf (last visited Feb. 20, 2018).

The Administrative Office of the U.S. Courts first developed CM/ECF in 1996 "for use in the [U.S. District Court for the] Northern District of Ohio to help the court deal with an onslaught of asbestos litigation and the massive amount of paperwork associated with it."  Tanya White Cromwell, *Electronic Case Filing Saves Space, Time, Improves Access to Documents*, KAN. CITY BUS. J. (May 2, 2003, 11:00 PM CST), https://www.bizjournals.com/kansascity/stories/2003/03/03/focus3.html.  After pilot programs were conducted in a handful of district courts, the system began to be rolled out nationwide to federal district courts in 2001 and 2002, soon followed by federal appellate courts in 2005.  Daniel T. Fenske, *E-Filing in Federal Courts: How to Avoid Common Mistakes*, 17 PRETRIAL PRAC. & DISCOVERY 4, 4 (2009).  According to information obtained from the Clerk's Office, this Court implemented CM/ECF for use in public civil cases in 2003, and in public criminal cases in 2005.  Today, all federal district, bankruptcy, and appellate courts, except the U.S. Supreme Court, use the CM/ECF system.  ADMIN. OFFICE OF THE U.S. COURTS, NEXT GENERATION OF CM/ECF: ADDITIONAL FUNCTIONAL REQUIREMENTS GROUP FINAL REPORT 1 (Feb. 27, 2012).  The Clerk's Office has further advised that this Court began to use CM/ECF for the docketing in sealed cases of sealed government applications and orders in criminal investigative matters in 2008.  New functionality added to the CM/ECF system allowed sealed documents to be docketed electronically on CM/ECF by the Clerk's Office on otherwise public civil dockets in 2009, and on public criminal dockets in 2011.  In November 2013, the CM/ECF system in this Court was further enhanced to allow the electronic docketing by attorneys of sealed documents in otherwise public civil and criminal cases, with access to the sealed docket entries limited to court personnel and designated parties.

[6]     The Reporters Committee is "an unincorporated nonprofit association of reporters and editors dedicated to safeguarding the First Amendment rights and freedom of information interests of the news media and public."  Intervenor's Pet. ¶ 2.  The Reporters Committee sought (1) retrospectively, to unseal applications, supporting materials, and orders concerning PR/TT devices and warrants or orders, issued pursuant to the SCA, requiring disclosure of contents or records of electronic communications, and (2) prospectively, to place all such materials on the Court's public docket, or else to unseal them after an appropriate period of time.  *Id.* ¶ 1.  Leopold and the Reporters Committee collectively are "the petitioners."

The parties' efforts to narrow the issues then progressed in three overlapping phases: (1) the unsealing and public release by the Clerk's Office of docket numbers and limited docket information for PR/TT and certain SCA matters filed during an agreed-upon range of years; (2) the unsealing and public release by the USAO of redacted PR/TT applications and orders from a sampling of such matters filed in 2012, in order to assess both the burdens of redacting and unsealing the requested records and the value of the information yielded; and (3) the extraction by the USAO of agreed-upon categories of information from ten percent of PR/TT matters filed in 2012, and the unsealing and public release of that extracted information.  Each phase is described further below.

### A.   The Court Unseals Docket Numbers and Limited Docket Information for PR/TT and Certain SCA Applications and Orders.

As summarized in a series of joint status reports, the parties agreed upon the steps required to begin identifying the PR/TT and SCA applications and orders at issue.  While declining to limit the scope of their requests for ultimate relief, the petitioners agreed to limit the unsealing immediately sought to PR/TT matters that the USAO initiated in 2012 "[f]or purposes of this stage of the litigation."  First Joint Status Report ("1st Jt. Rpt.") ¶ 2, ECF No. 19.  The USAO, in turn, agreed to "produce to petitioner a representative sampling of redacted applications for the year 2012," though the petitioners "declined to agree to a representative sampling."  *Id.* ¶ 2.  The parties requested that the Clerk's Office prepare a list of the docket numbers for PR/TT matters that the USAO initiated in 2012, and explained that the USAO would then file a motion to partially unseal the dockets for these PR/TT matters for the limited purpose of obtaining and using this list of docket numbers to match them with the relevant

internal USAO criminal investigation files. *Id.* ¶¶ 3–4.[7]  Once an actual investigation was

identified, the USAO would then determine which Assistant U.S. Attorney ("AUSA"), law

enforcement agent, and law enforcement agency had been assigned to that investigation, and

query whether a particular PR/TT matter concerned a pending, closed, or related pending

investigation. *Id.* ¶ 5.  After a determination of the status of an investigation, the USAO would

move to unseal partially any PR/TT matter that the USAO could verify related to a closed

investigation and was irrelevant to any pending investigation, for the limited purpose of

obtaining certified copies of the PR/TT application and order as well as any other pleadings filed.

*Id.* ¶ 6.  The USAO would then review such partially unsealed documents to determine whether

cause nonetheless existed to maintain the PR/TT matter under seal and, if not, what redactions

would be necessary prior to unsealing.  *Id.*  The USAO would redact personal identifying

information and the factual basis for each investigation, but disclose the statutory violation under

investigation.  *Id.*

> The USAO noted that this process
>
> could take some time, inasmuch as the identification of the broader investigation
> that is implicated by a particular pen register application may not always be evident
> from the document itself, and in some instances those agents and Assistants with
> knowledge of the relevant investigation may have since been transferred or may no
> longer be employed with the government.

*Id.* ¶ 5.  Indeed, determining whether an investigation is pending, closed, or related to a pending

investigation may itself "require consultation and coordination with various internal databases

and other jurisdictions."  *Id.*  Despite the "problem" posed in verifying the status of an

---

[7]       The Clerk's Office ascertained from review of CM/ECF dockets for sealed MC and MJ matters that the
Clerk's Office could identify which PR/TT applications had been filed by the USAO rather than by other DOJ
components only through manual review of each PR/TT matter's docket.  1st Jt. Rpt. ¶ 3.

investigation, the USAO acknowledged that most PR/TT applications filed in 2012 likely related to investigations that were closed.  Hr'g Tr. ("Sept. 2016 Tr.") at 5:20–22, 8:22 (Sept. 16, 2016), ECF No. 23.  Recognizing that "it is impossible to determine how long this process could take with respect to all [PR/TT] pleadings for 2012," the parties agreed that the USAO would initially produce a small number of redacted 2012 PR/TT applications and orders.  1st Jt. Rpt. ¶ 7; *see also* Sept. 2016 Tr. at 1–3 (reaffirming the parties' intent to proceed initially with the unsealing of three PR/TT matters from 2012).  "The exercise of locating, redacting and producing these documents," the parties said, "should provide insight . . . regarding the work entailed" and inform the scope and form of any further disclosure to follow.  1st Jt. Rpt. ¶ 7.  The parties agreed to confer once the USAO had released redacted materials from three 2012 PR/TT matters to determine how to proceed from there.  Sept. 2016 Tr. at 20:15–16, 21:1–13.

The Court agreed to the parties' request to unseal MC docket numbers for PR/TT matters that the USAO initiated in 2012.  *Id.* at 4:6–13.  To re-focus the parties on prospective relief, the Court also instructed the parties to advise whether a docketing system similar to that implemented in the U.S. District Court for the Eastern District of Virginia would provide the petitioners meaningful prospective relief in the form of limited public information about PR/TT and § 2703(d) matters.  *Id.* at 11:15–25, 12:1–25, 13:1–9, 16:22–24.[8]

---

[8]     The U.S. District Court for the Eastern District of Virginia maintains what is known as the "EC" ("electronic communications") docket, which is "a 'running list' that is publicly available from the [U.S. District Court for the Eastern District of Virginia's] clerk's office."  *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), 707 F.3d 283, 288 (4th Cir. 2013).  The EC docket "indicates all assigned case numbers, the date of assignment, the presiding judge, and whether the case is sealed" for PR/TT and SCA applications under 18 U.S.C. § 2703(d), and "lacks individual docket entries for all types of documents filed in each case and the dates of such entries."  *Id.*  The USAO has indicated that the Eastern District of Virginia's EC docket reveals to the public some information that relates to open investigations, but "doesn't seem to put anybody in danger," and that a similar docketing system's implementation in this jurisdiction would be "acceptable."  Hr'g Tr. ("Dec. 2016 Tr.") at 10:8 (Dec. 19, 2016), ECF No. 31.

Shortly thereafter, the Court provided Notice to the parties of the unsealing of a 53-page

list of 235 matter numbers, most of which were MC numbers, for all PR/TT matters that the

USAO initiated in 2012, along with limited docket information (*i.e.,* the matter caption, dates of

the application's filing and entry onto the docket, the application's caption, and the application's

CM/ECF case type).  *See* Order and Notice to the Parties, Attach. A, List of Misc. Case Numbers

for PR/TT Applications and Orders Filed in 2012 by USAO ("2012 PR/TT List"), ECF No. 22-

1.[9]  With the unsealing and release of this PR/TT matter docket information, the USAO was

directed to undertake the proposed sampling process to which the parties had agreed.  *See* Order

and Notice to the Parties, ECF No. 22.[10]

The parties subsequently jointly proposed, as an "initial step in the process for addressing

sealed original [PR/TT] matters filed by the USAO in other years," that the Clerk's Office

compile lists of all PR/TT matters that the USAO filed in the years 2008 through 2011, and 2013

through 2016.  Third Joint Status Report ("3rd Jt. Rpt.") ¶ 9, ECF No. 27; *see also* Fourth Joint

Status Report ("4th Jt. Rpt.") ¶ 3, ECF No. 28 (petitioners agreeing to limit earliest year for

PR/TT applications and orders to 2008); Hr'g Tr. ("Dec. 2016 Tr.") at 10:10–15 (Dec. 19, 2016),

ECF No. 31 (USAO withdrawing objection to petitioners' request for PR/TT matters lists

through 2016).  In separate Notices filed in February and April, 2017, the Court granted this

request and provided the parties unsealed matter numbers for USAO-initiated PR/TT matters and

orders in the years 2008 through 2011 and 2013 through 2016, along with limited docket

---

[9]     The 2012 PR/TT List refers for each matter to a date "Entered," *see generally* Order and Notice, which date
is when the PR/TT application was entered on the docket.

[10]     Notably, the 2012 PR/TT List revealed that PR/TT applications filed in 2012 had been assigned
inconsistent CM/ECF case types: some applications had been docketed using the "MC" case type, others using the
"Complaint" ("CMP") case type, and others using the "Order" case type.  *See generally* 2012 PR/TT Lists.  The
Clerk's Office overcame this lack of administrative uniformity by searching the local CM/ECF dockets for the term
"Pen Register" and the relevant statutory authority in the application caption.

information (*i.e.*, the matter caption, dates of the application's filing and entry onto the docket, the application's caption, and the application's CM/ECF case type). *See* Order & Notice to the Parties, ECF No. 32; *id.*, Attachs. A–E, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2011, 2013–2016 by USAO, ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-5; Order and Notice to the Parties, ECF No. 37; *id.*, Attachs. A–C, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2008–2010 by USAO ECF Nos. 37-1, 37-2, 37-3 (collectively, with 2012 PR/TT List, "PR/TT Lists"). These lists identified the USAO as having initiated the following numbers of PR/TT matters in each year: 329 in 2008; 244 in 2009; 231 in 2010; 284 in 2011; 310 in 2013; 209 in 2014; 217 in 2015; and 189 in 2016. *See* PR/TT Lists. Thus, lists of USAO-initiated PR/TT matters, with limited associated docket information, were released for nine years, 2008 through 2016, and reflected a total of 2,248 USAO-initiated PR/TT matters, not counting any extensions. *Id.*

The parties also requested access, similar to that for PR/TT matters, to lists of sealed matters regarding USAO applications for disclosure of electronic communications records, pursuant to 18 U.S.C. § 2703(d), for the years 2008 through 2016. Sixth Joint Status Report ("6[th] Jt. Rpt.") ¶ 20, ECF No. 36. This request was denied, "due to the myriad challenges, and resultant burden, of compiling such a list." Order & Notice to the Parties at 2, ECF No. 40. First, due to "the lack of uniform captions or textual form used for these records," which led to inconsistent docketing "on the [CM/ECF] system for these records," accurate identification of § 2703(d) matters was challenging and time-consuming. *Id.* In fact, the effort to compile a list of over eight hundred § 2703(d) matters for the year 2016 had taken the Clerk's Office over one month. *Id.* Second, determining whether the USAO or another entity had filed a § 2703(d) application would require review of individual dockets, "a time-consuming task given the

number of [matters] potentially subject to such review." *Id.* Third, determining whether §

2703(d) materials implicated grand jury subpoenas, to which obligations of secrecy attach under

Rule 6(e) of the Federal Rules of Criminal Procedure, likewise would require time-consuming

review of individual dockets. *Id.* at 3. Fourth, "these and other challenges may be exacerbated

for earlier years based upon the Clerk's Office staff experience compiling the previously issued

PR/TT lists." *Id.*

In response to the Court's practical concerns over compiling lists of § 2703(d) matters,

the parties proposed, through a joint status report, that the Clerk's Office conduct targeted

searches that "would alleviate any need . . . to manually open and review dockets." Seventh

Joint Status Report (7th Jt. Rpt.") ¶ 15, ECF No. 41. The parties specifically requested that the

Clerk's Office search for matters (1) corresponding with CM/ECF's § 2703(d) designated event

type, regardless of whether accompanied by an application for delayed notice pursuant to 18

U.S.C. § 2705(b) or filed by the USAO or a different DOJ component, and (2) responsive to a set

of five defined search terms likely to capture SCA warrant applications, pursuant to 18 U.S.C. §

2703(a) and (b) (there being no designated CM/ECF case or event type for SCA warrant

materials). *Id.* ¶¶ 13–14.[11] The parties acknowledged that any lists generated by such searches

likely "would be under-inclusive," but asserted "that use of these search terms would be

substantially effective and significantly reduce [the] burden on the Clerk's Office." *Id.* ¶ 15.

The parties "respectfully request[ed] as an initial matter that the Clerk's Office run the searches

described above to generate a total number of matters for each [type] of materials," so as to

---

[11]     The five search terms that the parties believed "would be highly likely to capture SCA Search Warrant
Materials" are: "a. *INFORMATION ASSOCIATED WITH*; b. *EMAIL ACCOUNT*; c. *E-MAIL
ACCOUNT*; d. *USER ID*; e. *COMPUTER SERVERS*." 7th Jt. Rpt. ¶ 14.

"allow the parties to understand the volume of Section 2703(d) and SCA Search Warrant matters at issue." *Id.* ¶ 16.

The Court provided the parties with the total number of matters responsive to the above-described searches, with the significant caveats that such numbers could be under-inclusive by not capturing all SCA matters initiated by the USAO and other DOJ components, and may also reflect double-counting of § 2703(d) matters "since applications for § 2703(d) orders filed in more than one year in the same Miscellaneous matter will result in the same matter being counted in more than one year." *See* Notice to the Parties ("Section 2703(d) Notice") at 2, ECF No. 43; Notice to the Parties ("SCA Warrant Notice") at 2, ECF No. 45. Specifically, the number of § 2703(d) matters responsive to the searches and filed in the following years were: 2008 – 80; 2009 – 55; 2010 – 136; 2011 – 90; 2012 – 64; 2013 – 160; 2014 – 334; 2015 – 581; 2016 – 1,136. Section 2703(d) Notice.[12] The number of SCA warrant matters responsive to the parties' suggested searches and filed in the following years were: 2008 – 0; 2009 – 68; 2010 – 121; 2011 – 152; 2012 – 164; 2013 – 131; 2014 – 107; 2015 – 252; 2016 – 271. SCA Warrant Notice. Thus, the total approximate number, over the relevant nine year period, of § 2703(d) matters was 2,636, and SCA warrant materials was 1,266.

**B.      The USAO Produces Redacted Materials From Four PR/TT Matters Using Sampling Process.**

Following the Court's unsealing and release of the 2012 PR/TT List, the USAO reviewed the list to match each docket number with the USAO's internal investigative file, using the target

---

[12]      The Clerk's Office calculated these numbers by tabulating, for each year, "the total number of Miscellaneous matters connected to three event [types] in CM/ECF, namely (1) Application for Order Pursuant to 18 U.S.C. § 2703(d); (2) Application for an Order Pursuant to 18 U.S.C. § 2703(c)(1)(B) & 2703(d); and (3) Application for Historical Cell Site Information for a Telephone Number." Section 2703(d) Notice.

telephone or account number, and then identified the AUSA assigned to the matter, a process that took several days.  Gov't Status Report ¶ 2, ECF No. 24.  Upon completing that review, the USAO selected a representative sampling of ten PR/TT matters assigned to AUSAs still employed by the USAO, and contacted each AUSA to determine whether, in the AUSA's view, a PR/TT matter could be unsealed, in part or whole.  *Id.*  In determining whether a PR/TT matter could be unsealed, "the AUSAs first retrieved and reviewed paper and/or electronic files, and, in some instances, consulted with the law enforcement agents and/or their supervisors."  *Id.*  The USAO ultimately determined that four of the ten sample PR/TT matters could be unsealed with redactions, but lacked sufficient information to make an informed determination on unsealing as to the other six matters.  *Id.*  The USAO then moved to unseal in part those four matters for the limited purpose of obtaining certified copies of all documents filed in each docket, which motions the Court granted.  *Id.* ¶ 3; Minute Order, dated October 31, 2016 (granting USAO motions to unseal in part 12-MC-12, 12-MC-129, 12-MC-227, and 12-MC-397 for limited purpose).  The USAO received certified copies of the documents filed in each of the four PR/TT matter dockets soon thereafter, and provided the documents to each matter's assigned AUSA for review and to propose redactions.  Gov't Status Report ¶ 4.

The USAO then moved to unseal in part the four PR/TT matters, *see* Second Joint Status Report ¶ 2, ECF No 25, with uniform redaction of personally identifiable information, such as names, addresses, and telephone or account numbers, as well as details about the underlying criminal investigations, *see* 3rd Jt. Rpt. ¶ 3; *see* Minute Order, dated Dec. 2, 2016 (directing USAO to move to unseal the four PR/TT matters under review and propose any needed redactions).  The Court granted these motions and placed redacted copies of the documents for the four sample PR/TT matters on the public docket in this matter.  *See* Notice to the Parties,

Attach. A, Unsealed & Redacted Filings in Matter No. 12-MC-12, ECF No. 26-1; *id.*, Attach. B, Unsealed & Redacted Filings in Matter No. 12-MC-129, ECF No. 26-2; *id.*, Attach. C, Unsealed & Redacted Filings in Matter No. 12-MC-227, ECF No. 26-3; *id.*, Attach. D, Unsealed & Redacted Filings in Matter No. 12-MC-397, ECF No. 26-4 (collectively "Sample PR/TT Materials").  These redacted filings amount to 127 pages overall, and covered both original PR/TT applications and extension applications.  *See* Sample PR/TT Materials.

The redacted PR/TT materials, stripped of identifying information about the individual or underlying criminal activity under investigation, revealed that the USAO's PR/TT applications largely used the same language to describe (1) the service provider from whom the USAO sought to compel production, (2) the scope of legal authority sought, (3) the need for such authority, (4) the steps the USAO would take in exercising that authority, including technical assistance to be required of the service provider, and (5) a request for sealing.  *See generally id.* The parties expressed disagreement as to the significance of the information that the sample PR/TT matter materials revealed.  The USAO described the materials as "substantially similar and reveal[ing] largely boilerplate information," and argued that any additional information that unsealing all of the remaining 2012 PR/TT matters might yield would have little value to the public relative to the significant "expendi[ture of] judicial and prosecutorial resources" that such broad unsealing would entail.  3rd Jt. Rpt. ¶¶ 4, 7.  Consequently, the USAO proposed instead to undertake the same sampling process used for the ten PR/TT matters in 2012 for a representative sample of PR/TT applications in other years.  *Id.* ¶ 7.

The petitioners, meanwhile, continued to insist that all PR/TT materials in closed investigations filed by the USAO be unsealed, subject to categorical redaction of personal or

criminal investigation identifying information, "on a mutually agreeable schedule." *Id.* ¶ 8.[13]
The petitioners described the unsealed sample materials as "substantively of interest to the[m],
and the press and public more generally," given that the materials "reveal[ed], among a number
of other things, the carriers involved in each matter, as well as the fact that in two of the four
matters the government repeatedly sought extensions of the court's authorization to use a
[PR/TT] device." *Id.* ¶ 5.

### C.      The USAO Extracts Categories of Information from Sealed PR/TT Matters.

At a status conference, in December 2016, to address the apparent impasse between the
parties regarding the scope of unsealing records on the 2012 PR/TT List, the USAO described
several practical challenges associated with the unsealing and redaction process used with
respect to the four sample PR/TT matters.  Dec. 2016 Tr. at 11:15–25, 12:1–5.  The USAO
explained that roughly half of the AUSAs who had filed particular PR/TT applications in 2012
no longer worked at the USAO, and that those AUSAs still employed had difficulty matching
PR/TT applications with particular docket numbers, given that the USAO's internal tracking
system organizes files using internal reference numbers different from the docket number
assigned by the Clerk's Office to a particular matter.  *Id.* at 11:15–24. The USAO represented
that it was "rethinking" how it maintains its own files to facilitate more easily the matching of
Miscellaneous matter numbers to the internal USAO investigative file, but that "[w]e're not there
yet." *Id.* at 12:3, 11.[14]  Further, the process of partially unsealing a PR/TT matter to identify its

---

[13]      The petitioners declined to "concede that the[se] categorical redactions are warranted or permissible in any
individual matter," but agreed not to "challenge the propriety of redactions made by the government" so as "to
facilitate the prompt unsealing of all of the electronic surveillance materials at issue that the government agrees
should be unsealed." 3rd Jt. Rpt. ¶ 8.
[14]      As described *infra* Part II.D, this issue has now been addressed by the USAO's adoption of the use of
templates that include the internal USAO reference number on sealed PR/TT and SCA-related applications.

initiating AUSA "was just too time consuming," *id.* at 12:4, particularly since the USAO was required to obtain physical copies of docket materials, as the USAO lacked electronic access to such sealed materials, *id.* at 33:1–21, and the redaction process was "painstaking" to ensure protection of all personally identifiable information and details about an underlying criminal investigation, *id.* at 20:14–24.[15]

In response to these practical concerns about the "painstaking" unsealing and redaction process the USAO had used with respect to the four sample 2012 PR/TT matters, the Court suggested that the USAO use an "extract[ion]" process as a "simple[r] . . . alternative" going forward. *Id.* Under this approach, the parties would identify particular categories of information contained in PR/TT materials that the USAO would extract and provide to the petitioners. *Id.* Extracting information from PR/TT materials not only would consume less of the USAO's time than an unsealing and redaction process, but would minimize the possibility of inadvertent disclosure of information properly kept under seal, such as personally identifying information. *Id.* at 24:1–7. The parties agreed in principle to consider and confer about such an extraction process. *Id.* at 37:23–25, 38:1–7. In response to the USAO's concern about accessing PR/TT materials electronically, the Court agreed to allow the USAO to access such sealed materials electronically. *Id.* at 33:22–25, 34:1–11. In addition, the Court proposed that the petitioners limit the scope of their request for unsealing and disclosure to materials that the USAO had filed electronically through CM/ECF, and urged the parties to confer as to the scope of potential prospective relief. *Id.* at 33:22–25, 34:1–17, 35:15–18, 21–22, 25, 36:1.

_____

[15]     As to the latter concern, the Court suggested that the USAO adopt templates for PR/TT applications and proposed orders that located all personally identifying information in uniform paragraphs within, rather than scattered throughout, the documents. Dec. 2016 Tr. at 16:15–23. Such templates have recently been adopted by the USAO. *See infra* Part II.D.

The parties soon advised that they would use the Court's proposed extraction method going forward as an alternative to the unsealing and redaction process the USAO had used with respect to the four sample 2012 PR/TT matters.  4th Jt. Rpt. ¶¶ 4–7.  In addition, the parties reached three agreements regarding the scope of the petitioners' requests.  First, the petitioners "agreed to limit their request for the unsealing of [PR/TT] matters to those matters filed by the USAO" from 2008 to the present, as earlier-filed PR/TT matters are not "electronically stored and retrievable."  *Id.* ¶ 3.[16]  Second, the USAO agreed to the unsealing or partial unsealing of two narrow categories of PR/TT materials—(1) PR/TT applications, along with related filings, that had been denied by judicial order, and (2) any substantive judicial opinions or orders entered in connection with a PR/TT application.  *Id.* ¶ 4.  Third, the parties "agreed, in principle," that the Court should create a public docketing system, modeled largely on the Eastern District of Virginia's "EC" docket, that would provide limited public information about sealed matters, including PR/TT matters.  *Id.* ¶ 8.  The USAO expressed "willing[ness] to engage in . . . discussions to help facilitate implementation of this type of system," and observed "that any change to the manner in which sealed matters are docketed would be greatly aided if the government were permitted to file sealed matters electronically," rather than in paper form, as then-existing policy required.  *Id.*

The parties did not agree, however, on two issues: first, they failed to agree on the categories of information the USAO would extract, but pledged to "continue to discuss and attempt to reach an agreement on what categories of information can be extracted," and, second, they disagreed on whether the USAO would extract information from a ten percent sample or

---

[16]    In a subsequent joint status report, the parties clarified that "the present" referred to the year 2016.  *See* Fifth Joint Status Report (5th Jt. Rpt.") ¶ 3, ECF No. 30.

18

from all PR/TT matters for each year. *Id.* ¶¶ 5, 6.

The parties soon reached a general agreement that the USAO would extract fifteen specific categories of information from some or all of the sealed PR/TT dockets: (1) Case Number, (2) Docket Number, (3) Date Executed, (4) Date Docketed, (5) Type (original or extension application), (6) Order Accompanied By Opinion (yes, no, or not applicable), (7) Number of Pages, (8) Signed By (AUSA or Magistrate Judge name), (9) Device Type, (10) Statutory Violation(s), (11) Agency, (12) Service Provider, (13) Number of Target Email Addresses / Phone Numbers / Addresses, Etc., (14) Other Statutory Authority, And If So, What (e.g., Section 2703(d)), and (15) Other Requests, And If So, For What (e.g., Cell Site Data) (collectively "extracted information"). Fifth Joint Status Report ("5[th] Jt. Rpt.") ¶ 5, p.6 tbl., ECF No. 30. Notwithstanding this broad agreement, however, the parties continued to disagree on three points: whether (1) the USAO would provide names of AUSAs who had initiated PR/TT applications; (2) the USAO would redact the statutory violation at issue where such information is deemed "particularly sensitive," with reservation of the petitioners' "right to challenge the redaction of any information in the chart [that the USAO] provided;" and (3) the USAO would extract information from ten percent or all of the sealed PR/TT matters. *Id.* ¶¶ 5–8.

The parties' three disagreements were resolved through Court rulings the following week. Specifically, the Court ruled that the USAO was not required to: (1) extract the names of AUSAs who had initiated particular PR/TT applications, Hr'g Tr. ("Feb. 2017 Tr.") at 21:24–25, 28:7–20, 42:18 (Feb. 17, 2017), ECF No. 34; (2) reveal the underlying statutory violations being investigated, when such information was sensitive and could potentially disclose or affect an ongoing investigation, subject to the  petitioners' right to challenge any such withholding as to particular matters, *id.* at 22:13 – 25, 23:9–13; or (3) extract information from all sealed PR/TT

matters—rather, the USAO would be required to extract information from only ten percent of matters, at least initially, although the petitioners could later seek additional extraction should the extraction process turn out to be less burdensome than the USAO anticipated, *id.* at 45:14–18.

The USAO completed the extraction process and provided the petitioners an extraction chart for ten percent of PR/TT matters filed by the USAO in 2012, for a total of 24 PR/TT matters. 6th Jt. Rpt., Ex. A, Extraction Chart, ECF No. 36. The USAO asserted that completing the extraction process for the 2012 PR/TT matters "took approximately 8.5 hours," *id.* ¶ 10, but nonetheless expressed willingness to perform the same extraction process for a ten percent sample of the remaining eight years of PR/TT matters, *id.* ¶ 10.[17] Despite the USAO's proposal to proceed with the extraction process for other years, the parties reported that they "ha[d] reached an impasse," as to whether USAO should extract information from ten percent or all of the sealed PR/TT matters for 2012 and the remaining years. *Id.* ¶¶ 15, 19.

Due to the petitioners' objection to moving forward with the extraction process from only a sample of ten percent from each list, the cooperative review and release of additional information from the sealed records at issue came to a screeching halt. The parties instead requested a briefing schedule to address "whether the common law and/or U.S. Constitution provide the public and, thus, petitioners, a right of access to the records from [PR/TT] matters that their respective Petitions seek to unseal." *Id.* ¶ 19.[18]

---

[17]     A Reporters Committee fellow asserted that she had completed the extraction process for the four 2012 matters previously unsealed in 47 minutes. *See* 6th Jt. Rpt., Ex. B, Decl. of Selina MacLaren, Legal Fellow, Reporters Comm. ¶¶ 2–4, ECF No. 36.

[18]     The first briefing schedule, s*ee* Minute Order, dated April 20, 2017, required modification since the petitioners initially addressed only the relief sought as to PR/TT materials, even though the petitioners clarified that they had not abandoned their claims for relief as to SCA applications and orders. Pet'rs' Mem. Supp. Pet. at 1 n.1, ECF No. 38. The Court directed the parties to confer regarding SCA materials, revised the briefing schedule to accommodate such conference, and directed the petitioners to address their SCA claims along with their PR/TT claims and "specify the precise relief sought." *See* Minute Order, dated May 22, 2017. After providing the parties

Briefing on these legal issues is now complete, and the petitioners' requests are ripe for review.

## II.    DISCUSSION

"The right of public access is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of an independent Judicial Branch." *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663 (D.C. Cir. 2017).  "[D]istrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet.*"  *In re Oliver,* 333 U.S. 257, 268–69 (1948) (footnotes omitted).  James Madison warned that "[a] popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. . . . A people who mean to be their own Governors, must arm themselves with the power which knowledge gives."  *Metlife, Inc.*, 865 F.3d at 665 (quoting Letter from James Madison to W. T. Barry, Aug. 4, 1822, *in* 9 THE WRITINGS OF JAMES MADISON 103 (Gaillard Hunt ed. 1910)).

"The public right of access [thus] is undisputed in both its importance and its historical pedigree."  *United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997).  "Public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness."  *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014) (quoting *Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988)).  Unlike"[t]he political branches of government," which "claim legitimacy by election, [a] judge[']s" legitimacy derives solely "by

---

the SCA matter lists discussed above, the Court set a revised briefing schedule.  Minute Order, dated July 28, 2017.

reason." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires rigorous justification." *Id.* "Although the right [of public access] is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests." *Metlife, Inc.*, 865 F.3d at 663.

"The right of public access" to judicial proceedings and records "springs from [both] the First Amendment and the common-law tradition" that such proceedings and records "are presumptively open to public scrutiny." *Doe*, 749 F.3d at 265; *see In re U.S. for an Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena # GJ2014031422765*, 41 F. Supp. 3d 1, 7 (D.D.C. 2014) ("The First Amendment or the common law provides the legal basis for the public's right of access to court records, depending on the particular court records at issue."). "[T]he right of public access, whether arising under the First Amendment or the common law, 'may be abrogated only in unusual circumstances.'" *Doe*, 749 F.3d at 266 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 178, 182 (4th Cir. 1988)); *cf. EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) ("[T]he starting point in considering a motion to seal court records is a strong presumption in favor of public access to judicial proceedings." (internal quotation marks omitted)). Different analytical frameworks apply to claimed rights of access established by the First Amendment and the common law, respectively. Those legal frameworks are discussed first, followed by a brief examination of the statutes authorizing the government surveillance applications and orders at issue, and then an analysis of the petitioners' requested relief, both prospectively and retrospectively.

A.    **Legal Framework**

### 1.      First Amendment Right of Access to Judicial Records

Courts utilize a two-step framework to assess the validity of a claimed First Amendment right of access.  *See Press–Enter. Co. v. Superior Court of Cal. for Riverside Cty.* ("*Press-Enter. II*"), 478 U.S. 1, 8–9 (1986).  The inquiry's first step, sometimes called the "experience and logic" test, is to determine whether a qualified right of access exists.  *Id.* at 9.  "The public possesses a qualified First Amendment right of access to judicial proceedings where (i) there is an 'unbroken, uncontradicted history' of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding."  *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)).

The inquiry's second step is to determine whether an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest" nonetheless trumps any qualified right of access that attaches.  *Press-Enter. II*, 478 U.S. at 9 (quoting *Press–Enter. Co. v. Superior Court of Cal.* ("*Press–Enter. I*"), 464 U.S. 501, 510 (1984)).  "Where there is a First Amendment right of access to a judicial proceeding, the 'presumption of access can be overridden only if (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest.'"  *Brice*, 649 F.3d at 796 (quoting *Wash. Post v. Robinson*, 935 F.2d 282, 290 (D.C. Cir. 1991)).

The Supreme Court has applied the First Amendment right of access not only to criminal trials, *see Richmond Newspapers, Inc.*, 448 U.S. at 573, but also to "judicial proceedings that are part of the criminal trial process," *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003); *see Press-Enter. I*, 464 U.S. at 505 (criminal voir dire); *Press-Enter.*

*II*, 478 U.S. at 13 (criminal preliminary hearings, as "conducted in California").  "[M]ost circuit courts," moreover, "have recognized that the First Amendment right of access extends to civil trials and some civil filings."  *ACLU v. Holder*, 673 F.3d 245, 252 (4th Cir. 2011) (collecting decisions).

### 2.  Common Law Right of Access to Judicial Records

The common law also provides a right of access "to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted).  Determining "whether a document must be disclosed pursuant to the common law right of access involves a two-step inquiry."  *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996).  "First, the court must decide whether the document sought is a 'public record.'"  *Id.* (internal quotation mark omitted). Second, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure."  *Id.* (internal quotation mark omitted).

Courts weigh six "generalized" factors, enumerated in *United States v. Hubbard*, and any relevant "particularized" factors in determining "the precise weight to be assigned . . . to the always strong presumption in favor of public access to judicial proceedings."  650 F.2d 293, 317 (D.C. Cir. 1980).  The *Hubbard* test is the D.C. Circuit's "lodestar because it ensures that we fully account for the various public and private interests at stake."  *Metlife, Inc.*, 865 F.3d at 666 (collecting citations).  The six generalized *Hubbard* factors are "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial

24

proceedings." *Id.* at 665 (quoting *Nat'l Children's Ctr., Inc.*, 98 F.3d at 1409).

*Hubbard* makes clear, however, that these generalized interests do not exhaust the considerations that a court weighs in determining whether to unseal documents, and that a court also must consider such particularized interests as specific contexts make relevant, where the generalized factors do not adequately account for such particularized interests. *See Hubbard*, 650 F.2d at 323 ("To be weighed against the particularized reasons which may justify public access are the particularized privacy or other interests. . . defendants may assert."), 324 (recognizing that a court may, in proper circumstances, determine disclosure's propriety "on the basis of the 'particularized' factors" even where "analysis of the generalized interests at stake" suggest a different outcome).[19]   A court's ultimate task, in applying the *Hubbard* factors, is to "consider[] the relevant facts and circumstances of the particular case, . . . weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts," and reach a "conclu[sion]" as to "[w]hat justice so requires.'" *Metlife, Inc.*, 865 F.3d at 665–66 (quoting *In re Nat'l Broad. Co.*, 653 F.2d 609, 613 (D.C. Cir. 1981)).

### B.      The Surveillance Materials At Issue

The government's gathering of evidence, both real-time and historical, in criminal investigations is highly regulated by statutes, codified in Title 18 of the United States Code, and in rules set out in the Federal Rules of Criminal Procedure.  *See, e.g.*, 18 U.S.C. §§ 2510 *et seq.* (governing real-time interception of wire, oral, or electronic communications); 18 U.S.C. §

---

[19]      Although the particularized interests identified by the *Hubbard* panel as relevant to that case were interests in personal privacy, *Hubbard* made clear that privacy interests are not the only type of particularized interest a court may consider in evaluating a motion to unseal.  650 F.2d at 323 ("To be weighed against the particularized reasons which may justify public access are the particularized privacy *or other interests* . . . defendants may assert." (emphasis added)).

2518(11), (12) (governing roving wiretaps); 18 U.S.C. § 2703(c) (governing compelled disclosure of basic subscriber information from electronic communications service and remote computing providers); 18 U.S.C. § 3103a (permitting covert searches if notice will cause an "adverse result"); 18 U.S.C. § 3117 (governing mobile tracking devices); FED. R. CRIM. P. 41 (governing search and seizure warrants).  While the petitioners' focus in this case is concededly "broad," June 2016 Tr. at 5:24, they nonetheless seek the unsealing of records related to only a subset of law enforcement evidence collection efforts, as authorized by the Pen Register Act ("PRA") and parts of the SCA. These two statutes are reviewed below, with particular attention to any provisions reflecting any presumption regarding initial or eventual public access.

### 1.     The Pen Register Act—PR/TT Materials

The PRA authorizes "[a]n attorney for the Government" to apply "for an order or an extension of an order . . . authorizing or approving the installation and use of a pen register or a trap and trace device under this chapter, in writing under oath or equivalent affirmation, to a court of competent jurisdiction."  18 U.S.C. § 3122(a)(1).  PR/TT devices are devices or processes that record outgoing and incoming signals from an instrument or facility that transmits or receives an "electronic communication," and can be used to identify the source or recipient of that communication, "albeit not the contents of that communication." *In re U.S. for an Order Authorizing the Installation & Use of A Pen Register & A Trap & Trace Device on E-Mail Account*, 416 F. Supp. 2d 13, 15–16 (D.D.C. 2006) (Hogan, C.J.) (citing definitions in 18 U.S.C. § 3127(3), (4), and concluding that the PRA "authorize[s] the Government to use pen registers and trap and trace devices on e-mail accounts during the course of criminal investigations"); *see also Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 527 (D.C. Cir. 2016) ("A pen register is a

device installed on a phone line to enable recording the phone numbers dialed on that line.").[20]

The PRA provides explicit instructions regarding the requisite content of applications seeking, and orders authorizing, the use of PR/TT devices.  Each application must include "(1) the identity of the attorney for the Government or the State law enforcement or investigative officer making the application and the identity of the law enforcement agency conducting the investigation; and (2) a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency."  *Id.* § 3122(b). The order authorizing the use of the PR/TT device must be entered "*ex parte*" based on a judicial finding "that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation."  *Id.* § 3123(a)(1).

A PR/TT order "shall specify" certain information about the target of this form of real-time surveillance, including: "the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility" on which the PR/TT device is used; "the identity, if known, of the person who is the subject of the criminal investigation;" "the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility" on which the PR/TT device is used; and "a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates."  *Id.* § 3123(b)(1).  PR/TT orders "shall authorize" the installation

---

[20]     A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication."  18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication."  *Id.* § 3127(4).

of a PR/TT device for no longer than 60 days, though extensions may be granted.  *Id.* § 3123(c).

Notably, such orders also "shall direct that . . . (1) the order be sealed until otherwise ordered by the court; and (2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court."  *Id.* § 3123(d).  The D.C. Circuit has pointed out that the PRA "provides for sealing [only] of a pen register order itself, not sealing of any and all information the order may contain even if appearing in other documents."  *Labow*, 831 F.3d at 528 (concluding that a pen register order was "shielded" from disclosure, under the Freedom of Information Act ("FOIA"), as specifically exempt by operation of the PRA, but not addressing "the extent [to which] the [PRA] arguably authorizes withholding documents other than a pen register order").

### 2. The Stored Communications Act—SCA Warrant and Section 2703(d) Materials

The SCA was enacted in 1986 as Title II of the Electronic Communications Privacy Act ("ECPA"), Pub. L. No. 99-508, 100 Stat. 1848 (1986), and regulates, *inter alia*, the government's access to stored wire and electronic communications.  The SCA's § 2703 "permits the government, in specified circumstances, to compel service providers to disclose records or information pertaining to their customers as well as the contents of their customers' stored electronic communications."  *In re Search of Info. Associated with [redacted]@gmail.com That is Stored at Premises Controlled by Google, Inc.* ("*Google*"), No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *6 (D.D.C. July 31, 2017) (Howell, C. J.).  "This provision's framework provides a sliding scale of protections, such that the legal mechanism law enforcement utilizes

and showing required depends on the kind of information sought."  *Id.*

Particularly relevant here, the SCA authorizes the government to require electronic communication service and remote computing service providers to disclose "the contents of a wire or electronic communication," without notice to the subscriber, pursuant to a warrant "issued using the procedures described in the Federal Rules of Criminal Procedure."  18 U.S.C. §§ 2703(a), (b)(1)(A).  In addition to such SCA warrants, the SCA also authorizes the government to compel disclosure under § 2703(d) of records pertaining to the subscriber, beyond the basic information set out in 2703(c)(1), to include such records as "logs maintained by a network server."  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It* ("*User's Guide*"), 72 GEO. WASH. L. REV. 1208, 1219 (2004).[21]  A § 2703(d) order may issue "only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).[22]

Unlike the PRA, the SCA contains no provision requiring the sealing of SCA warrants or

---

[21]     Section 2703(d) has been interpreted to allow the government to obtain historical cell site data, *see, e.g., In re U.S. for an Order Authorizing Monitoring of Geolocation & Cell Site Data for a Sprint Spectrum Cell Phone No.*, No. 06-mc-0186, 2006 WL 6217584, at *2 n.3 (D.D.C. Aug. 25, 2006) (Hogan, C. J.);  *In re U.S. for an Order Authorizing the Installation and Use of a Pen Register and/or Trap and Trace for Mobile Identification Number (585) 111–1111 and the Disclosure of Subscriber and Activity Information under 18 U.S.C. § 2703*, 415 F. Supp. 2d 211, 214 (W.D.N.Y. 2006), but pending before the Supreme Court is the issue of "[w]hether the warrantless seizure and search of historical cell phone records revealing the location and movements of a cell phone user over the course of 127 days," pursuant to § 2703(d), "is permitted by the Fourth Amendment," *Carpenter v. United States*, 2017 WL 2407484 (U.S. June 5, 2017) (No. 16-402).

[22]     Although § 2703(d), by its terms, authorizes the government to obtain the contents of electronic communications stored for over six months based on this standard, as this Court has explained, "the Sixth Circuit has held that the Fourth Amendment applies to the contents of emails and thus that a warrant, issued upon probable cause, is required to search or seize those communications." *Google*, 2017 WL 3445634, at *7 n.13 (citing *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010)).  Since 2013, the policy of the Department of Justice has been to use SCA warrants exclusively when compelling the disclosure of the contents of electronic communications.  *Id.* (citing H.R. Rep. No. 114-528, at 9 (2016)).

29

§ 2703(d) orders and applications in support thereof.  Nevertheless, the SCA explicitly relieves the government of any obligation to notify a subscriber or customer about the compelled disclosure pursuant to an SCA warrant, *see* 18 U.S.C. § 2703(b)(1)(A), and authorizes delayed notification to the subscriber of compelled disclosure pursuant to a § 2703(d) order, *see id*. § 2705(a).  In addition, the SCA authorizes the government to seek an order requiring the provider not to disclose to the subscriber, "for such period as the court deems appropriate," that the government had compelled disclosure of records, upon a showing that an enumerated adverse result may occur.  *Id.* § 2705(b).

C.    **Analysis**

The petitioners now seek, as prospective relief, publication, for all PR/TT and SCA warrant and § 2703(d) applications, of "case number[s] and certain associated docket information, including the case name, date of application, and magistrate judge to whom the matter is assigned," as well as periodic unsealing of dockets that no longer require secrecy. Pet'rs' Suppl. Mem. Supp. Pet. ("Pet'rs' Mem.") at 33–35, 39–40, 41–42, ECF No. 47.  As to retrospective relief, the petitioners seek extracted information from all sealed PR/TT matters that the USAO initiated since 2008, rather than only from a ten percent sample of such matters, plus "case numbers and certain associated docket information for [§ 2703(d)] matters filed from 2008 to the present."  *Id.* at 36, 40.  The petitioners do not seek extracted information from materials related to § 2703(d) applications, nor do the petitioners seek any retrospective relief as to SCA warrants.  *Id.* at 40, 42–43.[23]  They contend that both the First Amendment and the common law

_____

[23]    The petitioners acknowledge "that because Section 2703(d) Materials currently under seal may include grand jury-related information subject to Rule 6, broader unsealing (or extraction of information from sealed filings) for Section 2703(d) matters would require document-by-document review and pose other practical challenges." Pet'rs' Mem. at 40.  The petitioners also acknowledge that the lack of any reliable method to identify SCA warrant

grant a right of access to these surveillance materials.

As explained below, the petitioners' First Amendment claim fails, however, because the prerequisite of showing a longstanding tradition of public access simply does not exist as to the PR/TT and SCA materials at issue. Nevertheless, the petitioners' common law claim succeeds, albeit not to the full extent requested by the petitioners, as the materials at issue indisputably are judicial records, and the *Hubbard* factors, which govern decisions on whether to maintain documents under seal in the D.C. Circuit weigh in disclosure's favor, in light of the changes recently adopted by the USAO and Clerk's Office in the processing of such materials.

### 1.      First Amendment

To satisfy the First Amendment right of access test's first prong requires a court to conclude that "an 'unbroken, uncontradicted history' of openness" exists, *Brice*, 649 F.3d at 795, with respect to SCA warrant, § 2703(d), and PR/TT materials in "particular," *Press-Enter. II*, 478 U.S. at 9. Historical practice, as well as the PRA and SCA's text and statutory context, show that no such tradition of openness exists with respect to the sealed materials the petitioners seek to unseal and disclose. Nor can the petitioners rely on search warrants' judicially-recognized history of openness, as none of the materials to which the petitioners seek access— not even SCA warrants—are analogous to traditional search warrants issued under Rule 41 of the Federal Rules of Criminal Procedure. For these reasons, the petitioners cannot satisfy the "experience and logic" test's prong, and so cannot prevail on their First Amendment right of access claim.

---

materials currently under seal within the CM/ECF system would cause any unsealing or extraction of such materials to yield "under-inclusive information" that will not "provide the public meaningful insight into government electronic surveillance practices." *Id.* at 41–42.

SCA materials historically have not been publically available.  The petitioners do not dispute this fact, instead acknowledging that such materials "routinely" are "maintained under seal," Pet'rs' Mem. at 1, and that SCA warrants and § 2703(d) materials "are frequently sealed and kept under seal indefinitely," depriving "the public [of] information as to the number of SCA search warrants and Section 2703(d) orders issued by district courts in any given time period." *Id*. at 4.  The petitioners also concede that the "unsealing" of PR/TT orders and related materials "is in practice uncommon, and [that] judicial records regarding PR/TT devices, including basic docket information, are typically shielded from public scrutiny indefinitely."  *Id.* at 3.

Statutory text and context likewise show that ECPA materials generally have not traditionally been available to the public.  ECPA consists of three titles—Title I, amending the wiretap statute, which is not at issue here; Title II, the SCA; and Title III, the PRA.  *See* ECPA, 100 Stat. 1848; S. Rep. No. 99–541 (1986), at 3; *Google*, 2017 WL 3445634, at *6 n.9.  The PRA and wiretap statute each provide for default indefinite sealing of surveillance orders.  *See* 18 U.S.C. §§ 2518(8)(b) ("Applications made and orders granted under [the wiretap statute] shall be sealed by the judge."), 3123(d) ("An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that . . . the order be sealed until otherwise ordered by the court.").  The wiretap statute also provides for default sealing of wiretap applications, while the PRA imposes default nondisclosure obligations on third parties who own or lease facilities to which PR/TT devices are attached or who are obligated to assist the government in installing such devices.  *Id.* §§ 2518(8)(b), 3123(d)(2).  Although the SCA contains no similar default sealing or nondisclosure provisions, the SCA authorizes the government to seek such nondisclosure and, in practice, the government has "always been able to restrict access" to SCA warrants and § 2703(d) orders "by requesting a sealing order, regardless

of the statutory default," *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), 707 F.3d 283, 291 n.9 (4th Cir. 2013) (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1214 (9th Cir. 1989)), and to delay or preclude a notification to a subscriber or customer of an SCA warrant or § 2703(d) order's existence, *see* 18 U.S.C. § 2705(a)–(b).[24]

The SCA, moreover, does not exist in isolation, but is nestled between the PRA and wiretap statute within a statutory framework that broadly prioritizes law enforcement's need for secrecy over the public's interest in transparency.  Indeed, one commentator urging ECPA's reform has mused that "[t]hrough a potent mix of indefinite sealing, nondisclosure (i.e., gagging), and delayed-notice provisions, ECPA surveillance orders all but vanish into a legal void."  Stephen W. Smith, *Gagged, Sealed & Delivered: Reforming ECPA's Secret Docket*, 6 HARV. L. & POL'Y REV. 313, 314 (2012).[25]

The petitioners argue that the absence of any longstanding tradition of openness as to materials relating to ECPA materials generally or SCA materials, in particular, does not defeat their First Amendment right of access claim, given ECPA's relatively recent vintage.  Pet'rs' Mem. at 22–23.  Instead, the petitioners contend that courts should evaluate ECPA procedures "by the historical tradition of access applicable to an older, analogous process—in this case, search warrants."  *Id.*  The First Amendment may create a right of access to a procedure that has

---

[24]   The government may obtain an order delaying or precluding notification to a subscriber or customer of an SCA warrant or § 2703(d) order's existence upon a showing "that there is reason to believe" that notification would result in "endanger[ment of] the life or physical safety of an individual," "flight from prosecution," "destruction of or tampering with evidence," "intimidation of potential witnesses," or "seriously jeopardizing an investigation or unduly delaying a trial."  18 U.S.C. § 2705(a)(1)–(2), (b).  Given the posture of incipient criminal investigations when the government uses SCA authorities to gather evidence, this standard, in practice, often is easily met.

[25]   Indeed, this Court is aware of only one other district court—the U.S. District Court for the Eastern District of Virginia—that systematically provides the public with limited information about matters involving § 2703(d) and PR/TT applications.  *See supra* note 8.

no historical counterpart, as "[a] new procedure that substituted for an older one would presumably be evaluated by the tradition of access to the older procedure." *El-Sayegh*, 131 F.3d at 161. Although "affidavits submitted in support of search warrants are sometimes sealed to protect the secrecy of an ongoing criminal investigation," *Hubbard*, 650 F.2d at 316 n.84, the public has indeed had access to post-execution search warrant materials. "Frequently—probably most frequently—the warrant papers including supporting affidavits are open for inspection by the press and public in the clerk's office after the warrant has been executed." *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989); *see also Times Mirror Co.*, 873 F.2d at 1214 ("[M]ost search warrant materials routinely become public."); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) ("[A]lthough the process of issuing search warrants has traditionally not been conducted in an open fashion, search warrant applications and receipts are routinely filed with the clerk of court without seal."); *In re N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 88 (D.D.C. 2008) ("[P]ost-investigation warrant materials . . . have historically been available to the public . . . . [W]arrant applications and receipts are routinely filed with the clerk of court without seal."). The "routine practice" in this Court "is to make [search] warrant materials publicly available after a search has been executed and a return is available," although "in a particular case a party may file a motion to seal the warrant materials even after a search is executed." *Id.* at 88 n.8.

To evaluate SCA procedures in light of executed search warrants' historical tradition of openness, however, is an inapposite analogy. Analytical substitution of one judicial procedure for another is appropriate only where the procedure to which petitioners assert a right of access is "new." *El-Sayegh*, 131 F.3d at 161. The SCA, as enacted as part of ECPA, is over 31 years old. *See generally* ECPA, 100 Stat. 1848. Thus, whether SCA orders are of such recent vintage as to

require analytical substitution of Rule 41 search warrants is doubtful.

More fundamentally, analytical substitution is appropriate only where "[a] new procedure [] substituted for an older one." *El-Sayegh*, 131 F.3d at 161.  First Amendment analysis "look[s] to the substance of [the government's] power[s] rather than how [an] Act nominally refers to those powers." *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 646 (7th Cir. 2013) (prioritizing substance over form in Fourth Amendment analysis); *cf. R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 929 (9th Cir. 2005) (rejecting an "approach [that] would elevate form over substance and . . . enable the government to dictate the First Amendment result simply by manipulating the agency in the decision-making process" (internal quotation marks omitted)).  To determine whether the history of one judicial procedure may be substituted for another, then, requires determining the procedures' degree of functional similarity, rather than looking to labels.  SCA orders, even SCA warrants, are functionally unlike traditional search warrants and more akin to subpoenas, to which no recognized First Amendment right of access attaches, in two significant respects: their method of execution and opportunity for pre-disclosure challenge.  SCA orders thus do not analytically substitute for search warrants, meaning that the petitioners cannot rely on post-execution search warrant materials' "unbroken, uncontradicted history of openness," *Brice*, 649 F.3d at 795, to support their asserted First Amendment right of access to SCA materials.

"A warrant," as the Fourth Circuit has explained, "is a judicial authorization to a law enforcement officer to search or seize persons or things." *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000).  A search warrant "is issued without prior notice and is executed, often by force, with an unannounced and unanticipated physical intrusion," so as "[t]o preserve advantages of speed and surprise." *Id.*  The target, moreover, has no opportunity to challenge a

search warrant "before the warrant issues"—a judicial probable cause determination is the only

pre-execution check on the government's ability to obtain information via a warrant.  *Id.* ("The

demonstration of probable cause to 'a neutral judicial officer' places a 'checkpoint between the

Government and the citizen' where there otherwise would be no judicial supervision." (quoting

*Steagald v. United States*, 451 U.S. 204, 212 (1981)).  For these reasons, search warrants entail

an "intrusion [that] is both an immediate and substantial invasion of privacy."  *Id.*

A subpoena operates differently.  Whereas a search warrant entitles government agents to

inspect and/or rifle through targets' "persons, houses, papers, and effects," U.S. CONST. amend.

IV, a subpoena instead directs a target to "comply" with a "demand" for information, *Subpoena*

*Duces Tecum*, 228 F.3d at 348; *see also* FED. R. CRIM. P. 17(a), (c).  A subpoena "commences an

adversary process during which the person served with the subpoena may challenge it in court

before complying," meaning that "judicial process is afforded before any intrusion occurs."

*Subpoena Duces Tecum*, 228 F.3d at 348; *see also* FED. R. CRIM. P. 17(c)(2) ("On motion made

promptly, the court may quash or modify the subpoena if compliance would be unreasonable or

oppressive.").  A subpoena thus does not subject a target to "the immediacy and intrusiveness of

a search and seizure conducted pursuant to a warrant."  *Subpoena Duces Tecum*, 228 F.3d at 348.

These distinctions between search warrants and subpoenas—(1) execution via government

agents' physical presence and search or a recipient's individual compliance, and (2) the absence

or provision of an *ex ante* opportunity to challenge the disclosure sought—are so significant that

they form the basis for the search warrant's "probable cause" requirement.  *Id.* at 348–49.

An SCA warrant, though a warrant in name, is more analogous to a subpoena than to a

traditional search warrant with respect to (1) method of execution and (2) *ex ante* opportunity to

challenge compelled disclosure.  As to method of execution, an SCA warrant does not authorize

the government to search and seize "persons or things," in a search warrant's manner, *id.* at 348,

but rather requires a provider's "disclosure . . . of the contents of [certain] communication[s,]" 18

U.S.C. § 2703(a), in a subpoena's manner.  As this Court has recently explained:

> SCA warrants are not like the search warrants used in the physical world: they are
> 'executed' when a law enforcement agent delivers (sometimes by fax) the warrant
> to the service provider.  The service provider, not the agent, performs the 'search';
> the service provider 'produces' the relevant material to the agent; the user
> associated with the inbox often never learns that his inbox has been 'searched.'

*Google*, 2017 WL 3445634, at *18 (quoting Paul K. Ohm, *Parallel-Effect Statutes and E-Mail

"Warrants": Reframing the Internet Surveillance Debate*, 72 GEO. WASH. L. REV. 1599, 1610–

11 (2004)) (internal alterations and quotation marks omitted).  As to an *ex ante* opportunity to

challenge compelled disclosure, a recipient may move to quash an SCA warrant, *see In re

Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 15

F. Supp. 3d 466, 467 (S.D.N.Y. 2014) ("*Microsoft I*"), *rev'd*, 829 F.3d 197, 201 (2d Cir. 2016)

("*Microsoft II*"), *reh'g denied*, 855 F.3d 53 (2d Cir.) ("*Microsoft III*"), *cert. granted sub nom.

United States v. Microsoft Corp.*, 138 S. Ct. 356 (2017), and need not disclose any information

sought until the adversary process completes.  A traditional search warrant, in contrast, generally

provides the target neither prior notice of the search and/or seizure nor *ex ante* opportunity to

quash.  *See Subpoena Duces Tecum*, 228 F.3d at 348.

　　In short, as other Judges have recognized, the government executes an SCA warrant in a

manner more akin to that of a subpoena than to that of a traditional search warrant.  *See, e.g.*,

*Microsoft III*, 855 F.3d at 60 (Jacobs, J., dissenting from the denial of rehearing *en banc*)

(observing that an SCA warrant "functions as a subpoena though the [SCA] calls it a warrant");

*id.* at 70 (Raggi, J., dissenting from the order denying rehearing *en banc*) ("[An SCA warrant]

does not authorize federal agents to *search* any premises or to *seize* any person or materials," but

"authorizes a federal agent to require a service provider to disclose materials in its possession. . .

. A search warrant is executed with respect to a *place* . . . [b]y contrast, . . . a § 2703(a) warrant is

executed with respect to a *person*."); *Microsoft II*, 829 F.3d at 226 (Lynch, J., concurring) ("[An

SCA] 'warrant' . . . does not appear to be a traditional search warrant . . . . [T]he SCA does not . .

. contain language implying . . . that the warrant . . . authorizes government agents to go to the

premises of a service provider without prior notice to the provider, search those premises until

they find the computer, server or other device on which the sought communications reside, and

seize that device . . . . Rather, the statute expressly requires the 'warrant' not to authorize a

search or seizure, but . . . to allow the government to require a service provider to disclose the

contents of certain electronic communications." (alterations, emphasis, and internal citation and

quotation marks omitted)); *Microsoft I*, 15 F. Supp. 3d at 471 ("Although section 2703(a) uses

the term 'warrant' and refers to the use of warrant procedures, the resulting order is not a

conventional warrant . . . . [I]t is executed like a subpoena in that it is served on the ISP in

possession of the information and does not involve government agents entering the premises of

the ISP to search its servers and seize the e-mail account in question.").

Other aspects of the SCA confirm that an SCA warrant is in substance more analogous to

a subpoena than to a traditional search warrant. First, "[p]arallel provisions" of § 2703 "permit

the government to require equivalent disclosure of" identical categories of "communications by

the service provider" through an SCA warrant, § 2703(d) order, or subpoena. *Microsoft II*, 829

F.3d at 227 (Lynch, J., concurring). "Indeed, the various methods of obtaining the

communications . . . are not merely parallel" but "all depend on the same verbal phrase"—

"disclose" or "disclosure"—constituting "alternative means, applicable in different

circumstances, to require the service provider to disclose the communications." *Id.* (alterations

and internal quotation marks omitted); *see* 18 U.S.C. § 2703(a), (b)(1), (c)(1)–(2).  Second, §

2703 uses the term "warrant" rather than "search warrant" in all but one instance, and then only

with respect to a "search warrant . . . requiring *disclosure* by a provider."  18 U.S.C. § 2703(g)

(emphasis added).  Third, § 2703 incorporates only those procedures of Federal Rule of Criminal

Procedure 41 that govern a warrant's issuance, not those addressing execution.  *Id.* § 2703(a); *see*

*Google*, 2017 WL 3445634, at *8 ("The applicable *procedures* [governing an SCA warrant's

issuance] are those found in Federal Rule of Criminal Procedure 41.").[26]

For these reasons, SCA warrants in fact "are not search warrants at all and to call them

such confuses legal terminology."  *Google*, 2017 WL 3445634, at *18 (quoting Ohm, *supra*, at

1611).  "The structure of § 2703 . . . evinces an intent to create a distinct procedural mechanism

from a traditional Rule 41 'search warrant.'"  *Id.*  To the extent SCA warrants are analogous to

any longstanding procedures used by the government to collect evidence in criminal

investigations, they are analogous to grand jury subpoenas, for the reasons explained above.  No

historical tradition of public access to grand jury subpoenas exists.  *See* FED. R. CRIM. P.

6(e)(2)(B) (prohibiting prosecutors, grand jurors, court reporters, and others from "disclos[ing] a

matter occurring before the grand jury"); *Press-Enter. II*, 478 U.S. at 10 ("[G]rand jury

proceedings have traditionally been closed to the public and the accused."); *Douglas Oil Co. of*

*Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 n.9 (1979) ("Since the 17th century, grand jury

---

[26]     Indeed, this Court's recent decision holding that an SCA warrant operates to compel a domestic service
provider to produce records, which the provider may store overseas in whole or part, similarly concluded that SCA
warrants are akin to mere "subpoena[s] requiring the production of documents" domestically, rather than to search
"warrants for extraterritorial searches," which "courts may not issue."  *Google*, 2017 WL 3445634, at *14–15
(*quoting FTC v. Compagnie De Saint–Gobain–Pont-a-Mousson*, 636 F.2d 1300, 1316 (D.C. Cir. 1980)).  The
Supreme Court recently granted *certiorari* in *United States v. Microsoft Corp.*, which will resolve "[w]hether a
United States provider of email services must comply with a probable-cause-based warrant issued under 18 U.S.C.
2703 by making disclosure in the United States of electronic communications within that provider's control, even if
the provider has decided to store that material abroad."  *See* 138 S. Ct. 356 (U.S. Oct. 16, 2017) (No. 17-2).

proceedings have been closed to the public, and records of such proceedings have been kept from the public eye.  The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system."); *In re Sealed Case*, 199 F.3d 522, 526 (D.C. Cir. 2000) ("[T]he grand jury context presents an unusual setting where privacy and secrecy are the norm."); *In re Dow Jones & Co.*, 142 F.3d 496, 499 (D.C. Cir. 1998) ("[T]here is no First Amendment right of access to grand jury proceedings.").

Section 2703(d) and PR/TT orders are even less analogous to traditional search warrants than are SCA warrants, differing in both execution and applicable legal standard.  An § 2703(d) order, like an SCA warrant, requires a provider to disclose information sought rather than authorizing the government to conduct a physical search, and allows a recipient an opportunity to quash prior to complying with the production demanded.  18 U.S.C. § 2703(b)–(d).  Unlike an SCA search warrant, a § 2703(d) order's issuance need not comply with Rule 41 procedures or Rule 41's "probable cause" standard, but instead requires only "specific and articulable facts showing that there are reasonable grounds to believe" the information sought is "relevant and material to an ongoing criminal investigation."  *Id.* § 2703(d).  A PR/TT order likewise does not authorize government agents physically to search or seize "persons or things," *Subpoena Duces Tecum*, 228 F.3d at 348, in the manner of a search warrant, *see Smith v. Maryland*, 442 U.S. 735, 742 (1979) (rejecting the claim that "a pen register's . . . installation and use constitute[s] a 'search'"), although such orders authorize the government physically to install a PR/TT device at a "telephone line or other facility," and the showing required for issuance of a PR/TT order is mere relevance "to an ongoing criminal investigation," 18 U.S.C. §§ 3123(a)(1), (b)(1)(A).

In sum, no historical tradition of openness exists as to PR/TT, SCA warrant, or § 2703(d) materials, and such orders are too functionally unlike search warrants in issuance, execution or

challenge procedures to justify the latter's analytical substitution in evaluating the historical aspect of the petitioners' First Amendment right of access claim.  The petitioners' failure to show an "'unbroken, uncontradicted history' of openness," *Brice*, 649 F.3d at 795, as to these statutorily authorized methods under the PRA and SCA for the government to gather evidence in criminal investigations precludes petitioners from prevailing on their First Amendment right of access claim, *see In re Reporters Comm. For Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) ("[B]oth these ['history' and 'logic'] questions must be answered affirmatively before a constitutional requirement of access can be imposed."), making unnecessary any consideration of the claim's other elements.

### 2.      Common Law

The petitioners also argue that the common law affords them a right of access to the PR/TT and SCA materials at issue.  Pet'rs' Mem. at 15–21.  The limited scope of the petitioners' claim is significant—the petitioners seek access only to PR/TT, SCA warrant and § 2703(d) materials from closed criminal investigations, and only to those portions of such materials that do not reveal personally identifying information.  As such, the USAO does not contend that disclosure would impede an ongoing criminal investigation or reveal information that would impinge on personal privacy.  For the reasons that follow, the *Hubbard* factors weigh in favor of a prospective common law right of access to the materials to which the petitioners seek access, in light of administrative changes recently adopted by both the USAO and the Clerk's Office.  The significant burdens on the USAO and Clerk's Office that would attend recognizing a common law right of access to previously initiated PR/TT and SCA matters, however, properly are cognizable as particularized interests that weigh heavily against further retrospective relief than has already been provided.

### a. The Materials At Issue Are Judicial Records

A presumptive common law right of access attaches only to documents that are "public record[s.]" *Wash. Legal Found.*, 89 F.3d at 902 (internal quotation mark omitted). The USAO "[a]ssum[es] for the sake of argument" that the PR/TT and SCA materials at issue satisfy this requirement. Gov't's Opp'n at 25, ECF No. 51. The USAO is correct to so assume. "[W]hether something is a judicial record depends on 'the role it plays in the adjudicatory process.'" *Metlife, Inc.*, 865 F.3d at 666 (quoting *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013)). PR/TT and SCA applications and orders are judicial records, as "it is commonsensical that judicially authored or created documents are judicial records." *Appelbaum*, 707 F.3d at 290. A document filed with a court (1) that "can affect a court's decisionmaking process," (2) "which the parties hope to influence the court," and (3) "upon which the court must base its decision" likewise is a judicial record. *Metlife, Inc.*, 865 F.3d at 667. PR/TT and SCA applications and any supporting materials, which the government submits to obtain the related orders and on which courts rely in deciding whether to enter such orders, undoubtedly meet this standard. *See Appelbaum*, 707 F.3d at 291 ("[T]he derivative § 2703(d) motions are 'judicial records' because they were filed with the objective of obtaining judicial action or relief pertaining to § 2703(d) orders."); *accord Goetz*, 886 F.2d at 64 ("[A]ffidavits for search warrants are judicial records."). A "common law presumption of access [thus] attaches to" PR/TT and SCA orders and related materials, *Appelbaum*, 707 F.3d at 291, which the government can rebut only by showing "competing interests" that compel a "conclu[sion] that justice [] requires" maintaining a seal, *Metlife*, 865 F.3d at 665. The *Hubbard* factors govern this analysis. *Id.*

### b. Overview: Hubbard *Factor Analysis*

The petitioners seek access to information concerning the government's reliance on

statutory authority under the PRA and SCA to gather evidence in criminal investigations using: (1) PR/TT devices, (2) § 2703(d) orders, and (3) SCA warrants.  The type of information sought can be divided into three categories: (1) docket information, including the matter number and caption, the dates the application was filed and entered onto the docket, the assigned case type (*e.g.*, MC, CV, CR, MJ) and event type (*e.g.*, "Application for Pen Register"), and the assigned Magistrate Judge, *see, e.g.*, Order and Notice to the Parties, Attach. A, List of Misc. Case Numbers With Assoc. Docket Info., ECF No. 22-1; (2) fifteen specified categories of information extracted from applications and orders for such materials, *see, e.g.,* Extraction Chart; and (3) unsealed materials filed in a particular docket, with such redactions needed to protect information implicating privacy and law enforcement investigative interests.  Having already obtained docket information for USAO-initiated PR/TT matters over a nine year period, as noted *supra* Part I.C, the petitioners continue to seek retrospective access to extracted information for all PR/TT matters and docket information for § 2703(d) matters.  They also seek prospective access to real-time docket information and full unsealing, upon an investigation's closure, with appropriate redactions, of PR/TT, § 2703(d), and SCA warrant materials, with persistent monitoring by the Court.  Pet'rs' Mem. at 30–43.  Significantly, by contrast to their initial petitions, they no longer seek retrospectively the full unsealing, with redactions, of such materials.  *See id.*

Resolving the petitioners' common law right of access claim thus requires applying the *Hubbard* factors to three separate variables: (1) the statutory authority relied upon for the government's application and related order; (2) the type of information sought, *i.e.,* docket information, extracted information, or full unsealing of materials; and (3) whether the petitioners seek this information prospectively or retrospectively.  To simplify this analysis, the prospective

aspect of the petitioners' claim is considered first, followed by the claim's retrospective aspect.

Consideration of the *Hubbard* factors, in light of the "'strong presumption in favor of public access to judicial proceedings,'" *Metlife*, 865 F.3d at 665 (quoting *Hubbard*, 650 F.2d at 317), and the petitioners' decision to disclaim any entitlement to materials whose disclosure would impinge upon privacy or law enforcement investigative prerogatives, yields a conclusion, due largely to the administrative changes recently adopted by the USAO and Clerk's Office, that the petitioners are entitled to prospective relief, albeit not all they request nor on a real-time basis. The retrospective relief sought, however, involves to a much greater extent than the prospective relief the imposition of substantial burdens on the USAO and the Clerk's Office in complying with any order requiring the unsealing and extraction of information from over two thousand PR/TT matters, and compilation of docket information for over two thousand 2703(d) matters. This burden, cognizable as a particularized *Hubbard* factor, weighs firmly against allowing the petitioners additional retrospective access to the PR/TT and SCA materials at issue beyond the significant access already granted.

### c.      *Common Law Right To Prospective Access*

The petitioners seek prospective access to "case number[s] and certain associated docket information" in all PR/TT, SCA warrant, and § 2703(d) matters "including the case name, date of application, and magistrate judge to whom the matter is assigned," along with continuous unsealing of all the records on the dockets that no longer need be maintained under seal. Pet'rs' Mem. at 33–35, 39–40, 41–42. Given their request for unsealing, the petitioners do not seek prospective extraction of any of the categories of information that the USAO extracted from the 2012 PR/TT matter sampling. *See id.* For the reasons that follow, the *Hubbard* factors weigh in favor of some prospective access to docket information for PR/TT, § 2703(d) , and SCA warrant

44

matters, though not in favor of the timetable for disclosure of such information requested by the petitioners nor in favor of the continuous unsealing of the underlying materials on dates certain, subject to rigorous judicial monitoring.

### i.     Need for Public Access to the Documents at Issue

The need for public access to the documents at issue is the first *Hubbard* factor a court weighs in determining whether to unseal documents.  650 F.2d at 317.  The USAO concedes "that transparency is important," and objects only to additional retrospective disclosure given the "disclosures that have been made to date," not to additional prospective disclosure.  Gov't's Opp'n at 33.  Transparency as to docket information for PR/TT, SCA warrant, and § 2703(d) matters "is necessary for journalists to inform the public [of], and for the public to understand, the USAO's use of [these statutorily-authorized surveillance] devices" and "the role of the courts in overseeing their use."  Pet'rs' Mem. at 36.  "Such information, if provided for all of the sealed PR/TT[, SCA warrant, and § 2703(d)] matters filed by the USAO, will shed light on, *inter alia*, how frequently judges deny [such surveillance] applications, the types of crimes that are investigated using [such] devices, how frequently orders authorizing the installation and[/or] use of [such] devices are extended, and how frequently [such] applications have been accompanied by other types of requests."  *Id.* at 36–37.  These points are well-taken, and not disputed by the government. Thus, the first *Hubbard* factor thus weighs in favor of prospective disclosure of PR/TT, SCA warrant, and § 2703(d) matter docket information.

### ii.     Extent of Previous Public Access to the Documents

The extent of the public's previous access to the documents at issue is the second factor to be weighed in determining whether to unseal documents.  *Hubbard*, 650 F.2d at 318. "[P]revious access has been considered relevant to a determination whether more liberal access

should be granted to materials formerly properly accessible on a limited basis through legitimate public channels and to a determination [of] whether further dissemination of already accessible materials can be restrained." *Id.* (internal citation omitted). This factor is typically applied to actual, extant documents and has limited usefulness in evaluating the docket information the petitioners seek *prospectively* to disclose since, obviously, the public could not possibly have enjoyed access to documents that have not yet been filed with or entered by the Court.

Nonetheless, as the petitioners observe, "[t]he public is well aware that law enforcement uses PR/TT devices, search warrants under the SCA, and Section 2703(d) orders in criminal investigations." Pet'rs' Mem. at 18–19. The public also has access to docket and limited extracted information concerning the USAO's filing of PR/TT applications from 2008 through 2016 in this Court, which information has been made publicly available in this litigation, *see* PR/TT Lists, as well as to the number of matters that both the USAO and DOJ filed during that period connected to case types in the CM/ECF system associated with § 2703(d) and SCA warrant applications, *see* SCA Warrant Notice; Section 2703(d) Notice, respectively. In the petitioners' view, such docket information provides valuable information to the public primarily due to the light shed on broad trends and patterns in the USAO's use of PR/TT orders, § 2703(d) orders, and SCA warrants. Pet'rs' Mem. at 12–13, 18.

The petitioners seek disclosure of docket information about PR/TT, § 2703(d), and SCA warrant matters on a continuous, real-time basis, and point to the U.S. District Court for the Eastern District of Virginia as doing so. *See* Pet'rs' Mem. at 32–33, 37–40. Indeed, the Eastern District of Virginia does make publicly available on a real-time basis limited docket information as to PR/TT & § 2703(d) applications (but not as to SCA warrant applications), apparently without any adverse results. *See Appelbaum*, 707 F.3d at 288. Yet, such real-time docket

information necessarily implicates pending, active criminal investigations, while the petitioners here have from the outset limited their request to closed investigations, a limitation better respected by delaying disclosure of the docket information for at least six months.  Moreover, the prospective docket information sought by the petitioners here is more extensive than that provided in the Eastern District of Virginia on a real-time basis, and, consequently, this commendable example from a single neighboring district court simply does not provide a sufficiently parallel docket disclosure to establish this *Hubbard* factor.[27]  Thus, the second *Hubbard* factor weighs against any common law right of access claim to a continuous, real-time stream of the more fulsome docket information relating to PR/TT, § 2703(d), and SCA warrant matters requested by the petitioners.

### iii.     Fact of Objection and Objector's Identity

The fact that someone has objected to the documents' unsealing, and the objector's identity, is the third *Hubbard* factor to be weighed in reviewing motions to unseal.  650 F.2d at 319.  No individual or entity, other than the USAO, has objected to prospective disclosure of the PR/TT, § 2703(d), and SCA warrant matter docket information at issue.  *See* Pet'rs' Mem. at 19. The USAO asserts that the scope of the retrospective relief that the petitioners seek makes this factor's application impossible or unworkable, *see* Gov't's Opp'n at 34, but makes no similar argument as to prospective disclosure.  The third factor thus weighs in favor of a common law right of access to the prospective disclosure of the docket information sought.

### iv.     Strength of Property and Privacy Interests Asserted

---

[27]     The Eastern District of Virginia discloses "assigned case numbers, the date of assignment, the presiding judge, and whether the case is sealed," *see Appelbaum*, 707 F.3d at 288, without providing information on the case caption, which can reveal additional information about an ongoing criminal investigation, and is information sought by the petitioners here as part of their prospective relief, *see* Pet'rs' Mem. at 33, 39, 41.

The strength of any property and privacy interests asserted is the fourth *Hubbard* factor. 650 F.2d at 320.  No privacy or property interests are asserted with respect to the PR/TT, § 2703(d), and SCA warrant docket information the petitioners seek as prospective relief.  Not only has no individual or entity (other than the USAO) come forward to object to the petitioners' request, but the petitioners expressly disclaim any right of access to personally identifiable information, and agree to redaction "[t]o the extent personally identifiable information would appear in any of the currently sealed docket information or other information that [p]etitioners seek to have unsealed." Pet'rs' Mem. at 19.  In this circumstance, the requested docket information's disclosure is unlikely to impinge upon personal privacy concerns.

Moreover, the USAO has recently adopted use of uniform captions for PR/TT, § 2703(d), and SCA warrant matters that do not reveal, directly or indirectly, investigatory targets' identities and that facilitate disclosure, by avoiding the need to undertake the time-consuming and burdensome task of reviewing each caption to redact such information.  In these circumstances, the fourth *Hubbard* factor thus weighs in favor of prospective disclosure of PR/TT, § 2703(d), and SCA warrant docket information.

*v.*     *Possibility of Prejudice*

Possibility of prejudice to an individual is the fifth *Hubbard* factor to be weighed in reviewing a motion to unseal.  650 F.2d at 320.  Disclosing prospectively PR/TT, § 2703(d), and SCA warrant docket information would prejudice no individual, as such information reveals no personally identifiable information, due to the uniform captions adopted by the USAO.  Nor would disclosure prejudice the USAO, as the petitioners also disclaim any right of access to information that would, if publicized, compromise an ongoing criminal investigation.  *See* Pet'rs' Mem. at 26–27.  The fifth *Hubbard* factor thus weighs in favor of disclosure of the docket

48

information that the petitioners seek.

vi.    *Purposes for Which Documents Were Introduced*

The purpose for which documents were introduced is the sixth, final, and "single most important" *Hubbard* factor.  650 F.2d at 321.  The public's entitlement to judicial records is commensurate with the documents' importance to the judicial proceeding in question.  *See id.* (concluding that the sixth factor weighed against a right of access to documents that "were not determined by the trial judge to be relevant to the crimes charged," "used in the subsequent 'trial,'" or "described or even expressly relied upon by the trial judge in his decision on the suppression motion," and that were only "admitted in the criminal proceedings [] to assist the court in its determination of whether the search and seizure were unlawfully overbroad.").  In *Hubbard*, the Church of Scientology objected to the unsealing of papers that the defendants, who were all Church officials or employees, introduced into the underlying criminal proceedings for the sole purpose of contending that a government search and seizure had been unlawfully overbroad.  *Id.* at 297–98, 317–318.  The *Hubbard* panel observed, in the context of that case's particular facts, that recognizing a right of access to the documents at issue would create the perverse dynamic

> [where]by the act of attempting to show the excesses of the search by the extent of the documents seized—documents which may not be relevant to criminal charges or necessary to trial—defendants . . . and nondefendant owners . . . will invite public dissemination of the contents of the documents and thereby impair the very privacy rights they seek to vindicate, regardless of the use ultimately made of the documents by the court.

*Id.* at 321.

Recognizing a common law right of access to prospective docket information here, in contrast, would place no one in a similar bind.  PR/TT, § 2703(d), and SCA warrant materials,

49

moreover, play a far more important role to judicial proceedings than did the documents at issue in *Hubbard*. Each PR/TT, § 2703(d), or SCA warrant application is generally treated as a separate judicial matter and initiates the assignment of a unique docket number.[28] The information to which the petitioners seek access thus serves a crucial purpose to—and are, in a sense, the entire purpose of—the judicial proceedings in which they are docketed.

Even measuring PR/TT, § 2703(d), and SCA warrant materials' importance relative to the criminal case in which the USAO introduces a surveillance order's fruits (and not all criminal investigations result in charges being filed), documents that the USAO uses to obtain evidence for presentation to the grand jury to obtain an indictment and/or to introduce at trial, serve an important purpose to judicial proceedings. To be sure, docket information from PR/TT, § 2703(d), and SCA warrant matters perhaps are less important to judicial proceedings than are the actual materials themselves. Even so, the sixth *Hubbard* factor weighs in disclosure's favor.

*       *       *

In sum, five of six *Hubbard* factors, including the "single most important" such factor, *id.*—need for public access to the documents at issue, fact of objection and objector's identity, strength of any property and privacy interests asserted, possibility of prejudice, and purposes for which the documents were introduced—weigh in favor of prospective disclosure of PR/TT, § 2703(d), and SCA warrant matter docket information, while one factor—the extent of previous public access to the documents—has limited applicability. The Court thus concludes, considering the *Hubbard* factors together and as applied to the recently adopted administrative changes in the USAO and this Court's Clerk's Office, that the common law affords the

---

[28]     Other entries in the dockets for these government applications include the orders granting or denying the application, any amended application, applications for extension (*e.g.*, in a PR/TT matter), or a motion to seal.

petitioners a prospective right of access to the PR/TT, § 2703(d), and SCA warrant matter docket information.[29]  The precise scope of such relief, which a recently-adopted Memorandum of Understanding ("MOU") between the Clerk of the Court and the USAO will more than provide, is discussed *infra* Part II.D.

### d.      No Common Law Right To Additional Retrospective Access

The petitioners also seek retrospective relief in the form of public access to a different set of materials than those to which they seek prospective access. Specifically, as to retrospective relief, the petitioners seek: (1) to supplement the docket information already provided for PR/TT matters for the nine-year period of 2008 through 2016 with similar docket information over the same period for § 2703(d) matters; and (2) to compel the USAO to extract and disclose, as to all USAO-filed PR/TT matters during the years 2008 through 2016, the fifteen categories of information that the USAO provided as to the sampling of 2012 PR/TT matters.  Pet'rs' Mem. at 35–38.  The petitioners do not seek extracted information concerning historical § 2703(d) matters, and seek no retrospective relief whatsoever as to SCA warrants.  *Id.* at 40, 42–43.

*Hubbard*'s generalized factors weigh in favor of retrospective access to PR/TT extracted information and § 2703(d) docket information for essentially the same reasons they weigh in favor of prospective relief, as discussed above.  For example*,* the process of manually extracting specified categories of information from closed PR/TT matters and providing such information in chart form substantially eliminates any risk that information properly left under seal, such as information bearing on personal privacy or law enforcement investigative prerogatives, will

---

[29]      The petitioners' decision not to seek, as part of their requested prospective relief, extraction of specified categories of information, *see supra*, means that no occasion is presented to determine whether the common law entitles the petitioners to such relief.

inadvertently be disclosed due to a human redaction error.

Nevertheless, that *Hubbard*'s generalized factors weigh favorably toward retrospective unsealing and disclosure is not dispositive.  The retrospective relief inquiry also implicates a particularized consideration that the petitioners' claim for prospective relief does not implicate as much, due to operational and administrative changes adopted recently by the USAO and Clerk's Office—namely, the enormous burden that complying with an order granting the retrospective relief sought would impose on the USAO and Clerk's Office.  Under *Hubbard*, a district court must consider any "particularized . . . interests" that a party may assert in support of maintaining documents under seal.  650 F.2d at 323. These burdens are described below for the two parts of retrospective relief the petitioners seek: (1) extracted information from the 2,248 PR/TT matters filed by the USAO over nine years from 2008 through 2016; and (2) docket information from the roughly 2,636 § 2703(d) matters filed by the USAO and DOJ components over the same period.

*i. Estimated Burden of Extracting Information From 2,248 PR/TT Matters*

The USAO estimates that completing the extraction process for one hundred percent of PR/TT matters that it initiated between the years 2008 through 2016, minus the twenty-four 2012 PR/TT applications from which information has already been extracted, would take roughly 720 hours.  6th Jt. Rpt. ¶ 10 n.2.  To be sure, extraction, though somewhat less burdensome than unsealing and redacting actual PR/TT documents, nonetheless is a time-consuming process.[30]

Though disputed by the petitioners, the time estimate given by the USAO appears, if anything, to underestimate the time commitment that extracting information from one hundred

---

[30]     The process of redaction and unsealing would require the USAO to scrutinize carefully every page of every document filed in each PR/TT matter in order to ensure that no information bearing on personal identification or ongoing law enforcement concerns, which properly should be maintained under seal, inadvertently is disclosed.  3rd Jt. Rpt. ¶ 3.

percent of PR/TT matters that the USAO initiated from 2008 through 2016 would require. According to the Clerk's Office, the USAO filed a total of 2,248 PR/TT applications during this period.  *See generally* PR/TT Lists.  Assuming the USAO can extract information from twenty-four PR/TT matters in eight hours—a simplifying assumption made by the USAO, 6th Jt. Rpt. ¶ 10 n.2—extracting categories of information from all 2,248 matters the USAO filed over nine years, minus the 24 sample 2012 PR/TT matters already extracted, would take over 741 hours. Moreover, the USAO represented to the Court that extracting information from the 24 sample PR/TT matters actually took roughly eight and a half, rather than eight, hours—an estimate the Court has no reason to doubt.  *Id.* ¶ 10.  Assuming the USAO can extract information from twenty-four PR/TT matters in eight and a half hours, extracting categories of information from 2,248 matters, minus the 24 sample PR/TT matters from 2012 already extracted, would take approximately 788 hours—nearly 33 days working around the clock nonstop, or nearly twenty 40-hour workweeks.  Complying with such a mandate would divert significant amounts of valuable AUSA time and resources.

### ii. Estimated Burden of Producing § 2703(d) Docket Information

Producing requested lists of § 2703(d) matter docket information for the relevant nine year period, meanwhile, would impose similarly significant resource burdens on the Court and Clerk's Office by consuming substantial amounts of staff time—in particular, time necessary to ensure that information properly left under seal is not inadvertently disclosed.  The petitioners appear to assume that unsealing docket information for 2,636 § 2703(d) matters, *see* Section 2703(d) Notice, is a trivial clerical task, as easily performed as pressing the "print" button for a

list of CM/ECF matters generated by the search criteria. [31]

In reality, the process is substantially more time- and resource-intensive than that.  The task of assembling lists of historical § 2703(d) matters would require multiple Court and Clerk's Office staff members to scrutinize meticulously every entry on each page of every list released to purge these lists of any information bearing on personal identification or law enforcement investigative concerns.  Completing this painstaking process of examination and redaction for the PR/TT Lists took several Court and Clerk's Office personnel days to complete.  The lack of standardized case names or captions on applications and orders filed during the relevant nine-year period makes this task particularly challenging, as these captions have sensitive information bearing on personal identification peppered throughout.

Moreover, prior to the standardization of § 2703(d) captions, *see infra* Part II.D, such captions not infrequently would reference not § 2703(d) itself but only 18 U.S.C. § 2705(b), the SCA's delayed notice provision.  As a practical consequence, providing accurate and comprehensive § 2703(d) docket information would require carefully reviewing each § 2705(b) application that the USAO had filed to ascertain whether the application actually pertained to non-disclosure of a § 2703(d) order, a task fraught with peril given that § 2705(b)'s nondisclosure provision is available for both § 2703(d) orders and to grand jury subpoenas, which reveal "matter[s] occurring before the grand jury" and therefore are protected by Rule 6(e)'s secrecy protections.  *See* Fed. R. Crim. P. 6(e)(2).  Ensuring that disclosure of § 2703(d) materials would not inadvertently reveal confidential grand jury matters would require Court and Clerk's Office staff to undertake additional manual, time-consuming review.

---

[31]     To put this figure in context, the USAO initiated nearly 400 more § 2703(d) matters during the relevant nine-year period than PR/TT matters.  *Compare* PR/TT Lists *with* Section 2703(d) Notice.

These practical challenges should be minimized in future efforts to disclose docket information from USAO-initiated PR/TT, § 2703(d), and SCA warrant matters.  The standardization of caption information adopted by the USAO for new PR/TT, § 2703(d), and SCA warrant applications and administrative steps taken by the Clerk's Office in assigning different CM/ECF case type designations to various sealed criminal investigative matters, described in further detail *infra* Part II.D, is intended to facilitate the unsealing and disclosure of docket information by predictably placing specified categories of information in designated locations within the caption and by enabling retrieval of specific types of sealed materials from CM/ECF.  Yet, such administrative burdens are unavoidable as to disclosure of docket information concerning historical § 2703(d) and SCA warrant applications, and unwarranted in light of the unreliability and under-inclusiveness of the identification of these materials by the Clerk's Office, as detailed *supra* Part I.A; *see* 7th Jt. Rpt. ¶ 15 (acknowledging that a list of SCA warrant matters "would be under-inclusive," given the limitations of the CM/ECF system and other administrative challenges). Thus, the same reason that the petitioners give for not requesting retrospective docket information for SCA warrant materials, *see supra* note 23, and for eschewing extracted information for ten percent of PR/TT materials, *see infra* Part II.C.2.d.iii—that the results would fall short of "provid[ing] the public meaningful insight into government electronic surveillance practices,"  Pet'rs' Mem. at 41–42—applies here.

> *iii. Considering Burdens On Clerk's Office and USAO As* Hubbard *Specialized Factors*

As described above, the burdens on the Clerk's Office and the USAO of the petitioners' requested retrospective relief, delimited as it is, remains considerable.  At the same time, this burden is not evaluated on a blank slate but instead against the backdrop of the amount of information already publicly disclosed during the course of this litigation. Specifically, to date,

the petitioners and the public have been provided with (1) the total numbers of USAO-filed PR/TT matters during the period of 2008 through 2016; (2) the total numbers of § 2703(d) and SCA warrant matters, retrieved using certain search criteria, filed by the USAO and DOJ components during this period; (3) certain docket information concerning PR/TT matters the USAO initiated during this period; (4) over 100 pages of redacted documents from four representative sample PR/TT matters from 2012; and (5) fifteen categories of extracted information from a representative sample of ten percent of USAO-filed PR/TT matters from 2012.  These disclosures have already provided an unprecedented level of transparency into the process of judicial review of the USAO's use of PR/TT and SCA authorities to collect evidence in criminal investigations, and enables the petitioners to inform and educate the public.  The question now is whether the common law right of access, as mediated through application of the *Hubbard* particularized interests, requires more?

The petitioners argue that any administrative burden on the USAO or Clerk's Office that would attend granting the full scope of the retrospective relief sought "is not a compelling or countervailing interest sufficient to overcome the public's . . . common law rights of access." Pet'rs' Mem. at 30.  *Hubbard*, however, specifically instructs district courts to consider any "particularized . . . interests" asserted against unsealing, 650 F.2d at 323, and such interests may, under appropriate circumstances, include the burden that complying with an order granting such relief would impose.  The petitioners observe, correctly, that courts generally do not recognize such burden as a relevant factor in deciding the scope of a common law right of access to judicial records.  Pet'rs' Mem. at 29–30 (citing *United States v. Camick*, 796 F.3d 1206, 1213 n.5 (10th Cir. 2015) (denying a motion to seal supplemental record, which allegedly was necessary to avoid an "unduly burdensome and costly" process of "review or redaction," given the

"presumption in favor of the common-law right of access to judicial records" (internal quotation marks omitted)); *Meyer v. UNUM Life Ins. Co. of Am.*, Civ. No. 12-1134-KHV, 2014 WL 1095743, at *2 (D. Kan. Mar. 19, 2014) (concluding that "[t]he task of redacting," though admittedly "unwieldy and burdensome," nonetheless "does not rise to a significant interest that outweighs the public's right of access")).  This, however, is largely due to the fact that litigants ordinarily invoke the common law right of access with respect to specific documents, not to wholesale categories of sealed matters filed over an almost decade-long period, *see, e.g.*, *Camick*, 796 F.3d at 1213 n.5 (reviewing motion to seal the supplemental record in a single criminal case); *Meyer*, 2014 WL 1095743, at *2 (reviewing motions to file particular exhibits in a single case under seal).  Indeed, the petitioners identify no judicial decision recognizing such a right of access to broad categories of sealed materials filed over a period of years, let alone when such sealed materials are quintessentially sensitive because they relate to the exercise of statutory authorities to collect evidence in criminal investigations.  Courts thus have had little occasion, in common law right of access matters, to grapple with the issue of administrative burden that would attend unsealing and disclosure requests of the pending petitions' scope.

Contrary to the petitioners' argument, the only judicial decision of which the Court is aware to have confronted an analogously broad request for unsealing and/or disclosure of sealed criminal materials denied the request on the ground that "the scope of the relief sought . . . is overbroad" and "not practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is permissible." Order Den. Mot. Unseal Docs. & Publicly Docket Ct. Rs. at 1–3, *In re Jennifer Granick & Riana Pfeffkorn*, No. 16-mc-80206-KAW (N.D. Cal. June 23, 2017) ("*Gradick*") (denying petition for the unsealing and disclosure of "all sealed criminal miscellaneous cases filed between January 1, 2006 and December 31, 2011").  *Gradick*, though

decided under the First Amendment rather than common law right of access, *see id.*, illustrates that a court properly may consider the breadth of access to judicial records that a petition seeks, and the burden that would attend compliance with an order requiring such disclosure, in determining the scope of disclosure to grant.

Likewise, this Court has "declined to establish a public docket of materials filed in connection with any grand jury proceedings" on the ground, among others, "that to impose such a rule would be unduly burdensome"—a decision that the D.C. Circuit affirmed as within this Court's discretion. *In re Sealed Case*, 199 F.3d 522, 524, 526 (D.C. Cir. 2000) (internal quotation marks omitted).  Though the petitioners there asserted an entitlement to disclosure under Local Rule of Criminal Procedure 6.1 rather than the common law, *In re Sealed Case* illustrates that a district court, in exercising discretion to make public or maintain under seal voluminous judicial records from entire categories of sealed matters, properly may consider whether granting the relief sought would "impos[e] undue administrative burdens on the trial court." *Id.* at 525.[32]  The D.C. Circuit held, moreover, that the "District Court's explanation" for its denial of a request "for a redacted public docket in a *specific proceeding* . . . . must bear some logical connection to the *individual request*," meaning that such denial "must rest on something more than the administrative burdens that justified the denial of across-the-board docketing." *Id.* at 527 (emphasis added).  In doing so, the Circuit implicitly recognized that a court properly may cite "administrative burdens" to "justif[y] the denial of across-the-board" disclosure where a petitioner does not make an "*individual request*" for disclosure "in a *specific proceeding*," but

---

[32]     Local Rule of Criminal Procedure 6.1 provides, in relevant part, that "[p]apers, orders and transcripts of hearings subject to [grand jury secrecy], or portions thereof, may be made public by the Court on its own motion or on motion of any person upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury."  LCrR 6.1.

seeks wholesale disclosure of sealed materials across entire categories of matters initiated over a period of years. *Id.* (emphasis added).

Here, as in *Gradick* and *In re Sealed Case*, granting the petitioners' request for "across-the-board" access to extracted information from USAO-initiated PR/TT matters and § 2703(d) docket information in closed matters filed over a nine-year period, for the reasons explained above, "would be unduly burdensome" on the USAO and the Clerk's Office, thereby detracting from other mission-critical responsibilities. *Id.* at 523, 527; *cf. Dietz v. Bouldin*, 136 S. Ct. 1885, 1892–93 (2016) (recognizing a district court's "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases . . . sav[ing] the parties, the court, and society . . . costly time and litigation expense." (internal quotation marks omitted)).

Although the USAO had agreed to extract fifteen categories of information from ten percent of USAO-filed PR/TT matters from each year from 2008 to 2011 and 2013 to 2016, the petitioners have rejected that offer. Pet'rs' Mem. at 35–38. In the petitioners' view, such a limited sampling of PR/TT matters would be "non-statistically significant" and inadequate "for the public to gain meaningful insight into the sealed PR/TT matters filed by the USAO" or to "allow journalists or the public to identify trends or identify non-routine requests." *Id.* at 37. They emphasize the virtual uselessness of extracted information from a small percentage of USAO-filed PR/TT matters in three declarations. *See* Decl. of Jason Leopold ("Leopold Decl.") ¶¶ 11, 15, ECF No. 38-2 ("[T]here is no way to accurately report on or understand the full scope of the PR/TT matters in this Court with only 10% of the relevant data. . . . [T]he limited data available to [journalists] severely hampers [their] ability to provide the comprehensive coverage the public deserves."); Decl. of Riana Pfefferkorn, Cryptography Fellow, Center for Internet &

Soc'y ("CIS"), Stan. Law School ("CIS Decl.") ¶ 11–12, ECF No. 38-3 ("Unsealing a 10%

sample of the D.C. PRTT Matters would be extremely unlikely to reveal all of the haystack's

needles, and might capture none at all.  In short: the only way to be sure that the public learns

about these important matters—to find all of the needles—is to disclose the whole haystack for

public review. . . . The public cannot get a full, informed understanding of government

surveillance in this District if it is permitted to see only one small sample that will not reliably

capture all the public-interest cases."); Decl. of Will Potter, Prof. of Journalism, Univ. of Mich.

("Potter Decl.") ¶ 12, ECF No. 38-4 ("Unsealing only 10% of these records will continue to

prevent journalists, researchers, and academics from understanding the trends in the use of

PR/TT devices.").

        Indeed, the petitioners have represented that providing extracted information from a ten

percent sampling of PR/TT matters could be worse than providing no information at all, as such

a limited sampling "could lead to misleading, if not demonstrably inaccurate results."  Leopold

Decl. ¶ 11; *see also* Potter Decl. ¶ 12–13 ("It is methodologically unsound to attempt to show

trends based on a random selection of only 10% of records from a given year. . . . With only 10%

of the data available, a reporter would need to tell the editor, 'No, the data is not even close to

comprehensive, and any conclusions that can be drawn would not be reliable.'  As one can

imagine, a journalist would be severely limited in what they could write about the data.").  The

petitioners also assert that providing extracted information from less than one hundred percent of

PR/TT matters would have little to no public value.  *See, e.g.*, Leopold Decl. ¶ 13 ("A larger

sample size would not solve this problem.  Because the universe of PR/TT matters at issue is so

small, absent the release of data from all of the sealed cases relating to closed investigations

there is little [one] could meaningfully say about the 'big picture' with a level of confidence that

would meet journalistic standards."); Potter Decl. ¶ 14 ("[U]nsealing or providing information
for less than 100% of the records for these years will leave a journalist unable to perform a clear
and thorough job reporting on the use of PR/TT devices.  This would significantly undermine the
ability of the public to understand law enforcement's use of this surveillance technology and to
hold the government accountable.").

Through these submissions, the petitioners make amply clear that, in their view,
retrospective access to extracted information in PR/TT matters is an all-or-nothing situation:
such access to less than one hundred percent of USAO-initiated PR/TT matters would have little
to no value, and in fact might be worse than useless by yielding incomplete and misleading
information.  Yet, the administrative burden on the USAO and Clerk's Office that would be
triggered by compelling the USAO to fulfill the petitioners' request for unsealing and disclosure
of fifteen categories of extracted information in all PR/TT matters filed over nine years, would
be unduly significant.

Accordingly, upon consideration, under *Hubbard*, of the USAO's and Clerk's Office's
particularized interest in avoiding undue administrative burden, the common law right of access
does not entitle the petitioners to any additional retrospective relief.

### D.    Prospective Relief

Having concluded that, given the USAO's and Clerk's Office's recently adopted
administrative and operational changes in processing sealed government surveillance
applications in criminal investigative matters, the common law affords the petitioners a
prospective right of access sealed PR/TT, 2703(d), and SCA warrant matters, the Court next
addresses the precise scope of the prospective access to which the petitioners are entitled.  The
agreement entered into by the Clerk's Office and USAO provides the public with a significant

degree of information about this Court's judicial review process for such USAO-initiated matters that, in many respects, addresses substantial parts of the prospective relief the petitioners seek. *See* CLERK'S OFFICE, U.S. DIST. COURT, D.C. & CRIM. DIV., U.S. ATT'Y'S OFFICE, D.C., MEM. OF UNDERSTANDING: ELECTRONIC FILING OF CERTAIN SEALED APPLICATIONS & ORDERS ("MOU") (Aug. 15, 2017),

http://www.dcd.uscourts.gov/sites/dcd/files/MOU_Electronic_Filing_Pen_Registers.pdf.

For example, among "changes to current practices relating to the filing, docketing, and unsealing" of sealed PR/TT, § 2703(d) and SCA warrant materials "in this District" demanded by the petitioners is that "government attorneys should be both permitted and required to file . . . electronically via CM/ECF" such sealed materials.  Pet'rs' Mem. at 32, 38, 41.  The petitioners further ask that the "USAO and other government entities that file [these sealed materials] in this District should be encouraged to adopt uniform, standardized case captions and document titles . . . that do not include, for example, target names, telephone numbers, and e-mail addresses." *Id.* at 33, 39, 42.  These steps have already been accomplished or are underway.[33]

Historically, the USAO was required by this Court's local rules to file all sealed applications for PR/TT orders, § 2703(d) orders, and/or SCA warrants in paper form, but effective November 9, 2017, the local rules were amended to permit the electronic filing of such documents, with the "prior written authorization" of the Clerk of Court.  *See* LCrR 49(e)(4) ("Unless prior written authorization for electronic filing is given by the Clerk of Court, every document filed prior to the initial appearance of a criminal defendant, including but not limited to . . . a pen register application . . . [and] an application for stored electronic information or

---

[33]     The USAO may still submit applications in paper form "on weekends, outside of normal business hours, or in exigent circumstances."  MOU at 1.

evidence . . . [or] for disclosure of electronically stored evidence shall be filed in paper form."). The MOU provides the written authorization from the Clerk of the Court, required under revised Local Criminal Rule 49(e)(4), for the USAO to file such applications electronically.[34]

In addition, the MOU requires case captions for sealed applications and orders to follow standardized formats.  MOU at 2.  The standardized captions will contain no personally identifying information, such as the targeted email account, telephone number, or subscriber name, but, depending on the type of application, generally will include pertinent information about the number of targeted accounts, the service provider and the primary offense statute applicable to the criminal activity under investigation.  *Id.*  The captions for PR/TT applications, for example, must contain: (1) the number of target telephone lines, subscriber accounts, and/or devices that are the application's subject or subjects; (2) the type of target or targets (*e.g.*, a landline, cellular, or mobile telephone; email account; cell tower; or other facility or device) subject to the application; (3) the service provider to which the order would be directed; and (4) the primary offense statute(s) under investigation.  *Id.*  This standard case caption containing the variable information detailed above must be used by the USAO when initiating or making successive applications in a sealed PR/TT matter.  *Id.*[35]

Such standardized captions will enable the Clerk's Office periodically to generate reports on the CM/ECF system reflecting the total number, matter docket numbers, and case captions associated with sealed matters, which reports may be unsealed and made publicly accessible,

---

[34]    In operation, the MOU authorizes the USAO to submit PR/TT, § 2703(d), and SCA warrant applications electronically, by opening a sealed matter on CM/ECF, in accordance with written instructions provided by the Clerk's Office. MOU at 1–2.  Upon the duty Magistrate Judge's execution of an order granting or denying the application, the Clerk's Office will electronically docket the order, then advise USAO, through a notice of electronic filing, that the order has been signed and docketed, and can be accessed on CM/ECF.  *Id.*

[35]    One or more such caption variables may be omitted by the USAO if disclosure would risk compromising an ongoing investigation.  MOU at 2.

without undertaking the burdensome task of redacting personally identifiable or target

information that may otherwise—and historically has been—placed in the caption.[36]  Thus, while

the petitioners seek prospective relief about only PR/TT, § 2703(d), and SCA warrant materials,

the MOU will facilitate the unsealing and disclosure of limited information revealing the

numbers, case captions and filing dates of additional categories of sealed surveillance materials,

as such materials are added to coverage under the MOU.[37]

The Clerk's Office has also adopted new CM/ECF case types to more readily identify the

type of criminal investigative matter being initiated.  Thus, rather than assigning general MC

numbers to many different types of sealed criminal investigative matters, the Clerk's Office will

assign more specialized docket numbers reflective of the matter at hand.  For example, "PR" will

be used for PR/TT applications and "SC" for SCA applications, with special designations within

the SC case type for SCA warrant and § 2703(d) materials.

The petitioners would have both the Clerk's Office and the USAO take two additional

---

[36]     The Clerk's Office plans to generate, via CM/ECF, biannual docket reports reflecting docket numbers and case captions associated with certain categories of sealed criminal investigative matters filed during the six-month period ending six months prior to a given report's issuance.  MOU at 3.  A docket report issued on September 30, 2019, for example, would account for a sealed matter initiated in November 2018.  *Id.*  Upon unsealing, these biannual docket reports will be made publicly available.

[37]     The MOU currently authorizes the USAO to submit only PR/TT and § 2703(d) applications electronically, *see* MOU, Attach. A, Sealed Applications and Orders Subject to Electronic Filing MOU (Sept. 14, 2017), but this MOU and the attachment will be updated to authorize the electronic submission of other sealed government surveillance applications as administrative operations within both the Clerk's Office and the USAO allow.  As stressed above, the common law entitles the petitioners to prospective relief only because recently-adopted administrative and operational changes to the USAO and Clerk's Office's processing of sealed government surveillance applications in criminal investigative matters, as reflected in the MOU, reduces, to an administratively manageable level, the burdens that providing such disclosure would impose.  These administrative and operational reforms include allowing the USAO to file PR/TT, § 2703(d), and SCA warrant applications electronically.  The *Hubbard* factor analysis favoring prospective relief presupposes that the USAO can file such applications electronically with standard templates, which remove from application and case captions any personally identifiable or other information properly remaining under seal.  Otherwise, the particularized *Hubbard* factor of administrative burden on the USAO and the Clerk's Office would outweigh the generalized *Hubbard* factors that weigh toward disclosure, and the common law would provide no right of access.  Thus, a prospective right of access to information regarding SCA warrant matters shall not come into being until the MOU is updated to authorize the USAO to file such applications electronically.

steps in providing prospective relief.[38]  First, the petitioners request real-time unsealing and

public posting on PACER, upon initial filing of sealed PR/TT, § 2703(d), and SCA warrant

materials, of each matter's "case number and certain associated docket information," including

"case name, date of application, and magistrate judge to whom the matter is assigned." Pet'rs'

Mem. at 33, 39, 41. This information, petitioners explain, would "allow[] the public to know the

number of applications for PR/TT devices filed by the government and pending at a given time

in this District, and gives the public an opportunity to request that judicial records in particular

matters be unsealed." *Id.* at 33–34.

This request for real-time reporting by the Clerk's Office on the filing of PR/TT, §

2703(d), and SCA warrant materials represents a significant shift in the petitioners' position.

Over the course of this five-year litigation, the petitioners have insisted that they do not seek

access to pending, open and active criminal investigations, which this real-time reporting would

necessarily provide.  To the contrary, the original petitions in this case sought information only

about closed investigations.  *See, e.g.*, Pet. at 1 (disclaiming access to materials "which relate to

an ongoing investigation"); May 2016 Tr. at 5:10–11 ("[W]e're not asking for anything

---

[38]     The petitioners' extraordinary complaint that the MOU represents an "an end-run around [p]etitioners and
this litigation," Pets.' Reply to Gov'ts' Opp'n ("Pets.' Reply") at 5, ECF No. 52, is both misplaced and short-sighted
for several reasons.  First, as the USAO correctly observes, "the decision . . . how[] to establish a protocol to identify
more accurately, track, and ultimately terminate sealing orders is a matter that falls within the administrative
responsibility of this Court," Gov't's Resp. at 3 n.3—a responsibility that stands entirely independent of any
particular litigant or case.  Second, the MOU does not apply to the petitioners' requests alone, and the petitioners are
far from the only persons who may benefit from the MOU.  Going forward, the additional transparency as to the
judicial review process for sealed criminal investigative matters that the MOU provides will have benefit to the
public far broader than merely to the litigants in this case.  The petitioners simply have no unique status among the
public to be made privy to "private negotiations with the Clerk's Office," Pet'rs' Reply at 5, regarding
administrative and operational matters, as they demand.  Finally, and most importantly, as made clear in the text, the
petitioners' success in prevailing on their common law right of access claim as to prospective relief is due entirely to
the advances outlined in the MOU and adopted by both the USAO and the Clerk's Office in processing the sealed
criminal investigative matters at issue.  In this respect, "[s]ome people might call" the petitioners' accusation—that
the MOU's entry was improper and constituted some sort of "end-run" around them, Pets.' Reply at 4—"*chutzpah*."
*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 766 (2011) (Kagan, J., dissenting).

involving an ongoing investigation."); Sept. 2016 Tr. at 22:14 (reaffirming that the petitioners seek disclosure of information from only investigations that are "completely closed"); Dec. 2016 Tr. at 26:16–17 ("[W]e understand the open investigations issue, and we have stayed away from it."); *id.* at 23:3–5 (reiterating that the petitioners do not seek to "expos[e] an ongoing investigation" and have "limited [thei]r requests to closed investigations"); Feb. 2017 Tr. at 16:13, 38:15–16 (disclaiming "access to the documents" in "an ongoing investigation" and emphasizing that the petitioners seek access to materials "only . . . for closed investigations"). On this basis alone, the petitioners' demand for prospective relief in the form of real-time reporting of sealed matters for pending, open, and active criminal investigations is denied.

Instead, the Clerk's Office, as set out in the MOU, plans to provide biannual docket reports about various types of sealed criminal investigative matters filed twelve through six months prior to each report's publication. While some of these matters will remain open, the six-month delay in reporting somewhat reduces the risk to an ongoing criminal investigation. These reports will provide information about the total numbers of such matters and, as reflected in the standardized caption for each matter, the number and type of target accounts (*e.g.*, landline telephone, cellular telephone, and/or email), the providers' names, and the primary offense statutes under investigation. This information on the sealed applications subject to judicial review will provide additional transparency as to the processing of these sensitive matters, without jeopardizing either privacy or law enforcement interests. Indeed, this information is far more robust than that seemingly sought by the petitioners.

Second, the petitioners would require the USAO or other government entity initiating a sealed matter "to promptly move to unseal or partially unseal" upon "the close of the related criminal investigation," and, if a matter remains sealed "six months (180 days) after the date it

was initially filed," that the Court be prepared to issue "an order to show cause why it should not be unsealed in its entirety."  Pet'rs' Mem. at 34–35, 39, 42.  As the USAO correctly indicates, adoption of "a system that calls for the Court to issue show cause orders in each of the hundreds of PR/TT and SCA matters that are filed each year would be labor-intensive for the Clerk's Office and would require the USAO[] to expend resources to review each matter and respond to each show cause order."  Gov't's Opp'n at 41 n.18.  This is simply unworkable.  Instead, periodic reports by the Clerk's Office concerning sealed criminal investigative matters and dockets will serve the public interest by providing additional transparency regarding the judicial review of sealed criminal investigative matters in a manner that is less burdensome to the Court, the Clerk's Office, and the USAO.

Moreover, the very reasons that the petitioners cite as the public value in obtaining public access to redacted PR/TT, § 2703(d), and SCA warrant materials—making the public aware of the USAO's use of (1) novel legal theories to obtain orders allowing for particular types of surveillance, and/or (2) techniques "to compel a service provider to provide novel or unusual technical assistance," Pets.' Mem. at 13 (quoting CIS Decl. ¶ 10 (alterations omitted))—are the reasons disclosure may be detrimental to ongoing law enforcement investigations.  Such disclosure could tip off targets and subjects of ongoing criminal investigations to the existence of investigative methods and techniques, the very efficacy of which may rely, in large part, on the public's lack of awareness that the USAO employs them.  This, in turn, would enable targets and subjects to structure their communications so as to evade detection or to spoliate, through tampering or outright destruction, potential evidence already in existence, to the prejudice of ongoing criminal investigations and the concomitant increased risk to public safety.  Imposing such burdens on law enforcement investigations cannot be justified, notwithstanding the public

value that disclosure of redacted PR/TT, § 2703(d), and SCA warrant materials may have.

A court's "decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599. The additional steps demanded by the petitioners as prospective relief would impose significant administrative and other burdens on the Clerk's Office and USAO, but would do little to increase transparency compared to the information that will be made publicly available under the MOU. For these reasons, the information and access afforded by the steps outlined in the MOU on a going-forward basis provide all the prospective relief to which the common law entitles the petitioners.

## III.    CONCLUSION

This litigation illustrates that "changing technology affects the public's appetite for information concerning court proceedings," and "[t]his in turn changes and affects the requirements for judicial transparency." Hon. T.S. Ellis III, *Sealing, Judicial Transparency and Judicial Independence*, 53 VILL. L. REV. 939, 942–43 (2008). Indeed, "[t]ransparency is a function of both technology and public expectations, and both of these factors vary over time." *Id.* at 941. While judicial independence is embedded in our constitutional framework, this critical feature of our federal government is bolstered by transparency in how the courts review and resolve the matters presented to them. Otherwise, "[s]ecret proceedings, including unwarranted or excessive sealing of court records, engender suspicion, mistrust and a lack of confidence in the judicial process and, if not rare and well understood as necessary, such proceedings will likely lead to attempts to limit judicial authority and independence." *Id.* at 940. Thus, taking stock of where transparency may be improved as to records originally sealed to good purpose, is not just a fruitful exercise that may be prodded by litigation such as the one at

bar, but a necessary administrative endeavor for the courts.

In this case, the sealed judicial records at issue are sensitive government applications seeking authorization to collect, for use in ongoing criminal investigations, certain types of information about electronic and telephonic communications.  The parties are in agreement that information in these sealed judicial records implicate myriad considerations, including the sensitive personal privacy and reputational interests of the customers or subscribers, about whom the information was sought; important public safety and law enforcement interests in avoiding any disruption of, or loss of evidence in, ongoing criminal investigations; and, finally, the Court's interest in ensuring the administrative feasibility of providing meaningful, rather than misleading, information and imposing no more than manageable burdens on the Clerk's Office and the USAO.  These weighty interests of protecting privacy and public safety, and providing additional transparency for these sealed judicial records in an administratively workable manner, exist in significant tension with providing the public access sought by the petitioners. Nonetheless, this Court has striven to articulate a common law right of access to sealed judicial records regarding the government's exercise of statutory surveillance authorities that strikes a workable balance.

To that end, while the First Amendment extends no right of access to these judicial records, the Court identifies a prospective right of access, due to the significant administrative and operational reforms undertaken in tandem by the Clerk's Office and the USAO, to certain categories of information, which will be disclosed on a periodic basis, regarding the total number of PR/TT, § 2703(d), and SCA warrant applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications.  The

69

prospective right of access articulated here is designed to minimize any risk of revealing

information about ongoing law enforcement investigations or the individuals targeted, but will

enable the public to know, albeit on a limited basis, more about what this Court is doing in

reviewing these types of surveillance applications.  No retrospective right of access is

recognized, in consideration of the significant administrative burdens that retrospective

disclosure would impose on the Clerk's Office and USAO.

For the foregoing reasons, the petitioners' petitions to unseal are granted in part and

denied in part.  An appropriate Order accompanies this Memorandum Opinion.

**Date:** February 26, 2018

_____
BERYL A. HOWELL
Chief Judge