## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION
OF JASON LEOPOLD TO UNSEAL
CERTAIN ELECTRONIC SURVEILLANCE
APPLICATIONS AND ORDERS.

Misc. Action No. 13-mc-00712

Chief Judge Beryl A. Howell

### MEMORANDUM OPINION

Jason Leopold and the Reporters Committee for Freedom of the Press filed petitions to

unseal voluminous judicial records, dating back years, authorizing the government's use of

certain statutory authorities to gather information for use in now-closed criminal investigations,

which petitions were predicated on asserted rights of access under the First Amendment and the

common law.  *See* Leopold's Pet. Unseal Records ("Leopold's Pet."), ECF No. 1; Reporters

Comm.'s Appl. to Unseal & for Other Appropriate Relief ("Reporters Comm.'s Appl."), ECF

No. 18.  On February 26, 2018, the Court recognized a prospective right of access under the

common law to limited information concerning three categories of judicial records, routinely

maintained under seal, relating to applications filed by the U.S. Attorney's Office for the District

of Columbia ("USAO") for: (1) warrants issued pursuant to the Stored Communications Act

("SCA"), *see* 18 U.S.C. § 2703(a); (2) court orders issued pursuant to the SCA's § 2703(d); and

(3) orders authorizing the installation and use of pen register and trap and trace ("PR/TT")

devices pursuant to the Pen Register Act ("PRA"), *see id.* § 3123.  *See* Order Granting in Part &

Denying in Part Leopold's Pet. & Reporters Comm.'s Appl. ("Order"), ECF No. 53; *Matter of*

*Leopold to Unseal Certain Elec. Surveillance Applications & Orders* ("*Leopold*"), 300 F. Supp.

3d 61 (D.D.C. 2018).  The Court declined to recognize a broader or retrospective right of access

under the common law or to recognize any right of access under the First Amendment to these routinely sealed records. *Leopold*, 300 F. Supp. 3d at 108.

The petitioners now seek reconsideration of the Court's Order and Memorandum Opinion. *See* Pet'rs' Mot. Reconsideration, ECF No. 55. Specifically, the petitioners ask the Court to (1) reconsider its conclusion that the First Amendment affords no right of access to the three categories of judicial records at issue, (2) reconsider its conclusion that the common law provides no broader right of access than that which the Court has recognized, and (3) more clearly specify the factual findings upon which the Court based its resolution of the petitioners' common law claim. *Id.* at 1. For the reasons explained below, the petitioners' motion for reconsideration is denied.

## I.    BACKGROUND

The Court's previous Memorandum Opinion laid out this matter's background in great detail, *see Leopold*, 300 F. Supp. 3d at 68–79, so only a brief overview of the relevant facts is necessary. In July 2013, Leopold, a journalist currently employed by BuzzFeed News, filed a petition to unseal nearly twenty years of sealed government applications, pursuant to various statutory authorities, plus related affidavits and orders, regarding the government's collection of information during law enforcement investigations, "except for those which relate to an ongoing investigation." *See* Leopold's Pet. at 1. Leopold asserted that both the First Amendment and the common law established rights of access to these materials. *Id.* at 4, 12–18. Three years later, after the case was reassigned to the undersigned Judge, the Reporters Committee was permitted to intervene, *see* Reporters Comm.'s Unopposed Mot. Intervene, ECF No. 16, and filed its own petition to unseal, *see* Reporters Comm.'s Appl. Over the next year, the petitioners and the USAO, with guidance from this Court, engaged in discussions on how properly to vindicate, in

light of substantial law enforcement investigative and individual privacy concerns, the public's

interest in transparency of judicial records concerning the government's use of statutorily

authorized investigative tools.  *See Leopold*, 300 F. Supp. 3d at 67–68.

In the course of these discussions, the petitioners agreed to limit the scope of their

unsealing request by shortening the time period covered and seeking only records relating to (1)

SCA warrants, pursuant to 18 U.S.C. § 2703(a); (2) SCA orders, pursuant to 18 U.S.C. §

2703(d); and PR/TT orders.  *Id.* at 69.  The USAO, meanwhile, agreed to unseal

> (1) the total numbers of USAO-filed PR/TT matters during the period of 2008
> through 2016; (2) the total numbers of § 2703(d) and SCA warrant matters,
> retrieved using certain search criteria, filed by the USAO and DOJ components
> during this period; (3) certain docket information concerning PR/TT matters the
> USAO initiated during this period; (4) over 100 pages of redacted documents from
> four representative sample PR/TT matters from 2012; and (5) fifteen categories of
> extracted information from a representative sample of ten percent of USAO-filed
> PR/TT matters from 2012.

*Id.* at 100.  At all times, the petitioners' limited the scope of their requested relief to materials

from closed investigations.  This limit necessarily precludes real-time disclosure of any

information or records, including docketed case numbers, for these criminal investigative

matters, since the USAO only seeks, and the Court only grants, such orders in "ongoing criminal

investigation[s]." 18 U.S.C. § 2703(d); *id.* § 3123(a)(1).  Eventually, the parties could reach no

further agreement, and requested that the Court resolve the petitioners' claims.  *Leopold*, 300 F.

Supp. 3d at 79.

On February 26, 2018, the Court granted in part and denied in part the petitioners'

petitions.  *See* Order.  The Court explained, in an accompanying Memorandum Opinion, that the

petitioners' First Amendment right of access claim failed because the petitioners had failed to

establish "the prerequisite [] showing [of] a longstanding tradition of public access . . . as to the

PR/TT and SCA materials at issue." *Leopold*, 300 F. Supp. 3d at 85.  Further, no retrospective

right of access under the common law was recognized, in light of the considerable administrative burden that such extensive unsealing of nearly a decade's worth of surveillance materials would impose on the USAO and the Clerk's Office, due to the necessity of identifying, reviewing and redacting sensitive law enforcement and privacy-protected information from any unsealed records.  *Id.* at 97–103.  The Court held, however, that the common law afforded the petitioners a limited prospective right of access to certain information on the materials sought "in light of the changes recently adopted by the USAO and Clerk's Office in the processing of such materials." *Id.* at 85. Specifically, the Court held that the petitioners enjoyed a prospective common law right of access to information, to be disclosed periodically, "regarding the total number of PR/TT, § 2703(d), and SCA warrant applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications."  *Id.* at 108.

The petitioners have now filed a motion for reconsideration, *see* Pet'rs' Mot. Reconsideration, which is ripe for review.

## II.    LEGAL STANDARD

Rule 59(e) of the Federal Rules of Civil Procedure allows a party to file "[a] motion to alter or amend a judgment."  FED. R. CIV. P. 59(e).  A Rule 59(e) motion is "discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).  As the D.C. Circuit recently stressed, "the reconsideration or amendment of a judgment is nonetheless an extraordinary measure."  *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018).  A Rule 59(e)

4

motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment," *id.* (quoting *Exxon Shipping v. Baker*, 554 U.S. 471, 486 n.5 (2008)), and "is 'not a vehicle to present a new legal theory that was available prior to judgment,'" *id.* (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)). Thus, "Rule 59(e) is not available to a party who 'could have easily avoided the outcome, but instead elected not to act until after a final order had been entered.'" *Id.* at 220 (quoting *Ciralsky v. CIA*, 355 F.3d 661, 665 (D.C. Cir. 2004)).

## III.   DISCUSSION

Having identified no "intervening change of controlling law" or new and previously unavailable evidence, the petitioners are entitled to reconsideration only if the Court committed "clear error" or worked "manifest injustice." *Messina*, 439 F.3d at 758 (quoting *Firestone*, 76 F.3d at 1208). The petitioners contend that reconsideration is appropriate because the Court erred in concluding that (1) the First Amendment affords no right of access to judicial records relating to SCA warrants, § 2703(d) orders, and PR/TT orders, and (2) the common law affords the petitioners only a limited, prospective right of access to these records.[1] Additionally, the petitioners ask the Court to (3) clarify the factual basis of its conclusion as to the common law right of access. As detailed below, the petitioners identify no error in the Court's analysis, much less error that is "clear" or gives rise to "manifest injustice." *Id.* The petitioners thus are not entitled to reconsideration.

---

[1]   Even if the Court had erred in failing to recognize a First Amendment right of access to SCA warrant materials, any such error could not have prejudiced the petitioners, as the petitioners ultimately sought only prospective access to SCA warrant materials, in light of the acknowledged practical difficulties demonstrated over the course of the litigation that attend identifying, reviewing and unsealing only appropriate materials, *see* Pet'rs' Suppl. Mem. Pts. & Auths. Supp. App. Unseal ("Pet'rs' Mem. Supp. App. Unseal") at 42–43, ECF No. 47, and the Court granted the requested prospective access to limited information concerning SCA warrant materials under the common law, *Leopold*, 300 F. Supp. 3d at 108; *see Russell v. Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 (D.C. Cir. 2014) ("A district court's" error "does not constitute reversible error if it did not *prejudice* the parties.").

### A. The Court Did Not Err in Concluding That SCA Warrants Are Analogous to Subpoenas Rather Than to Traditional Search Warrants.

To establish a right of access to judicial records under the First Amendment, a petitioner must show both (1) "an 'unbroken, uncontradicted history' of openness" as to the materials to which access is sought and that (2) "public access plays a significant positive role in the functioning of the proceeding." *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). "A new procedure that substituted for an older one" is "evaluated by the tradition of access to the older procedure." *United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997).

The Court concluded that the First Amendment afforded no right of access to the judicial records at issue because the petitioners had failed to show that SCA and PR/TT materials either historically have been publicly available or may be analytically substituted for materials to which courts have recognized a First Amendment right of access. *Leopold*, 300 F. Supp. 3d at 85–91.[2] In reaching this conclusion, the Court determined that SCA warrants, § 2703(d) orders, and PR/TT orders are more analogous to subpoenas, to which no recognized First Amendment right of access attaches, than to traditional search warrants. *Id.* at 88–91.

The petitioners argue that the Court erred in concluding that SCA warrants, § 2703(d) orders, and PR/TT orders are more analogous to subpoenas than to traditional search warrants. Pet'rs' Mem. Supp. Mot. Reconsideration ("Pet'rs' Mem.") at 6, ECF No. 55.[3]  Specifically, the

---

[2]     The petitioners assert that the Court erred in suggesting that "the SCA is not sufficiently 'new' to be 'evaluated by the tradition of access to' an older procedure, such as search warrants." Pet'rs' Mem. at 10 (internal citation omitted). This assertion is incorrect, as the Court did in fact evaluate SCA warrants by the tradition of access to an older procedure—namely, subpoenas. *See Leopold*, 300 F. Supp. 3d at 88–91. While expressing doubt that "SCA orders are of such recent vintage as to require analytical substitution," given that such orders have existed for over thirty years, the Court conducted such analytical substitution nonetheless. *Id.* at 34–35. The Court's skepticism as to analytical substitution's propriety thus did not prejudice the petitioners.

[3]     The petitioners posit that reconsideration of the Court's denial of the petitioners' First Amendment claim "is appropriate" because they had not previously had a "full opportunity . . . to address" the argument that "SCA search warrants, Section 7703(d) [sic] orders, and PR/TT orders are [more] analogous to subpoenas" than to

petitioners make the following arguments, several of which the Court previously rejected: (1) the SCA's use of the term "warrant" establishes that SCA warrants are akin to traditional search warrants, *id.* at 6, 9, 11; (2) SCA warrants do not differ sufficiently as to method of execution from traditional search warrants so as to be more like subpoenas, *id.* at 7; (3) the practical inability of a target or subject of an ongoing criminal investigation to challenge an SCA warrant prior to execution renders an SCA warrant akin to a traditional search warrant, *id.* at 7–8; and (4) a Fourth Amendment search requires a warrant, *id.* at 8.  The petitioners further contend that: (5) the Court's analysis will diminish journalists' ability to resist government efforts to collect evidence in their possession relevant to a law enforcement investigation, *id.* at 12–15; (6) § 2703(d) and PR/TT order materials are more analogous to traditional search warrants than to subpoenas, *id.* at 15–16; (7) the Court failed to address the petitioners' asserted right of access to court dockets, *id.* at 17–18; and (8) the Reporters Committee has from the beginning sought real-time unsealing of docket information, *id.* at 18.  These arguments are addressed in turn.

> **1.  The Court Correctly Concluded That the SCA's "Warrant" Nomenclature Does Not Support a First Amendment Right of Access.**

---

traditional search warrants, as the USAO had not taken that position.  Pet'rs' Mem. at 3.  To the contrary, the petitioners had every opportunity to address this argument in their initial memorandum, *see* Pet'rs' Mem. Supp. App. Unseal at 42–43, but instead simply assumed, without further discussion of the issue, that SCA warrants are substantively akin to traditional search warrants.  That the USAO did not dispute this erroneous assumption did not deprive the petitioners of the opportunity they had in both their initial and reply memoranda to show, rather than just assume, "that SCA search warrants, Section 7703(d) [sic] orders, and PR/TT orders are analogous to" Pet'rs' Mem. at 3, traditional search warrants rather than to subpoenas.  A central question in the *Microsoft* litigation, which the petitioners cite throughout their briefing, was whether an SCA warrant is more akin to a traditional search warrant or to a subpoena.  *See Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 60 (2d Cir. 2017) (Jacobs, J., dissenting from the denial of rehearing en banc) ("The instrument functions as a subpoena though the Act calls it a warrant"); *id.* at 70 (Raggi, J., dissenting from the order denying rehearing en banc); *Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 214–16 (2d Cir. 2016); *id.* at 226–27 (Lynch, J., concurring); *In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 15 F. Supp. 3d 466, 471 (S.D.N.Y. 2014).  The prominence, at every stage of the *Microsoft* litigation, of the issue of whether an SCA warrant is in substance more akin to a traditional search warrant or to a subpoena plainly put the petitioners on notice of the need to address this predicate issue in arguing that an SCA warrant is analogous to a traditional search warrant for purposes of establishing a First Amendment right of access.  In short, the petitioners' failure to address this issue owes more to an incorrect assumption rather than to any lack of opportunity to do so.

First, the petitioners argue that the SCA's use of the term of art "warrant" in § 2703(a) shows that Congress intended "that the public ha[ve] a First Amendment right of access to records related to a warrant once the related investigation has come to an end." *Id.* at 6.  The Court addressed and rejected this argument in recognizing that "First Amendment analysis looks to the substance of the government's powers rather than how an Act nominally refers to those powers." *Leopold*, 300 F. Supp. 3d at 88 (quoting *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 646 (7th Cir. 2013) (alterations and internal quotation marks omitted)).  To determine whether an SCA warrant is analogous to a traditional search warrant or to a subpoena, the Court reasoned, "requires determining the procedures' degree of functional similarity, rather than looking to labels." *Id.*  As a matter of function and substance, an SCA warrant is more like a subpoena than a traditional search warrant.  *See id.* at 88–91.  The petitioners do not explain why "labels," *id.*, rather than function and substance, should govern analysis of whether SCA warrants should "be evaluated by the tradition of access to" traditional search warrants or subpoenas, *El-Sayegh*, 131 F.3d at 161.  This is not to say the word choice on what to call an SCA warrant is irrelevant to its substance and function.  After all, "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached" to that term. *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012).  Thus, the language Congress uses to describe SCA warrants may help to understand an SCA warrant's substantive and functional content, but a label is not dispositive.[4]

---

[4] The legislative history cited by the petitioners for the proposition "that Congress had in mind conventional search warrants when it used the term 'warrant' in the SCA," Pet'rs' Mem. at 9, shows only that Congress intended to import into SCA warrants the probable cause requirement.  *See* H.R. REP. No. 99-647, at 68 (1986) ("The Committee required the government to obtain a search warrant because it concluded that the contents of a message in storage [for less than 180 days] were protected by the Fourth Amendment."); S. REP. 99-541, at 3 (1986) (describing the SCA's purpose as "to protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs.").

As this Court previously has explained, however, Congress's purpose in using the term "warrant" in the SCA was to "import[] some—but not all—of the requirements of Rule 41, including, most importantly, the probable cause requirement." *In re Search of Info. Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.* ("*Google*"), No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *21 (D.D.C. July 31, 2017).[5]  The question here is not whether or not to respect Congress's decision to "adopt[]" into the SCA "the cluster of ideas that were attached" to the term "warrant," but rather, which particular ideas Congress intended to include in the "cluster of ideas" "adopted" into the SCA. *Cooper*, 132 S. Ct. at 1449.

Nothing in the SCA's text, structure, or legislative history suggests a congressional design to incorporate into the SCA any "understanding that the public has a First Amendment right of access to records related to a warrant once the related investigation has come to an end." Pet'rs' Mem. at 6.  Indeed, as *Google* noted, an SCA warrant provides for less public disclosure regarding government collection of information than does a traditional search warrant in at least one respect: "unlike a [traditional] search warrant, which requires that the warrant and receipt for property taken be left with 'the person from whom, or from whose premises, the property was taken,' . . . no notice to the customer is required to be given by the government when using an SCA warrant." 2017 WL 3445634, at *19 (quoting FED. R. CRIM. P. 41(f)(1)(C)).  The government, under § 2705(b), also may preclude a service provider from notifying a customer of an SCA warrant's existence, *id.*, "for such period as the court" that approved the SCA warrant

---

[5]      The petitioners fail to address *Google*'s reasoning in any meaningful way other than perfunctorily to "respectfully urge the Court to follow" the analysis of the Second Circuit's *Microsoft* ruling, Pet'rs' Mem. at 10; *see Microsoft*, 829 F.3d 197, which analysis *Google* expressly considered and rejected, *see* 2017 WL 3445634, at *5, **13–14, **18–19, **23–24.  The Court's Memorandum Opinion in this matter reached a conclusion contrary to that of *Microsoft* on the issue of whether an SCA warrant is more analogous to a traditional search warrant or a subpoena, and in so doing relied on *Google*, which expressly rejected *Microsoft*, and cited to the opinions of judges who disagreed with the reasoning of the Second Circuit's *Microsoft* ruling, as well as the opinion of the magistrate judge of the Southern District of New York that *Microsoft* reversed. *See Leopold*, 300 F. Supp. 3d at 89.  The Court thus rejected, rather than failed to consider, *Microsoft*'s reasoning.

"deems appropriate," 18 U.S.C. § 2705(b).  A person subject to a search and seizure pursuant to a traditional search warrant is entitled to be notified of such search and seizure, while a person whose information the government obtains through an SCA warrant is not entitled to know the government has obtained such information.  *See Google*, 2017 WL 3445634, at *22 (noting the SCA's "omission of any user notification requirement").  Congress's provision of less public disclosure regarding searches and seizures conducted pursuant to SCA warrants than those conducted pursuant to traditional search warrants belies the notion that Congress, merely by employing the term "warrant," designed SCA warrants to disclose the government's collection of evidence to the same extent as does a traditional search warrant.

That an SCA warrant incorporates the probable cause standard, *see* 18 U.S.C. § 2703(a), does not make an SCA warrant more akin to a traditional search warrant, because an SCA warrant, like a subpoena, lacks those features of a traditional search warrant that necessitate the probable cause standard in the first place.  "[T]he immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant demand the safeguard of demonstrating probable cause to a neutral judicial officer before the warrant issues."  *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000).  A subpoena, in contrast, "requires the recipient of the order to turn over evidence to the government within a specified period of time" and provides *ex ante* opportunity to challenge disclosure, and so "do[es] not require probable cause" to issue.  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1211 (2004).[6]  As this Court has explained, an SCA warrant is

---

[6]     In this regard, a subpoena provides two core elements of due process: notice and an opportunity to be heard.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").

more akin to a subpoena than to a traditional search warrant as to both "method of execution and opportunity for pre-disclosure challenge," *Leopold*, 300 F. Supp. 3d at 88, in that an SCA warrant compels a recipient to hand over information rather than authorizing government agents' physical intrusion to seize it, and is subject to pre-execution challenge, *see id.* at 88–90.  Thus, an SCA warrant shares neither feature of a traditional search warrant that necessitates the probable cause standard.  The fact that Congress, in SCA's §2703(a), accorded the content of wire and electronic communications held by providers of electronic communication services ("ECS") or remote computing services ("RCS") heightened protection with a probable cause requirement before a government entity is authorized to compel disclosure does not otherwise render an SCA warrant more akin to a traditional search warrant than to a subpoena.

The petitioners attempt to bolster their argument by pointing to the CLOUD Act, enacted as part of the Consolidated Appropriations Act, 2018, Pub. L. 115-141.  In the petitioners' view, this legislation "makes clear that Congress used 'warrant' in the SCA as a term of art."  Pet'rs' Reply Supp. Mot. ("Pet'rs' Reply") at 5, ECF No. 59.  Under the CLOUD Act,

> [a] provider of [ECS] or [RCS] shall comply with the obligations of this chapter to preserve, backup, or disclose the contents of a wire or electronic communication and any record or other information pertaining to a customer or subscriber within such provider's possession, custody, or control, regardless of whether such communication, record, or other information is located within or outside of the United States"

18 U.S.C. § 2713.  The petitioners acknowledge the "considerable case law establishing that subpoenas apply to information stored abroad," whereas "conventional warrants . . . do not apply abroad unless a statute expressly permits it," Pet'rs' Reply at 7 (internal quotation marks omitted); *see Google*, 2017 WL 3445634, at **14–15, and argue that Congress's enactment of the CLOUD Act shows that Congress intended an SCA warrant to be akin to a traditional search warrant, because "[i]f Congress intended SCA warrants to be a type of subpoena, there would be

no need to pass the CLOUD Act."  Pet'rs' Reply at 7; *see also id.* ("If SCA search warrants are indeed a form of subpoena, the CLOUD Act would have been superfluous.").  This reasoning ignores the seemingly (but apparently not) obvious reality that Congress just as likely enacted the CLOUD Act precisely to clarify that an SCA warrant is functionally analogous to a subpoena, rather than to a traditional search warrant, because Congress feared the Supreme Court would reach a contrary (and, in Congress's view, erroneous) conclusion in the then-pending appeal from the Second Circuit of the *Microsoft* decision.[7]  The CLOUD Act's enactment thus, if anything, shows that Congress intended an SCA warrant to function as a subpoena, rather than as a traditional search warrant.

## 2. An SCA Warrant's Method of Execution is More Akin to That of a Subpoena Than That of a Traditional Search Warrant.

The petitioners argue that an SCA warrant's "typical method of execution . . . does not establish that an SCA search warrant is more akin to a subpoena than to a conventional, brick-and-mortar search warrant."  Pet'rs' Mot. at 7.  First, the petitioners note, "brick-and-mortar search warrants *may* also require third-party compliance."  *Id.* (emphasis added).  This is true enough, but an SCA warrant's execution *always* requires a third-party provider's compliance, *see*

---

[7]     Certainly, prior to the CLOUD Act's enactment, the view of the vast majority of courts to consider the question of whether an SCA warrant applied to information stored overseas was directly opposite to the position advanced by the Second Circuit panel in *Microsoft*.  *Compare Microsoft*, 829 F.3d at 201 (construing 18 U.S.C. § 2703(a)'s use of the term "warrant" to import traditional search warrants' domestic "territorial limitations"), *with Google*, 2017 WL 3445634, at *5 (construing 18 U.S.C. § 2703(a) to allow the government to compel production of information stored abroad); *Matter of Search of Info. Associated with [redacted]@gmail.com That is Stored at Premises Controlled by Google, Inc.*, No. 16-MJ-757 (GMH), 2017 WL 2480752, at *1 (D.D.C. June 2, 2017), *aff'd sub nom. Google* (same); *Matter of Search of Contents & Records Relating to Google Accounts*, No. 18-MC-00020, 2018 WL 942301, at *1 (S.D. Ohio Feb. 15, 2018) (same); *In re Search Warrant Issued to Google*, 264 F. Supp. 3d 1268, 1269 (N.D. Ala. 2017) (same); *In re Search Warrant No. 16-960-M-1 to Google*, 275 F. Supp. 3d 605, 606 (E.D. Pa. 2017) (same); *Matter of Search of Content Stored at Premises Controlled by Google Inc.*, No. 16-MC-80263-RS, 2017 WL 3478809, at *5 (N.D. Cal. Aug. 14, 2017) (same); *In re Search of Content That is Stored at Premises Controlled by Google*, Case No. 16–mc–80263, 2017 WL 1487625, at *1 (N.D. Cal. Apr. 25, 2017) (same); *In re Search of Premises Located at [redacted]@yahoo.com, Stored at Premises Owned, Maintained, Controlled or Operated by Yahoo, Inc.*, Case No. 17–mj–1238 (M.D. Fla. April 7, 2017) (same); *In re Information Associated with One Yahoo Email Address that is Stored at Premises Controlled by Yahoo*, Case Nos. 17–mj–1234, 17–mj–1235, 2017 WL 706307, at *4 (E.D. Wis. Feb. 21, 2017) (same); *In re Search Warrant No. 16–960–M–01 to Google*, 232 F.Supp.3d 708, 722–723 (E.D. Pa. Feb. 3, 2017) (same).

18 U.S.C. § 2703(a), whereas a traditional search warrant's execution does not, *see generally* FED. R. CRIM. P. 41.  An SCA warrant is more analogous to a subpoena than to a traditional search warrant in this respect.  Second, the petitioners note that "[a]n agent's physical presence is not precluded in the execution of an SCA search warrant."  Pet'rs' Mot. at 7 (alterations and internal quotation marks omitted).  This too is true enough, but a traditional search warrant's execution *always* entails a government officer's physical presence, *see* 18 U.S.C. § 3105, whereas an SCA warrant's execution does not, *see id.* § 2703(g) ("Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter.").[8]  An SCA warrant thus is more analogous to a subpoena than to a traditional search warrant as to method of execution.

### 3. A Target's Practical Inability to Move to Quash an SCA Warrant Prior to Execution Does Not Render an SCA Warrant Analogous to a Traditional Search Warrant.

The petitioners argue that an SCA warrant is more akin to a traditional search warrant than to a subpoena with respect to opportunity for pre-execution challenge because only the provider of ECS or RCS, not the target whose content or records are sought, typically has such opportunity as a practical matter.  *See* Pet'rs' Mem. at 7.[9]  The fact that the government generally

---

[8]     The petitioners' admission "that a government agent's physical presence is more often involved in the execution of a traditional search warrant than in the execution of an SCA search warrant," Pet'rs' Mem. at 7, is at best a serious understatement.

[9]     The petitioners assert that "[t]he records obtained via an SCA warrant . . . belong to the subscriber," Pet'rs' Mem. at 8, citing *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010), for the proposition that a subscriber has a property interest in records the government may obtain through an SCA warrant.  *Warshak*, however, merely held that a subscriber has "a reasonable expectation of privacy," not a property interest, "in the contents of an email account."  *Id.*  In any event, conflating property with privacy interests, as petitioners do, is analytically incorrect because ownership may be a factor in but is not the touchstone of Fourth Amendment protections.  *See Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) ("More recently, the Court has recognized that 'property rights are not the sole measure of Fourth Amendment violations.'" (*quoting Soldal v. Cook County*, 506 U. S. 56, 64 (1992))); *United States v. Jones*, 565 U.S. 400, 411 (2012) ("[W]e do not make trespass the exclusive test" of reasonableness under the Fourth Amendment); *Katz v. United States*, 389 U.S. 347, 353 (1967) ("[T]he premise that property interests control the right of the Government to search and seize has been discredited." (internal quotation marks omitted)); *id.* at 360 (Harlan, J., concurring) ("[A]n enclosed telephone booth is an area where . . . a person has a constitutionally protected reasonable expectation of privacy.").

can prevent a target from learning of an SCA warrant's existence, and thus, from challenging the SCA warrant's execution ahead of time, through non-disclosure and sealing orders does not render an SCA warrant more akin to a traditional search warrant than to a subpoena in this respect.  The recipient of the SCA warrant may nonetheless challenge compliance with the subpoena on grounds of scope or undue burden.  *See, e.g.*, *Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 200 (2d Cir. 2016) (recognizing that an SCA warrant's recipient may move to quash); *cf.* 18 U.S.C. §2703(d) (allowing a court to modify or quash order "if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider.").

Further, ECS and RCS providers to whom SCA warrants are directed, like the targets themselves, have legal incentives to move to quash SCA warrants that appear defective in some regard.  The SCA prohibits providers from disclosing to the government contents of or records relating to a target's electronic communications except under certain enumerated circumstances. 18 U.S.C. § 2702(a).  One such circumstance is where disclosure is authorized pursuant to § 2703.  *Id.* § 2702(b)(2), (c)(1).  The SCA creates a cause of action under which one aggrieved by an SCA violation may sue a provider for damages, including potentially punitive damages.  *Id.* § 2707(a)–(c).  A provider, however, may assert "[a] good faith reliance on . . . a court warrant or order" as "a complete defense to any civil . . . action."  *Id.* § 2707(e)(1).

The D.C. Circuit has not clarified the meaning of the SCA's term "good faith," but other courts have weighed in on this question.  The Ninth Circuit has held "that the good faith defense under 18 U.S.C. § 2707(e) is met when the defendant complies with [SCA process] that appears valid on its face, in the absence of any indication of irregularity sufficient to put the defendant on

notice that the [process] may be invalid or contrary to applicable law," and did not "*actually kn[o]w* that the [process] was invalid under the applicable law." *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1180–81 (9th Cir. 2013). The Seventh Circuit, meanwhile, has held that a provider is entitled to raise the good faith exception where SCA process lacks "any indication of irregularity sufficient to put [the provider] on notice that the [SCA process] was 'phony.'" *McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006); *accord John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1010 (7th Cir. 2018). The Tenth Circuit has concluded that the SCA's good faith exception tracks that of the Fourth Amendment, *Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997), under which an officer's reliance on a warrant defeats a motion to suppress unless the warrant was "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably [have] presume[d] it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). Another court has concluded that "good faith" in the SCA context requires, among other things, "a subjective good faith belief that [one] disclosed plaintiff's subscriber information pursuant to a signed, valid warrant." *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 648 (E.D. Va. 2004) (Ellis, J.).

This case presents no need definitively to construe the SCA's good faith exception, but the point is that while a target typically will be unable to move to quash an SCA warrant prior to execution, the provider to whom the SCA warrant is directed has an incentive to move to quash an apparently defective SCA warrant—namely, to avoid the risk of civil liability—and thereby stands somewhat in the target's shoes to vindicate the target's interests in ensuring a valid SCA warrant. In fact, the Cloud Act added grounds for which the provider may seek to quash or modify "legal process" for "the contents of a wire or electronic communication" if the provider reasonably believes the customer or subscriber is not a U.S. person or resident and "the required

disclosure would create a material risk that the provider would violate the laws of a qualifying foreign government." 18 U.S.C. § 2703(h)(2)(i)–(ii).

A provider's ability to move to quash, to be sure, is not a perfect substitute for a target's ability to do the same.  The question, however, is not whether an SCA warrant is identical to a subpoena in every respect, but merely whether an SCA warrant is more like a subpoena or a traditional search warrant.  The existence of an actor—the provider to whom an SCA warrant is directed—with both the opportunity to move to quash a seemingly-deficient SCA warrant and incentives to do so makes an SCA warrant more akin to a subpoena than to a traditional search warrant in this regard.[10]

### 4.  That an SCA Warrant's Execution Constitutes a "Search" Does Not Render an SCA Warrant Analogous to a Traditional Search Warrant.

The petitioners argue that "[l]ike a physical search requiring a warrant, the government's collection of the content of private communications in electronic form constitutes a search." Pet'rs' Mem. at 8.  In so saying, the petitioners appear to assume that a search warrant is the only instrument by which the government can effectuate a Fourth Amendment search.  That an SCA warrant's execution constitutes a search within the Fourth Amendment's meaning, however, would not establish that an SCA warrant is more analogous to a traditional search warrant than to a subpoena, as either instrument is used to effectuate a Fourth Amendment search.  "[T]he Fourth Amendment's protection against unreasonableness" applies to "*compulsory* production of

---

[10]     The petitioners' contention that "[t]he government appears, at times, to use conventional search warrants and SCA search warrants interchangeably," Pet'rs' Mem. at 8 n.4, merely underscores the differences between SCA warrants and traditional search warrants.  The petitioners assert that "records unsealed by the Reporters Committee in a separate matter illustrate that government agents used non-SCA search warrants to seize, during a physical search, computer and electronic records, documents, and materials, electronic information or data, and correspondence, emails, documents, calendar or diary entries, electronic files, contact information, or data of any kind which reflect or relate to any communications or contacts."  *Id.* (internal quotation marks omitted).  Of course, the very fact that those "government agents" physically "seize[d], during a physical search," the "records, documents, and materials" in question, *id.*, is precisely what distinguishes the traditional search warrants at issue there from SCA warrants, which instead compel a provider's production of information.

private papers," and thus, to a subpoena *duces tecum*. *Subpoena Duces Tecum*, 228 F.3d at 347

(quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). "[N]o unreasonable search and seizure"

occurs, however, "when a subpoena, suitably specific and properly limited in its scope, calls for

the production of documents which, as against their lawful owner to whom the writ is directed,

the party procuring its issuance is entitled to have produced." *Id.* (quoting *Wilson v. United

States*, 211 U.S. 361, 376 (1911) (alterations omitted)). A subpoena "sufficiently limited in

scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably

burdensome" thus passes constitutional muster. *Id.* (quoting *See v. City of Seattle*, 387 U.S. 541,

544 (1967)). As such, the petitioners' contention that "the government's collection of the

content of private communications in electronic form constitutes a search," Pet'rs' Mem. at 8, is

a non-sequitur with no bearing whatsoever on whether an SCA warrant is more analogous to a

subpoena or to a traditional search warrant.

### 5. Any Impact the Court's Ruling Will Have on the Privacy Protection Act's Construction is Not Ground for Reconsideration.

The petitioners argue, for the first time on reconsideration, that "[t]he Court's

determination that SCA search warrants are akin to subpoenas . . . . introduces troubling

uncertainty into a realm of well-established existing legal protections for the news media."

Pet'rs' Mem. at 12. Under the Privacy Protection Act ("PPA"), the government may not, "in

connection with the investigation or prosecution of a criminal offense, [] search for or seize" (1)

"any work product materials possessed by a person reasonably believed to have a purpose to

disseminate to the public a newspaper, book, broadcast, or other similar form of public

communication" or (2) "documentary materials . . . possessed by a person in connection with a

purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of

public communication," except under certain enumerated circumstances. 42 U.S.C. §

17

2000aa(a)–(b).  One such excepted circumstance is that the government may search for and seize

"documentary materials, other than work product materials," otherwise subject to the PPA's

protections, where "such materials have not been produced in response to a court order directing

compliance with a subp[o]ena duces tecum" and "there is reason to believe that the delay in an

investigation or trial occasioned by further proceedings relating to the subp[o]ena would threaten

the interests of justice."  42 U.S.C. § 2000aa(b)(4)(B).  In this circumstance, "the person

possessing the materials shall be afforded adequate opportunity to submit an affidavit setting

forth the basis for any contention that the materials sought are not subject to seizure."  *Id.*

§2000aa(c).

    The petitioners contend that "[t]he Court's Opinion gives rise to uncertainty with respect

to the PPA's application to SCA search warrants, which can be used by the government to obtain

the contents of communications between reporters and their sources."  Pet'rs' Mem. at 14. [11]

This argument is unavailing for several reasons.

    First, as noted, the petitioners' previous briefing did not mention the PPA whatsoever, *see*

Pet'rs' Mem. Supp. Mot. Unseal.  Thus, even if the petitioners' assertions regarding the PPA

somehow amounted to reversible error, the petitioners' failure to raise this argument in their

---

[11]     The petitioners find error in "[t]he Court's Opinion, which concludes that a defining feature of a search
warrant was the lack of an opportunity for pre-disclosure challenge by the target of the investigation," because this
"conflicts with" the PPA, "which ensures that certain warrant targets will have an opportunity to bring a pre-
disclosure challenge."  Pet'rs' Mem. at 14.  The Court recognized that "[a] traditional search warrant . . . *generally*
provides the target neither prior notice of the search and/or seizure nor *ex ante* opportunity to quash."  *Leopold*, 300
F. Supp. 3d at 89 (emphasis added).  Use of the term "generally," *id.*, contemplated that unusual exceptions to this
rule exist.  One such exception is 42 U.S.C. § 2000aa(c).  At the same time, the Fourth Amendment itself does not
require a search warrant to provide the target pre-execution notice or opportunity to object, *see Subpoena Duces
Tecum*, 228 F.3d at 348, and the PPA enumerates six distinct circumstances under which the government may search
and seize otherwise-protected "work product" or "documentary materials" without providing the person possessing
such materials any opportunity to challenge the search and seizure.  *See* 42 U.S.C. § 2000aa(a)(1)–(2), (b)(1)–
(4)(A).  Congress, in electing to allow, under one particular circumstance, a warrant's target to challenge the
warrant's execution ahead of time, has created a narrow exception to, rather than overturned wholesale, the general
rule that a search warrant provides "neither prior notice of the search and/or seizure nor *ex ante* opportunity to
quash."  *See Leopold*, 300 F. Supp. 3d at 89.

earlier briefing prevents them from doing so for the first time on a motion for reconsideration. *See Leidos, Inc.*, 881 F.3d at 217.

Second, more significantly, the petitioners' argument is not a claim of legal error, but rather, a concern about the precedential impact the Court's ruling may have in future, yet-to-be-litigated matters concerning "laws and procedures not directly at issue in this case," Pet'rs' Mem. at 12, to which the petitioner may or may not be party. The petitioners' dismay that the Court's ruling may have undesired precedential value in some future proceeding does not amount to a showing of error at all, much less a showing of "clear error or . . . manifest injustice" that the petitioners must make to obtain reconsideration. *Messina*, 439 F.3d at 758 (quoting *Firestone*, 76 F.3d at 1208).

Third and finally, it is far from clear that the PPA's procedural limits on the issuance of search warrants for information possessed by reporters, properly construed, do in fact apply to SCA warrants. The PPA was enacted in 1980, prior to the Internet's widespread usage, *see* Pub. L. 96-440, § 101, 94 Stat. 1879 (1980), and last amended in 1996, *see* Pub. L. 104–208, § 101(a), 110 Stat. 3009 (1996), "when commenters still referred to the Internet as the information super-highway," Bryan R. Kelly, *#privacyprotection: How the United States Can Get Its Head Out of the Sand and into the Clouds to Secure Fourth Amendment Protections for Cloud Journalists*, 55 WASHBURN L.J. 669, 690 (2016). Indeed, the petitioners identify no case evaluating the PPA's applicability to SCA warrants, much less holding the PPA to apply to SCA warrants, nor has the Court identified any such cases. In any event, this matter does not involve the PPA and presents no need to construe that statute.[12]

---

[12] The petitioners argue that certain Department of Justice regulations, which contemplate prior notice to a journalist or news organization prior to a search warrant's execution, "assume[] SCA search warrants are akin to other warrants" and "make[] clear that SCA search warrants fall within the scope of the PPA." Pet'rs' Mem. at 15 (citing 28 C.F.R. § 50.10(b)(2)(ii) ("The policy also governs applications for warrants to search the premises or

**6.   The Petitioners Offer No New Arguments as to Whether a First Amendment Right of Access Attaches to PR/TT and § 2703(d) Materials.**

The petitioners argue that the Court erred in determining that no First Amendment right of access attaches to § 2703(d) and PR/TT orders, asserting that PR/TT and § 2703(d) orders are functionally equivalent to search warrants, which "have been 'traditionally open to public scrutiny,'" and "that the 'method of execution' of PR/TT and Section 2703(d) orders . . . does not functionally distinguish them from search warrants."  Pet'rs' Mem. at 15–16 (quoting *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1337 (D.C. Cir. 1985)).  The Court's Memorandum Opinion, which determined that "Section 2703(d) and PR/TT orders are even less analogous to traditional search warrants than are SCA warrants, differing in both execution and applicable legal standard," already has rejected this reasoning, *Leopold*, 300 F. Supp. 3d at 91, and the Court need not rehash these reasons on a motion for reconsideration, *see Leidos, Inc.*, 881 F.3d at 217 (recognizing that a Rule 59(e) motion "may not be used to relitigate old matters").

In a last gasp effort to save their First Amendment right of access claim, the petitioners contend that "[l]ogic [] strongly supports" recognition of this right because access will (1) allow "the public" to "ensure that judges are not merely serving as a rubber stamp for the police," and (2) "enable judges to more effectively perform their oversight function when it comes to law enforcement use of PR/TT devices and Section 2703(d) orders."  Pet'rs' Mem. Supp. App.

---

property of members of the news media, pursuant to [Rule] 41; or to obtain from third-party [providers of ECS or RCS] the communications records or business records of members of the news media, pursuant to [the SCA].")).  Any position that the Department of Justice has taken on the interpretive question of whether an SCA warrant falls within the PPA's scope, and the degree of deference, if any, due to such interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not at issue in this matter, and the Court declines the petitioners' highly irregular insistence on litigating that question.  In any event, even if the PPA were construed not to apply to SCA warrants, nothing prevents the Department of Justice, as a matter of policy, from obtaining and executing SCA warrants only in circumstances where the PPA would allow the execution of a traditional search warrant.  In other words, even if the PPA does not by its own terms apply to SCA warrants, the Department of Justice nonetheless may elect to treat the PPA as a floor rather than a ceiling with respect to use of SCA warrants.

Unseal at 23–24; Pet'rs' Mem. at 11, 16.  The "logic" prong of the First Amendment right of

access analysis was not previously addressed since the petitioners' failure to show a history of

access to the materials at issue "preclude[d] petitioners from prevailing on their First

Amendment right of access claim."  *Leopold*, 300 F. Supp. 3d at 91; *see also Brice*, 649 F.3d at

795 ("The public possesses a qualified First Amendment right of access to judicial proceedings

where (i) there is an 'unbroken, uncontradicted history' of openness, *and* (ii) public access plays

a significant positive role in the functioning of the proceeding." (quoting *Richmond Newspapers,

Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (emphasis added)); *Reporters Comm.*, 773 F.2d at

1332 ("[B]oth these ['history' and 'logic'] questions must be answered affirmatively before a

constitutional requirement of access can be imposed.").  Indeed, *El-Sayegh* considered a

petitioner's "fail[ure] to satisfy the first of the two necessary criteria for a First Amendment right

of access" claim fatal to the petitioner's claim.  131 F.3d at 161.  Rather than present any new

argument as to why the First Amendment affords right of access to § 2703(d) and PR/TT

materials the Court has not already heard and rejected, the petitioners merely repeat arguments

they already have made and insist that the Court got it wrong the first time.  This will not do at

the motion for reconsideration stage.[13]  *See Leidos, Inc.*, 881 F.3d at 217.

---

[13]        In asserting that the First Amendment affords a right of access to § 2703(d) and PR/TT materials, the petitioners cite *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996), for the proposition that "Section 2703(d) and PR/TT orders are court orders to which the public right of access has traditionally applied." Pet'rs' Mem. at 15.  This is misleading in context, as *National Children's Center* neither addressed § 2703(d) or PR/TT orders whatsoever nor involved a First Amendment right of access claim, but held that a district court abused its discretion under the *Hubbard* factors in sealing a consent decree between a federal agency and private employer. *Id.* at 1408.  *Nat'l Children's Ctr.* merely explained that "the starting point in considering a motion to seal court records is a strong presumption in favor of public access to judicial proceedings."  *Id.* at 1409.  The Court's Memorandum Opinion cited *Nat'l Children's Ctr.* for this very proposition, *see Leopold*, 300 F. Supp. 3d at 80, and concluded that the common law (although not the First Amendment) affords the petitioners a qualified, prospective right of access to the judicial records at issue, *see id.* at 69.  *Nat'l Children's Ctr.* thus lends no weight to the petitioners' First Amendment right of access claim.

Moreover, had the Court reached the "logic" prong, the petitioners would be entitled to no access under the First Amendment greater than that to which the Court already has determined the petitioners are entitled under the common law, due to the nature of the criminal investigative materials at issue.  In deciding whether logic supports a First Amendment right of access, a court asks "whether public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enters. Co. v. Superior Court of Cal. for the Cty. of Riverside*, 478 U.S. 1, 8 (1986).  "[I]t takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly."  *Id.* at 8–9.  For example, "'the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.'"  *Id.* at 9 (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979)).  "[S]afeguarding the confidentiality of grand jury proceedings" serves "several distinct interests," such as "assur[ing] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule."  *Douglas Oil Co.*, 441 U.S. at 218–219.  While the USAO's use of SCA and PR/TT surveillance authorities in the course of ongoing criminal investigations may not always, technically, be grand jury materials subject to Federal Rule of Criminal Procedure 6(e), the same considerations highlighted by the Supreme Court regarding the need for secrecy in grand jury proceedings apply to ongoing criminal investigations.

Public access to the judicial records at issue would raise real risks of disclosing personally identifiable information that could damage the reputations of persons investigated but never charged, jeopardize the safety of cooperating defendants and witnesses, and even discourage potential cooperators in the future.  Public access also could compromise future investigations by revealing the existence or workings of "investigative methods and techniques, the very efficacy of which may rely, in large part, on the public's lack of awareness that the

USAO employs them." *Leopold*, 300 F. Supp. 3d at 107.  These considerations illustrate that logic weighs against any broader right of access under the First Amendment than that which the Court already has recognized under the common law.

This conclusion is confirmed by the fact that while Congress has mandated public reporting on the use of certain surveillance authorities to facilitate oversight, those mandates are carefully circumscribed. For example, the Administrative Office of the U.S. Courts is required to publish an annual report "concerning the number of applications for orders authorizing or approving the interception of wire, oral, or electronic communications," and associated information, 18 U.S.C. § 2519(3), based on reports of judges who issued wiretap orders "that expired during the preceding year," or denied applications for such orders, *id.* § 2519(1). Notably, this reporting is for wiretap orders that have "expired" rather than are ongoing.  *Id.*  In addition, the Attorney General is required annually to report to Congress "on the number of pen register orders and orders for trap and trace devices applied for by law enforcement agencies of the Department of Justice," with specified associated information, *id.* § 3126, as well as on the number of accounts, with associated information, for which "emergency" voluntary disclosures by providers have been made to governmental entities, *id.* § 2702(d).  The Director of the Federal Bureau of Investigation ("FBI"), must also report annually to Congress regarding the number, with associated information, of requests for subscriber and transactional records in counterintelligence investigations.  *Id.* § 2709(f).  No similar reporting requirements have been mandated with respect to SCA applications or orders under any provision of § 2703.  Congress, in mandating reporting of certain categories of information concerning the government's use of surveillance authorities, but not SCA warrants, § 2703 orders, or active PR/TT orders in ongoing

criminal investigations, has voiced its judgment concerning the types of information significant

for oversight and for which disclosure serves the public interest.

**7.  The Petitioners' Accusation that the Court Failed to Address an Asserted Right of Access to Court Dockets is False.**

The petitioners assert that "that the Court erred in failing to give separate consideration to

the public's distinct First Amendment right of access to court dockets."  Pet'rs' Mem. at 17.  The

Court did not "separate[ly]," *id.*, address the petitioners' particular First Amendment right of

access claim to docket information because the Court concluded that no First Amendment right

of access whatsoever attaches to any of the judicial records the petitioners seek to unseal.  *See*

*Leopold*, 300 F. Supp. 3d at 92.  This wholesale denial of petitioners' First Amendment right of

access claim reached all aspects of the records at issue and naturally encompassed any aspect of

the petitioners' claim concerning docket information.  Significantly, the Court did recognize a

prospective common law right of access to certain SCA warrant, § 2703 order and PR/TT order-

related information, to be disclosed in intervals at least six months after issuance of the legal

process when ongoing criminal investigations are more likely to be closed.  *See Leopold*, 300 F.

Supp. 3d at 94–95, 108.

**8.  The Reporters Committee Did Not Seek Real-Time Docket Information From the Beginning.**

The petitioners assert that the Court "erred as a factual matter when it found that

Petitioners did not 'from the outset' seek access to 'real-time docket information' on a forward-

looking basis."  Pet'rs' Mem. at 18 (quoting *Leopold*, 300 F. Supp. 3d at 94).  The petitioners

argue that the Reporters Committee has always sought real-time disclosure of docket information

for government applications under SCA's §§ 2703(a) and (d), and for PR/TT orders.  *See id.*

While petitioners may now wish to re-write the history of this litigation, the record is clear.  The

very first document the Reporters Committee filed in this matter was a motion to intervene

expressing the Reporters Committee's intent to seek unsealing of "records relating to applications for court orders for the use of electronic surveillance tools in investigations *that are no longer active*," as well as "public access to dockets and docket entries concerning applications and orders for the use of *such* tools." Reporters Comm.'s Unopposed Mot. Intervene, Attach. 1, Mem. Pts. & Auths. at 13, ECF No. 16-1 (emphasis added). The Court granted the Reporters Committee's motion the next day, *see* Minute Order, dated Aug. 18, 2016, and the Reporters Committee immediately filed an application "to unseal all applications and supporting documents . . . seeking" SCA warrants, § 2703(d) orders, and PR/TT orders, "as well as any court orders granting or denying any [such orders], in connection with any investigation *that is no longer active*," as well as to make public "dockets and docket entries reflecting *such* applications and orders." Reporters Comm.'s Appl. at 1 (emphasis added). Based on a plain reading of these papers, the Reporters Committee's request was understood to be limited to "*such* applications and orders" appearing in "*no longer active*" criminal investigations. To seek unsealing of docket information only in closed investigations is of course logically inconsistent with seeking real-time unsealing of such information, as the USAO only applies for, and the Court only grants, surveillance orders in active, ongoing investigations.

Any ambiguity in the records sought to be unsealed was resolved by the petitioners reiterating over the litigation's course that they sought relief only as to closed investigations. *See, e.g.*, Hr'g Tr. at 26:16–17 (Dec. 19, 2016), ECF No. 31 ("[W]e understand the open investigations issue, and we have stayed away from it."); *id.* at 23:3–5 (reiterating that the petitioners do not seek to "expos[e] an ongoing investigation" and have "limited [thei]r requests to closed investigations"); *id.* at 26:4, 16–17 (asserting that "we understand the open investigations issue, and we have stayed away from it," including with respect to "docket

sheets"). The Reporters Committee thus limited, from its very first filings in this matter, the unsealing of docket information it sought to closed criminal investigations. In any event, even had the Reporters Committee sought real-time disclosure of docket-information from the outset, the common law would afford no right of access to such information in light of the significant administrative burden, which the Court has detailed at length, *see Leopold*, 300 F. Supp. 3d at 97–99, that would attend the process of redaction to avoid impinging on personal privacy or revealing information that would jeopardize related ongoing investigations.

Significantly, the petitioners cite no case law whatsoever recognizing any entitlement to real-time unsealing of the type and magnitude of information the petitioners seek. *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), which the petitioners repeatedly cite in support of their First Amendment right of access claim, rejected a "challenge to the docketing procedures in the Eastern District of Virginia," holding that "there is no First Amendment right of access to § 2703(d) proceedings," and thus that "district courts [need not] publicly docket each matter in the § 2703(d) context." 707 F.3d 283, 295 (4th Cir. 2013); *see also id.* (describing the petitioners' demand as "uncharted waters").[14]

---

[14]    In a similar vein, the petitioners assert that the Court failed to consider the petitioners' request for docket information from PR/TT applications the USAO filed in 2017. *See* Pet'rs' Mem. at 22. This too is incorrect. The Court identified "a prospective right of access . . . to certain categories of information, which will be disclosed on a periodic basis, regarding the total number of PR/TT . . . applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications." *Leopold*, 300 F. Supp. 3d at 108. Pursuant to this right of access, the Court has unsealed a list of all PR/TT applications that the USAO filed during the first nine months of 2017, *see* Order & Notice, ECF No. 1, *In re Disclosure of Pen Registers From Jan. 1, 2017 Through Sept. 30, 2017*, 18-mc-61 (Apr. 30, 2018) (Howell, C.J.), which list is identical in kind to the PR/TT docket information the Court previously has unsealed during this litigation, *see* Order & Notice to the Parties, Attachs. A–C, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2008–2010 by USAO, ECF Nos. 37-1, 37-2, 37-3; Order & Notice to the Parties, Attachs. A–E, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2011, 2013–2016 by USAO, ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-5; Order & Notice to the Parties, Attach. A, List of Misc. Case Numbers for PR/TT Appls. & Orders Filed in 2012 by USAO ("2012 PR/TT List"), ECF No. 22-1. A similar list covering the remaining months in 2017 will be unsealed in due time. Thus, the petitioners are incorrect to say that the Court did not consider the petitioners' request for docket information as to PR/TT applications that the USAO filed in 2017, and, even if this request were not resolved in the context of this litigation, the unsealing of PR/TT docket information already accomplished renders this request moot.

*          *          *

In sum, the petitioners have identified no error in the Court's analysis of their asserted First Amendment right of access to the surveillance materials at issue, and thus are not entitled to reconsideration in this regard.  *See Messina*, 439 F.3d at 758.

## B.  The Court Properly Weighed the Administrative Burden the Petitioners' Requested Retrospective Relief Would Impose.

To establish a right of access to judicial records under the common law, a petitioner must show that "the public's interest in disclosure" outweighs "the government's interest in keeping the document[s] secret."  *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996) (internal quotation marks omitted).  In undertaking this analysis, courts weigh six "generalized" factors, enumerated in *United States v. Hubbard*, as well as any relevant "particularized" factors," to determine "the precise weight to be assigned . . . to the always strong presumption in favor of public access to judicial proceedings."  650 F.2d 293, 317 (D.C. Cir. 1980).  The six generalized *Hubbard* factors are "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings."  *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)).

The Court concluded that five of the six generalized *Hubbard* factors weigh in favor of some limited right of access to SCA warrant, § 2703(d) order, and PR/TT order materials, but that the significant administrative burdens on the USAO and Clerk's Office that would attend retrospective access to these materials constituted a "particularized" factor, *Hubbard*, 650 F.2d at

27

322–24, weighing against recognition of a retrospective right of access. *Leopold*, 300 F. Supp.

3d at 97–103. The Court further concluded that the common law afforded the petitioners a

limited prospective right of access to certain categories of information regarding SCA warrant, §

2703(d) order, and PR/TT order materials, to be disclosed on a periodic basis. *Id.* at 103–07.

The Court's recognition of a prospective right of access rested in significant part on

administrative and operational changes to the filing and processing of sealed government

surveillance applications that the USAO and Clerk's Office recently adopted, pursuant to a

Memorandum of Understanding, that significantly ease the administrative burdens that limited,

forward-looking unsealing of surveillance materials would entail. *Id.* at 108.

The petitioners argue that the Court erred in weighing, under *Hubbard*, the administrative

burden that recognizing a retrospective right of access would entail, and assert that considering

administrative burden under *Hubbard* will disadvantage members of the public seeking to access

judicial records without conserving judicial resources. Pet'rs' Mem. at 21. For the reasons that

follow, these arguments are unpersuasive.

**1. The Court Did Not Err in Recognizing Administrative Burden as a Cognizable Factor Under *Hubbard*.**

The petitioners find error in the Court's consideration of the administrative burden that

compliance with the petitioners' requested retrospective relief would impose on the USAO and

Clerk's Office. Pet'rs' Mem. at 19.[15] The petitioners argue that "to the extent courts can

---

[15]     The petitioners object to the Court's characterization of their request for unsealing as "across-the-board" and giving rise to an "all-or-nothing situation," complaining that such descriptions are "inaccurate[.]" Pet'rs' Mem. at 21 (citing *Leopold*, 300 F. Supp. 3d at 101, 103). As the Court's Memorandum Opinion made clear, the petitioners' request for unsealing sought "access to extracted information from USAO-initiated PR/TT matters and § 2703(d) docket information in closed matters filed over a nine-year period." *Leopold*, 300 F. Supp. 3d at 101. The Court noted the petitioners' own contention, asserted through multiple declarations, that "access to less than one hundred percent of USAO-initiated PR/TT matters would have little to no value, and in fact might be worse than useless by yielding incomplete and misleading information." *Id.* at 61; *see also id.* at 59–61 (collecting declarations through which the petitioners asserted that unsealing extracted information from less than 100% of PR/TT matters for a given year would produce no useful information and in fact might yield misleading results); Pet'rs' Mem.

consider interests beyond the six enumerated factors identified by the D.C. Circuit in *Hubbard*, those interests must be connected to the content of the records at issue," *id.*, but cite no authority to support this claim.  Instead, they only note *Hubbard*'s instruction that "the potential for prejudice inherent in the documents' release must be assessed with specific reference to the documents' contents," 650 F.2d at 323 n.116, which language they say "makes clear that the countervailing interests sought to be protected by sealing in a given case must be connected to the contents of the specific records at issue," Pet'rs' Mem. at 20.  This language, however, applies only where the particularized interest weighing against disclosure is in fact "the potential for prejudice inherent in the documents' release," *Hubbard*, 650 F.2d at 323 n.116, not where, as here, the particularized interest weighing against disclosure is something different altogether.  In this regard, *Hubbard*'s very next line clarifies that "[t]he possibility of prejudice is [] *another* 'particularized' interest which may be asserted to deny public access." *Id.* (emphasis added).  This language's natural import is that particularized interests that can weigh against unsealing are not limited to prejudice potentially stemming from release of the document's contents.

Indeed, *Hubbard* instructs courts to weigh "the particularized privacy *or other* interests that" a "defendant may assert" to oppose unsealing, without defining or limiting in any way which "particularized . . . other interests" a court may consider.  650 F.2d at 323.  The Court previously explained this point, *see Leopold*, 300 F. Supp. 2d at 82 & n.19 ("*Hubbard* makes clear . . . that a court also must consider such particularized interests as specific contexts make relevant," and "that privacy interests are not the only type of particularized interest a court may

---

Supp. App. Unseal at 37 ("Because information from a non-statistically significant 10% sampling of PR/TT matters will not, among other things, allow journalists or the public to identify trends or identify non-routine requests, Petitioners respectfully request the following relief, which is necessary for the public to gain meaningful insight into the sealed PR/TT matters filed by the USAO in this District.").  While the petitioners' tactic to urge the unsealing of extracted information from "one hundred percent" of the sealed matters at issue, rather than some lesser sampling amount, may have backfired by creating an unduly burdensome "all-or-nothing situation," petitioners cannot be heard now to complain that the Court inaccurately described the petitioners' litigation position.

consider in evaluating a motion to unseal."), and the petitioners identify no flaw in the Court's reasoning. The petitioners' contention that the administrative burden that would attend large-scale unsealing is not a cognizable interest under *Hubbard* simply finds no support in that or any other opinion.[16]

The petitioners emphasize that "the purpose for which the documents at issue were introduced," Pet'rs' Mem. at 23, is the "single most important element" of *Hubbard* analysis. 650 F.2d at 321. While the Court recognized that this factor weighs in favor of disclosure, *see Leopold*, 300 F. Supp. 3d at 96–97, since the purpose for which documents were introduced bears heavily on whether to recognize a common law right of access at all, this factor bears less heavily on the precise scope of the right of access to be recognized. There is no inconsistency in concluding that the important purpose the materials at issue play in judicial proceedings counsels for a right of access, and that the administrative burden that would attend retrospective unsealing counsels for a purely prospective scope to that right of access. Furthermore, the purpose the materials at issue serve do not weigh so heavily in favor of disclosure as the petitioners seem to think. SCA warrants, § 2703(d) orders, and PR/TT orders enable the government to collect information in the course of an ongoing criminal investigation. Pre-indictment criminal investigations require secrecy to function, so as to curb "the risk that those about to be indicted would flee" or spoliate evidence and assure that persons exonerated by the investigation, or who

---

[16]     The petitioners highlight that in *Metlife*, the D.C. Circuit instructed the district court to "[a]pply *Hubbard* to the records in this case," which consisted of over two thousand pages of documents, because "the district court is best suited to conduct that analysis given its considerable familiarity with those records." 865 F.3d at 675–76. This case is inapposite since there, the party seeking to retain records under seal made no argument that administrative burden weighed against disclosure, and so the D.C. Circuit did not consider, much less reject, such argument. *See generally id.*; *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (internal quotation marks omitted)). In fact, the district court in *Metlife* did not apply the *Hubbard* factors at all, having concluded erroneously that a federal statute superseded the *Hubbard* test. *See Metlife*, 865 F.3d at 675. The *Metlife* panel, moreover, made a point of declining to direct the district court's *Hubbard* analysis. *Id.* at 676.

assist the government as cooperating witnesses, "will not be held up to public ridicule." *Douglas Oil Co.*, 441 U.S. at 219. For these reasons, the purpose that the materials at issue serve lean only narrowly toward disclosure under *Hubbard*, and then only toward a limited amount of disclosure with respect only to closed investigations.

The petitioners say that "administrative burden may be asserted in every case in which a member of the public seeks to unseal records to which the common law right of access applies." Pet'rs' Mem. at 20; *accord id.* at 24–25 ("[A]dministrative burden is conceivably present in every case where a member of the public seeks access to sealed judicial records."). This is true enough, but the weight a court will assign such concern will correspond to the volume of documents a petitioner seeks to unseal. Where petitioners seek to unseal "specific documents," *Leopold*, 300 F. Supp. 3d at 101, the administrative burden that attends unsealing may be slight, and so will not weigh heavily on a court's *Hubbard* analysis. Where, in contrast, petitioners seek to unseal "wholesale categories of sealed matters filed over an almost decade-long period," *id.*, the administrative burden such unsealing will entail appropriately may weigh more heavily in a court's *Hubbard* analysis. The petitioners say that "[t]reating administrative burden as a *Hubbard* factor would make the public's ability to obtain access to judicial records dependent not on the content of the particular records at issue, but rather on the type (or extent) of relief sought in a particular case." Pet'rs' Mem. at 20. This is correct. Where the type of record sought to be unsealed requires careful review prior to unsealing to ensure that information properly retained under seal is not disclosed, and where the volume of the materials sought be unsealed amplifies the burden that undertaking such review will impose on a party and/or the Court, *Hubbard* properly allows a court to cognize such burden in weighing a motion to unseal. *See* 650 F.3d at 323.

On this point, as the Court has noted, *Leopold*, 300 F. Supp. 3d at 101, the only judicial decisions involving similarly broad unsealing requests cited by either party denied such requests on the ground of administrative infeasibility. *See In re Sealed Case*, 199 F.3d 522, 524, 526 (D.C. Cir. 2000); Order Den. Mot. Unseal Docs. & Publicly Docket Ct. Rs. at 1–3, *In re Jennifer Granick & Riana Pfeffkorn* ("*Granick* Order"), No. 16-mc-80206-KAW (N.D. Cal. June 23, 2017). The petitioners' silence as to these decisions reflects that their position—that considerations of administrative burden cannot tip the scales against unsealing—is not tenable.[17]

The petitioners are critical that the Court's Memorandum Opinion "marks the first time that a court has found that the administrative burden of unsealing is an appropriate factor to consider when balancing the public's interest in disclosure against competing interest under *Hubbard*." Pet'rs' Mem. at 24. This criticism is misleading to the extent the petitioners suggest that courts do not weigh administrative burden in resolving requests to unseal.

---

[17]     *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 97 (2d Cir. 2004), which the petitioners now cite, for the first time, for the proposition that "courts have corrected systemic denials of the public's rights of access to judicial records notwithstanding associated administrative burden," Pet'rs' Mem. at 24, is not to the contrary. *Pellegrino* recognized "a qualified First Amendment right of access to docket sheets" in "thousands of cases where sealing procedures prohibited court personnel from allowing the public to access the files in those proceedings and, in certain comparatively rare instances, from acknowledging the existence of these cases altogether." 380 F.3d at 86, 102. *Pellegrino* is distinguishable on two grounds. First, the dockets at issue involved civil and criminal matters, rather than pre-indictment investigatory matters, such as "grand jury proceedings," which *Pellegrino* acknowledged "function properly only if kept secret." *Id.* at 96; *see also id.* ("The only decision denying a First Amendment right to public docketing concerned grand jury proceedings, which the Supreme Court has emphasized are entitled to a presumption of secrecy."). The public's interest in transparency as to civil and criminal cases, *cf.* U.S. CONST. amend. VI (guaranteeing a "public trial"), does not extend to pre-indictment investigative matters, which require secrecy to function properly, *see Pellegrino*, 380 F.3d at 96. *Pellegrino* thus did not confront the need to prevent inadvertent disclosure of materials properly left under seal to protect individuals' privacy or related ongoing criminal investigations. Second, the government never contended that administrative burden counseled against recognizing such a right of access, and so *Pellegrino* never passed upon such an argument. *See Cooper Indus.*, 543 U.S. at 170.

    The petitioners also cite *United States v. Valenti*, which held that the U.S. District Court for the Middle District of Florida's maintenance of a "sealed docket in criminal cases" was "inconsistent with affording the various interests of the public and the press meaningful access to criminal proceedings." 987 F.2d 708, 710, 715 (11th Cir. 1993). Specifically, the petitioners cite *Valenti*'s rejection of the government's assertion "that this court should avoid binding the district court to any formal procedure that is unduly burdensome." Pet'rs' Mem. at 24 (citing *Valenti*, 987 F.2d at 715). Like *Pellegrino*, however, *Valenti* involved criminal cases, not pre-indictment criminal investigative matters, as to which significant law enforcement, public safety and privacy interests counterbalance the public's interest in transparency.

As the Court previously has explained, *In re Sealed Case* held the district court did not abuse its discretion in concluding that "mandatory public docketing of grand jury ancillary proceedings . . . . would be unduly burdensome."  199 F.3d at 525–26; *see also Leopold*, 300 F. Supp. 3d at 101 (citing and analyzing *In re Sealed Case*).  *In re Sealed Case* further recognized that "administrative burdens [can] justif[y] the denial of across-the-board docketing."  *Id.* at 527. The D.C. Circuit thus has acknowledged that considerations of administrative burden can justify denial of broadly-sweeping requests to unseal.  Likewise, as the Court previously has explained, the petitioners in *Granick* sought "the unsealing of the docket sheets of all sealed criminal miscellaneous cases filed between January 1, 2006 and December 31, 2011."  *Granick* Order at 1.  *Granick* held that such "request for wholesale unsealing is not practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is permissible."  *Id.* at 2–3; *see also Leopold*, 300 F. Supp. 3d at 101 (citing and analyzing *Granick*).  The petitioners fail to acknowledge, much less explain away, either *In re Sealed Case* and *Granick*.

The petitioners thus are incorrect to the extent they assert that courts do not consider administrative burden in resolving broad requests to disclose materials maintained under seal.

### 2. Negative Practical Consequences Will Not Attend Recognition of Administrative Burden as Cognizable Under *Hubbard*.

The petitioners argue that recognizing administrative burden as a cognizable factor under *Hubbard* will have two "significant practical implications that both disadvantage members of the public seeking to assert their right of access to judicial records and run counter to any goal of conserving judicial resources."  Pet'rs' Mem. at 21.  First, the petitioners argue that allowing courts to "deny the public access to judicial records . . . based upon the type or extent of access that is sought . . . will shift the burden to members of the public to attempt to identify the exact right amount of access that a court will not deem too administratively burdensome for the

Government." *Id.* This is correct. A petitioner seeking access to dockets maintained under seal must be mindful that an overly-broad request for unsealing may impose on the Clerk's Office and/or USAO such undue administrative burden as to weigh against disclosure under *Hubbard*. This does place on the petitioner some responsibility to exercise good judgment in deciding the scope of unsealing to seek, especially where, as here, the judicial records to be unsealed require careful, page-by-page review prior to disclosure to ensure that no information properly left under seal inadvertently is disclosed, so as to protect ongoing investigations and the considerable privacy interests of potential subjects or targets of criminal investigations that may not have resulted in any formal charges. To require a petitioner to contemplate the possibility that an overly-burdensome request for unsealing may be denied does not amount to legal error.

Second, the petitioners argue that allowing courts to deny requests for unsealing that pose undue administrative burden "will also incentivize future petitioners to file multiple petitions, each seeking a different, limited form of access, in the hopes of satisfying what is an entirely unclear standard for determining what level of public access to judicial records is low-burden enough to be available under the common law." Pet'rs' Mem. at 21. This assumes courts will turn a blind eye toward such transparent gamesmanship. Nothing in *Hubbard* compels courts to indulge such tactics, of course. A court reviewing a petition for access to sealed judicial records properly may consider, under *Hubbard*, the access to such records already granted through other, notionally separate petitions, as well as the administrative burden that granting each notionally separate petition collectively may impose on the Clerk's Office and government.

Finally, the petitioners describes the Court's conclusion as holding "that administrative burden to the Government outweighs the public's common law right of access with respect to the specific relief sought by Petitioners as to SCA Search Warrant, Section 2703(d), and PR/TT

matters." Pet'rs' Mem. at 25.  This characterization is inaccurate, suggesting the Court

concluded that the public in fact has a retrospective common law right of access to the

surveillance materials the petitioners seek to unseal, and that considerations of administrative

burden "outweigh[ed]" this right of access.  *Id.*  That is not what the Court said.  Rather, the

Court recognized that under *Hubbard*, a court may consider administrative burden in deciding

whether to recognize any right of access in the first place, not that such a right of access exists

but nonetheless gives way to countervailing considerations.  *See Leopold*, 300 F. Supp. 3d at 103

("[T]he common law right of access does not entitle the petitioners to any additional

retrospective relief."); *see also id.* at 108 ("No retrospective right of access is recognized, in

consideration of the significant administrative burdens that retrospective disclosure would

impose on the Clerk's Office and USAO.").

Similarly, the petitioners' assertion that "the Court's recognition of administrative burden

as a new *Hubbard* factor will allow violations of the public's common law right of access so

long as those violations are broad and systemic enough to be administratively challenging to

remedy," Pet'rs' Mem. at 24, is predicated on a misunderstanding of the Court's decision.  First,

as explained above, administrative burden is not a new *Hubbard* factor, but one *Hubbard* has

always allowed a court to weigh.  *See* 650 F.2d at 323 (instructing courts to weigh "the

particularized privacy *or other* interests that" a "defendants may assert" to oppose unsealing

(emphasis added)).  Second, also as explained above, cognizing administrative burden under

*Hubbard* will not "allow violations of the public's common law right of access" to go

unremedied, as a court may conclude that no asserted common law right of access exists in the

first place where recognizing such right of access would impose undue administrative burdens.

### C.  The Court Appropriately Identified the Factual Findings Supporting a Conclusion that the Common Law Affords No Additional Retrospective Relief.

Finally, the petitioners argue that the Court failed "to make on-the-record factual findings in support of its determination that the Government made the requisite showing to overcome the public's presumptive right of access to all of the SCA Search Warrant, Section 2703(d), and PR/TT Materials at issue in this case." Pet'rs' Mem. at 22.  This is incorrect.  The Court has already identified, in great detail, the practical challenges that attend the wide-scale unsealing of sealed surveillance applications and associated materials, including, most significantly, the high degree of individual review of each page of each document proposed to be unsealed, which is needed to ensure that confidential information properly retained under seal is not inadvertently disclosed.

The Court found that "completing the extraction process for one hundred percent of PR/TT matters that [the USAO] initiated between the years 2008 through 2016, minus the twenty-four 2012 PR/TT applications from which information has already been extracted, would take" between 720 and 788 hours, the latter figure amounting to "nearly 33 days working around the clock nonstop, or nearly twenty 40-hour workweeks." *Leopold*, F. Supp. 3d at 98. "Complying with such a mandate," the Court found, "would divert significant amounts of valuable AUSA time and resources." *Id.*

The Court further found that unsealing "§ 2703(d) matter docket information . . . would impose similarly significant resource burdens on the Court and Clerk's Office by consuming substantial amounts of staff time—in particular, time necessary to ensure that information properly left under seal is not inadvertently disclosed." *Id.*  The Court found that "assembling lists of historical § 2703(d) matters would require multiple Court and Clerk's Office staff members to scrutinize meticulously every entry on each page of every list released to purge these lists of any information bearing on personal identification or law enforcement investigative

concerns," and that "[c]ompleting this painstaking process of examination and redaction for the

PR/TT Lists took several Court and Clerk's Office personnel days to complete." *Id.* at 99.  As

the Court explained, "[t]he lack of standardized case names or captions on applications and

orders filed during the relevant nine-year period makes this task particularly challenging, as these

captions have sensitive information bearing on personal identification peppered throughout." *Id.*

The fact that § 2703(d) captions were standardized only recently, prior to which "such

captions not infrequently would reference not § 2703(d) itself but only 18 U.S.C. § 2705(b), the

SCA's delayed notice provision," moreover, means that "providing accurate and comprehensive

§ 2703(d) docket information would require carefully reviewing each § 2705(b) application that

the USAO had filed to ascertain whether the application actually pertained to non-disclosure of a

§ 2703(d) order, a task fraught with peril given that § 2705(b)'s nondisclosure provision is

available for both § 2703(d) orders and to grand jury subpoenas, which reveal 'matter[s]

occurring before the grand jury' and therefore are protected by Rule 6(e)'s secrecy protections."

*Id.* (quoting FED. R. CRIM. P. 6(e)(2)).   "Ensuring that disclosure of § 2703(d) materials would

not inadvertently reveal confidential grand jury matters," the Court found, "would require Court

and Clerk's Office staff to undertake additional manual, time-consuming review."  *Id.*  The Court

found that while administrative changes to the USAO's filing and the Clerk's Office's docketing

of PR/TT and § 2703(d) orders will minimize such practical challenges going forward, "such

administrative burdens are unavoidable as to disclosure of docket information concerning

historical . . . applications."  *Id.*

Finally, the Court considered "the amount of information already publicly disclosed

during the course of this litigation," including "(1) the total numbers of USAO-filed PR/TT

matters during the period of 2008 through 2016; (2) the total numbers of § 2703(d) and SCA

warrant matters, retrieved using certain search criteria, filed by the USAO and DOJ components during this period; (3) certain docket information concerning PR/TT matters the USAO initiated during this period; (4) over 100 pages of redacted documents from four representative sample PR/TT matters from 2012; and (5) fifteen categories of extracted information from a representative sample of ten percent of USAO-filed PR/TT matters from 2012." *Id.* at 100. These disclosures, the Court found, "have already provided an unprecedented level of transparency into the process of judicial review of the USAO's use of PR/TT and SCA authorities to collect evidence in criminal investigations, and enables the petitioners to inform and educate the public." *Id.*

In sum, the Court has amply identified the factual findings supporting a conclusion that the common law affords no additional retrospective relief.  Based on these extensive findings, no need is presented to clarify the Court's Memorandum Opinion or Order "to set forth the specific factual findings upon which" the Court reached that conclusion.  Pet'rs' Mem. at 25.

## IV.      CONCLUSION

For the foregoing reasons, the petitioners' motion for reconsideration is denied.  An appropriate Order accompanies this Memorandum Opinion.

**Date:** August 16, 2018

_____
BERYL A. HOWELL
Chief Judge